

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

----------------------------------------------------x

REGGIE WHITE, MICHAEL BUCK, and
  HARDY NICKERSON,

                Plaintiffs,        Civil Action
                                  No. *4-92-906*

      v.

NATIONAL FOOTBALL LEAGUE, FIVE SMITHS,    CLASS ACTION
  INC., BUFFALO BILLS, INC., CHICAGO    COMPLAINT
  BEARS FOOTBALL CLUB, INC., CINCINNATI
  BENGALS, INC., CLEVELAND BROWNS, INC.,
  DALLAS COWBOYS FOOTBALL CLUB, LTD.,
  PDB SPORTS, LTD., DETROIT LIONS, INC.,
  GREEN BAY PACKERS, INC., HOUSTON OILERS,
  INC., INDIANAPOLIS COLTS, INC., KANSAS
  CITY CHIEFS FOOTBALL CLUB, INC.,
  LOS ANGELES RAIDERS, LTD., LOS ANGELES
  RAMS FOOTBALL CO., INC., MIAMI DOLPHINS,
  LTD., MINNESOTA VIKINGS FOOTBALL CLUB,
  INC., KMS PATRIOTS, L.P., NEW ORLEANS
  SAINTS L.P., NEW YORK FOOTBALL GIANTS,
  INC., NEW YORK JETS FOOTBALL CLUB,
  INC., PHILADELPHIA EAGLES FOOTBALL
  CLUB, INC., B & B HOLDINGS, INC.,
  PITTSBURGH STEELERS SPORTS, INC.,
  CHARGERS FOOTBALL CO., SAN FRANCISCO
  FORTY-NINERS, LTD., SEATTLE SEAHAWKS,
  INC., TAMPA BAY AREA NFL FOOTBALL
  CLUB, INC., and PRO-FOOTBALL, INC.,

                Defendants.

----------------------------------------------------x

LINDQUIST & VENNUM             WEIL, GOTSHAL & MANGES
4200 IDS Center               767 Fifth Avenue
Minneapolis, Minnesota 55402     New York, New York 10153
(612) 371-3211               (212) 310-8000

FILED  **SEP 2 1 1992**

FRANCIS E. DOSAL, CLERK

DEPUTY CLERK'S INITIALS

Plaintiffs, by their undersigned attorneys, for their Complaint herein allege as follows:

## INTRODUCTION

1.    This action is brought to enjoin violations by each defendant of the federal antitrust laws with respect to plaintiffs and similarly situated NFL football players whose contracts expire on February 1, 1993, and to redress injuries sustained by plaintiffs as a result of violations by each defendant of the federal antitrust laws.  Plaintiffs are professional athletes who have been employed by individual teams in the National Football League ("NFL").  Defendants have jointly agreed and conspired to monopolize the market for professional football player services and to deny plaintiffs the ability to market their services as professional football players in a competitive market through the set of anticompetitive restrictions known as Plan B.  As a result of defendants' anticompetitive agreements, plaintiffs have been prevented from receiving a competitive market value for their services and have been denied the freedom of movement available to employees in virtually every other industry in the United States.  A jury has found that these anticompetitive Plan B agreements violate Section 1 of the Sherman Act, and defendants are bound by that verdict.  None of the plaintiffs will be under contract to any NFL team as of February 1, 1993, and each of them will suffer irreparable injury if they are subjected to the illegal Plan B

2

restrictions, other anticompetitive restrictions that have a similar effect, or any other unreasonable restrictions on their freedom to negotiate contracts with NFL teams in a competitive market.

## JURISDICTION AND VENUE

2. These claims arise and are brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

3. This Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1337.

4. Venue in this action is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22. Each of the defendants can be found, resides, has an agent, or transacts business in the District of Minnesota, and the unlawful activities were carried on in part by one or more of the defendants within this district.

## THE PARTIES

5. Plaintiff Reggie White is a professional football player who, since 1985, has been employed in interstate commerce by defendant Philadelphia Eagles Football Club, Inc., which owns and operates the Philadelphia Eagles. After the 1992 NFL season, his contract with the Eagles will expire on February 1, 1993.

6. Plaintiff Michael Buck is a professional football player who, since 1990, has been employed in interstate commerce by defendant New Orleans Saints L.P., which owns and operates the New Orleans Saints. After the 1992 NFL season, his contract with the Saints will expire on February 1, 1993.

7.    Plaintiff Hardy Nickerson is a professional football player who, since 1987, has been employed in interstate commerce by defendant Pittsburgh Steelers Sports, Inc., which owns and operates the Pittsburgh Steelers. After the 1992 NFL season, his contract with the Steelers will expire on February 1, 1993.

8.    Defendant National Football League ("NFL"), which maintains its offices at 410 Park Avenue, New York, New York, is an unincorporated association consisting of the 28 separately-owned and operated professional football teams listed in paragraph 9. The NFL is engaged in interstate commerce in the business of, among other things, operating the sole major professional football league in the United States.

9.    The other defendants are the 28 NFL member teams, each of which, upon information and belief, is a corporation, except where noted below. Upon information and belief, each of the defendant teams is a separately-owned and independent entity which operates a professional football franchise for profit under the team name and in the cities set forth below:

| NFL Defendant Team Owner | State of Organization, Citizenship or Incorporation | Team Name (City) |
|---|---|---|
| Five Smiths, Inc. | Georgia | Atlanta Falcons |
| Buffalo Bills, Inc. | New York | Buffalo Bills |
| Chicago Bears Football Club, Inc. | Delaware | Chicago Bears |
| Cincinnati Bengals, Inc. | Ohio | Cincinnati Bengals |

| | | |
|---|---|---|
| Cleveland Browns, Inc. | Delaware | Cleveland Browns |
| Dallas Cowboys Football Club, Ltd. | Texas | Dallas Cowboys |
| PDB Sports, Ltd. | Colorado | Denver Broncos |
| Detroit Lions, Inc. | Michigan | Detroit Lions |
| Green Bay Packers, Inc. | Wisconsin | Green Bay Packers |
| Houston Oilers, Inc. | Texas | Houston Oilers |
| Indianapolis Colts, Inc. | Delaware | Indianapolis Colts |
| Kansas City Chiefs Football Club, Inc. | Texas | Kansas City Chiefs |
| Los Angeles Raiders, Ltd. | California | Los Angeles Raiders |
| Los Angeles Rams Football Co., Inc. | Delaware | Los Angeles Rams |
| Miami Dolphins, Ltd. | Florida | Miami Dolphins |
| Minnesota Vikings Football Club, Inc. | Minnesota | Minnesota Vikings |
| KMS Patriots, LP | Delaware | New England Patriots |
| New Orleans Saints, LP | Texas | New Orleans Saints |
| New York Football Giants, Inc. | New York | New York Giants |
| New York Jets Football Club, Inc. | Delaware | New York Jets |
| Philadelphia Eagles Football Club, Inc. | Delaware | Philadelphia Eagles |
| B & B Holdings, Inc. | Arizona | Phoenix Cardinals |

| | | |
|---|---|---|
| Pittsburgh Steelers Sports, Inc. | Pennsylvania | Pittsburgh Steelers |
| Chargers Football Co. | California | San Diego Chargers |
| San Francisco Forty-niners, Ltd. | California | San Francisco Forty-niners |
| Seattle Seahawks, Inc. | Washington | Seattle Seahawks |
| Tampa Bay Area NFL Football Club, Inc. | Florida | Tampa Bay Buccaneers |
| Pro-Football, Inc. | Maryland | Washington Redskins |

## CLASS ACTION ALLEGATIONS

10. Plaintiffs are representatives of an injunctive relief class, as defined by Rule 23(b)(2) of the Federal Rules of Civil Procedure, and bring this action on behalf of themselves and their class members as described in paragraph 12 below.

11. The class represented by the class plaintiffs is comprised of all players whose current NFL contracts expire on February 1, 1993. Upon information and belief, there are approximately 280 persons who are members of the class. All of these persons will be represented by the class plaintiffs.

12. The class is so numerous and geographically so widely distributed that joinder of all members is impracticable. There are questions of law and fact common to the class. The claims of the representative parties are typical of the claims of the class they represent, and the representative parties will fairly and adequately protect the interests of the class they represent.

13.   Each person in the class was subject to uniform agreements, rules and practices among the defendants in that they were all subject to the Plan B restrictions during and/or prior to the 1992 NFL season, and will, upon information and belief, be subject to the same or similar restraints imposed by defendants, not all of which are known to the class plaintiffs, which will prevent these players from offering their services to NFL teams in a competitive market.  A jury has found that the anticompetitive Plan B restrictions violate Section 1 of the Sherman Act.  The class seeks injunctive relief to prohibit defendants from subjecting the class members to:  (i) the Plan B restrictions; (ii) any other restrictions having effects similar to those of the Plan B restrictions, on the freedom of the class members to negotiate contracts with NFL teams after their contracts expire on February 1, 1993; or (iii) any other unreasonable restrictions by defendants on the freedom of the class members to negotiate contracts with NFL teams after their contracts expire on February 1, 1993.

14.   The defendants have acted, have refused to act, and will act, on grounds generally applicable to the class by imposing the Plan B or similar restrictions on NFL players whose contracts have expired, thereby making appropriate preliminary and final injunctive relief with respect to the class as a whole.

### NATURE OF INTERSTATE TRADE AND COMMERCE

15.   The primary business in which defendants are engaged is the operation of major league professional football teams and the

sale of tickets and telecast rights to the public exhibition of the individual and collective football talents of players such as plaintiffs. To carry on this business, the NFL defendants must compete with each other for and retain the professional services of players, such as plaintiffs, who are signed to play football for one of the NFL defendant teams.

16. The business of major league professional football is distinct from other professional sports businesses, as well as from college and minor league football. Its distinguishing features include: the rules of the sport and the season during which it is played; the talents and rates of compensation of the players, for whom playing football is their full-time profession; the nature and amounts of trade and commerce involved; and the unique demand for the NFL defendants' games by the consuming public, both as ticket purchasers and as home viewers of and listeners to television and radio.

17. The NFL defendants' operation of and engagement in the business of major league professional football involves a substantial volume of interstate trade and commerce, including, inter alia, the following interstate activities: travel; communications; purchases and movement of equipment; broadcasts and telecasts of league games; advertisements; promotions; sales of tickets and concession items; employment of players and referees; and negotiations for all of the above.

18.   The NFL defendants' aforesaid interstate transactions involve collective annual expenditures and receipts in excess of 1.5 billion dollars.

19.   During the 1990, 1991 and/or 1992 NFL seasons, each of the plaintiffs was employed by or seeking employment from one or more of the defendant teams in interstate commerce as professional football players in the NFL.

BACKGROUND

20.   The NFL defendants enjoy a monopoly in the market for major league professional football in the United States, and have willfully acquired or maintained that monopoly in violation of Section 2 of the Sherman Act.  See United States Football League v. National Football League, 644 F. Supp. 1040, 1042 (S.D.N.Y. 1986), aff'd on other grounds, 842 F.2d 1335 (2d Cir. 1988). This verdict is entitled to collateral estoppel effect and defendants are "precluded from relitigating the existence of their monopoly power in the relevant market of major league professional football in the United States."  McNeil v. National Football League, 1992 W.L. 76874, at 22 (D. Minn. Apr. 15, 1992).

21.   The NFL defendants are also "collaterally estopped from relitigating the issue of the existence of a relevant market for the services of professional football players in the United States."  Id. at 18.  The NFL member teams are the only participants in that market, and the only potential for competition in that market is between the separately-owned and independently-operated NFL teams.  However, rather than engaging

in competition for the players' services, the NFL defendants have combined and conspired to eliminate such competition among themselves for the vast majority of NFL players, including plaintiffs, through group boycotts and concerted refusals to deal.  This has been accomplished by the NFL defendants jointly adopting and imposing "rules" and "policies" that have the purpose and effect of preventing players from offering their services to other NFL teams in a competitive market when their player contracts expire.

The Old Rozelle Rule

22.   The history of the NFL's anticompetitive restraints on the market for professional football players' services goes back at least to the imposition of the so-called "Rozelle Rule," which was adopted by the NFL members in 1963 as an amendment to their Constitution and By-Laws.  This rule essentially provided that an NFL team desiring the services of a veteran player whose contract had expired could not sign that player without paying "compensation" to the player's former club.  It further provided that the Commissioner of the league, then Pete Rozelle, would assess the compensation after the fact if the two clubs could not agree on the compensation.  Thus, despite having entirely fulfilled his contractual obligations to his team, each NFL player was nevertheless not free to bargain with another team for his services in a competitive market, since the former team, by virtue of its ability to compel compensation from any other NFL

team, was able to deter and restrict any new offers for the player's services.

23.   The Rozelle Rule substantially restrained competition among the NFL teams for players' services.   It tended to bind players to one team throughout their careers, and denied players the right to sell their services in a competitive market.

24.   In 1972, several players brought an action challenging the legality of the Rozelle Rule under the antitrust laws.   After an extensive non-jury trial, the district court found the Rozelle Rule to be both a per se violation of the antitrust laws as well as invalid under the rule of reason.   Mackey v. National Football League, 407 F. Supp. 1000 (D. Minn. 1975).   The Eighth Circuit affirmed on the basis of the rule of reason, holding that the Rozelle Rule constituted an unreasonable restraint of trade in violation of § 1 of the Sherman Act.   Mackey v. National Football League, 543 F.2d 606 (8th Cir. 1976).   A subsequent class action was filed on behalf of NFL players who had been subject to the Rozelle Rule, and that action resulted in a settlement which included a payment to the players of more than $13,000,000 in damages.

The First Refusal/Compensation System

25.   In 1977, and again in 1982, the NFL entered into collective bargaining agreements with the National Football League Players Association ("NFLPA"), which at that time was the collective bargaining representative of all NFL players.   As part of these agreements, the NFL defendants insisted that a new set

11

of restraints governing veteran free agent players be instituted. This "First Refusal/Compensation" system provided that each NFL team could prohibit a veteran player whose contract had expired from moving to another NFL team by exercising a right of first refusal and matching a competing team's offer to such a player. Moreover, if the player's former team chose not to match the offer, it would receive substantial compensation from the new team in the form of one or more college draft choices. Because the NFLPA (which was then a union) consented to these restraints as part of collective bargaining agreements (which also contained a number of benefits to the players), the restraints enjoyed a limited non-statutory "labor exemption" from the antitrust laws during the terms of the agreements.

26. Despite the NFLPA's hope that the new set of restraints would permit some degree of competition for players' services, the First Refusal/Compensation system proved to be even more restrictive of competition than the Rozelle Rule. During the five-year period covered by the 1982 collective bargaining agreement, only one of the over 1,400 players whose contracts expired ever received an offer from a competing team, and that offer was matched so the player was not permitted to change teams.

27. The 1982 collective bargaining agreement expired on August 31, 1987. Upon the expiration of that agreement, the NFLPA determined that it would never again agree to a continuation of the First Refusal/Compensation system. Having

12

experienced the severe anticompetitive effects of this system for ten years, the NFLPA concluded that only a truly competitive market would provide players with their basic economic rights.

The NFL Defendants' Continued Imposition
Of The First Refusal/Compensation System

28.   Despite intensive negotiations both before and after the expiration of the 1982 collective bargaining agreement in August 1987, the NFLPA (which was then a union) was unable to reach agreement with the NFL defendants on a new collective bargaining agreement, since the defendants wanted the players to agree to continue the anticompetitive First Refusal/Compensation system and the players would not do so.  Ultimately, the players went on strike, but this too failed to lead to a new collective bargaining agreement.

29.   After the 1982 collective bargaining agreement expired in 1987, the NFL defendants continued to impose the First Refusal/Compensation system despite the absence of a new collective bargaining agreement, and, indeed, over the express objections of the NFLPA.

The Powell Litigation

30.   Faced with the continued imposition of the anticompetitive First Refusal/Compensation system, on October 15, 1987, the NFLPA and several individual players filed a class action complaint against the NFL defendants, alleging, <u>inter alia</u>, that the continued imposition of this system without union consent constituted an unreasonable restraint of trade in violation of the antitrust laws.  <u>Powell v. National Football</u>

13

League, No. 4-87-917 (D. Minn.). In response, the NFL defendants moved for summary judgment on the ground that the challenged restraints were still protected by the nonstatutory labor exemption, even though the restraints were no longer part of any collective bargaining agreement.

31. On January 29, 1988, the district court in Powell denied the NFL defendants' motion for summary judgment and ruled that where a challenged restraint on competition was incorporated in a bona fide collective bargaining agreement, the nonstatutory labor exemption only survived until such time as the parties have arrived at an impasse in their bargaining with respect to that issue. Powell v. National Football League, 678 F. Supp. 777 (D. Minn. 1988). On July 11, 1988, the district court ruled that as the NFLPA and the NFL defendants had in fact reached an impasse with respect to the First Refusal/Compensation system, the system was therefore subject to the antitrust laws, and indeed was likely to be found to be an antitrust violation at trial. Powell v. National Football League, 690 F. Supp. 812 (D. Minn. 1988).

The Implementation of "Plan B"

32. Not content with their previous system of anticompetitive veteran player restraints, in 1989 the NFL defendants unilaterally implemented a new system of player restraints, which they called "Plan B."

33. Under Plan B, each NFL team has the right each year to restrict at least 37 players, who continue to be subject to a new version of the anticompetitive First Refusal/ Compensation

14

system.  The Plan B system leaves only the remaining few active roster players and certain other "injured reserve" or non-active roster players on each team with a limited two-month period to offer their services to other NFL teams without being subject to the First Refusal/Compensation system.  Since virtually all of the most desirable players are restricted under Plan B, the system primarily allows teams to release those players who would have been expendable in any event.  The vast majority of players are placed on the list of restricted players issued by the NFL defendants prior to each NFL season under Plan B, and thus they remain bound to their former teams under the First Refusal/Compensation system.  Indeed, the system is even worse for the restricted players than before, since Plan B included an immediate reduction in non-salary player benefits and a wage scale which was scheduled to take effect in 1993 (but which defendants recently repudiated).

34.  The market for professional football players' services has been substantially restricted as a result of the NFL defendants' anticompetitive Plan B scheme.  The Plan B First Refusal/Compensation system has operated to eliminate the ability of players to obtain a competitive market value for their services by inhibiting or preventing bidding by individual NFL teams, and has also served to restrict or eliminate the players' freedom of movement.  Of more than 4,000 players who have been restricted under Plan B since 1989, not one has moved to a new team.

15

## The Eighth Circuit's Powell Decision

35.  On November 1, 1989, an Eighth Circuit panel reversed the ruling of the district court in Powell and held, in a 2-1 decision, that the nonstatutory labor exemption continued to protect the player restraints that were previously agreed to in the expired 1982 collective bargaining agreement until the NFL players ended their collective bargaining relationship with defendants.  Powell v. National Football League, 930 F.2d 1293, 1303-04 (8th Cir. 1989); see also id. at 1305 (Heaney, J., dissenting).  On January 17, 1990, the Eighth Circuit denied the Powell plaintiffs' petition for a rehearing en banc.  Chief Judge Lay (the original author of Mackey v. National Football League, 543 F.2d 606 (8th Cir. 1976)) and Judge McMillian filed a sharp dissent.  The Solicitor General of the United States subsequently supported the Powell plaintiffs' petition for certiorari before the U.S. Supreme Court, arguing that the Eighth Circuit's decision was wrong.  However, the Supreme Court ultimately denied the petition for certiorari, with two Justices dissenting.  111 S. Ct. 711 (1991).

## The End of the Players' Union

36.  The NFL players determined that they could not permit their assertion of collective bargaining rights (which had proven futile in trying to achieve a new collective bargaining agreement) to serve as a basis for depriving them of their antitrust rights in the Eighth Circuit.  Accordingly, the players decided to end the role of the NFLPA as a collective bargaining

16

representative.  On November 6, 1989, the NFLPA informed the NFL defendants that it was relinquishing its role as the collective bargaining representative of the NFL players.  Over 60% of the players who were in the NFL at that time signed petitions stating that neither the NFLPA nor any other entity was thereafter authorized to act as their representative in collective bargaining.  On December 5, 1989, the NFLPA amended its Constitution and By-Laws to prohibit it from ever again serving as a union representing NFL players in collective bargaining.  The NFLPA also filed a labor organization termination notice with the U.S. Department of Labor, and the IRS changed the NFLPA's tax exempt status from that of a "labor organization" to that of a "business league."

The McNeil Case and The End of The
Non-Statutory Labor Exemption

37.  After the NFL players ended their collective bargaining relationship with the NFL defendants, eight individual football players filed a lawsuit against the NFL and all of its member teams (the same defendants herein), alleging, inter alia, that the imposition of the Plan B restraints constituted an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.  McNeil v. National Football League, No. 4-90-476 (D. Minn.).

38.  The McNeil plaintiffs moved for partial summary judgment against the NFL defendants' labor exemption defense on the ground that, because the NFLPA had ended its role as a collective bargaining representative, the nonstatutory labor

17

exemption could not apply.  The district court in McNeil granted the plaintiffs' motion, finding that the nonstatutory labor exemption ended no later than December 5, 1989, since the players were "no longer part of an 'ongoing collective bargaining relationship' with the [NFL] defendants."  McNeil v. National Football League, 764 F. Supp. 1351, 1358 (D. Minn. 1991).  On June 12, 1991, the Eighth Circuit denied the NFL defendants' motion for an interlocutory appeal of that issue.

39.  Since all of the defendants in this action were defendants in McNeil, and had a full and fair opportunity to litigate the non-statutory labor exemption issue in that case, they are collaterally estopped here from again raising the non-statutory labor exemption as a defense for player restrictions imposed during the 1990 NFL season and thereafter.

The McNeil Verdict and The Illegality of Plan B

40.  On September 10, 1992, the McNeil jury found that the First Refusal/Compensation system of Plan B violates Section 1 of the Sherman Act and that the plaintiffs in that case suffered economic injury as a result.  Since all of the defendants in this action were defendants in McNeil, and had a full and fair opportunity to litigate the legality of Plan B in that case, they are collaterally estopped here from again contesting the legality of the Plan B restrictions during the 1990 NFL season and thereafter.

## The Impact of Plan B Upon Plaintiffs

41. Each of the plaintiffs is a veteran football player whose NFL contract expires on February 1, 1993, and who was previously restricted under Plan B and thus subject to the First Refusal/Compensation system. Upon information and belief, defendants intend to continue to impose the Plan B restrictions, or restrictions with a similar anticompetitive effect, after the 1992 NFL season. Absent such restrictions, each of the plaintiffs would be free to offer his services to other NFL teams in a competitive market. Each of the plaintiffs and class members will suffer severe and irreparable harm if they are prevented from offering their services to other NFL teams in a competitive market after their current contracts expire on February 1, 1993. In addition, some of the named plaintiffs suffered damages as a result of previously being restricted under Plan B.

42. Each of the injuries which the class members will incur upon the end of the 1992 NFL season will not be even close to fully compensable in monetary damages. This is particularly true due to the short length of most NFL careers, the constant threat of career-ending injury, and the difficulty in estimating and proving the amount of monetary damages. The threatened injuries of the class members are therefore irreparable, warranting the issuance of preliminary and permanent injunctive relief for the class.

## Reggie White

43.    Plaintiff Reggie White has been a defensive lineman for the Philadelphia Eagles since 1985.  Prior to the 1989, 1990, 1991 and 1992 NFL seasons, he was listed by the Eagles as a restricted player under Plan B.

44.    Mr. White has been a starting defensive lineman for the Eagles for the past eight years, and is widely regarded as one of the premier defensive players in the NFL.  He has been elected to the Pro-Bowl for the past six seasons.  His current contract with the Eagles expires on February 1, 1993.

45.    Shortly after his first contract negotiations with the Eagles, in 1985, Mr. White's agent and contract negotiator signed a contract with the Eagles to become an assistant to the president/general manager of the team.  Mr. White discovered that his contract with the Eagles contained numerous provisions that were unfairly advantageous to the Eagles, including a life insurance policy that named the owner and general manager of the Eagles (Norman Braman and Harry Gamble, respectively) as trustees who would receive substantial benefits upon Mr. White's death. Mr. White also discovered that his contract included an additional year at the option of the Eagles that his agent had not disclosed to him.  Mr. White discharged his agent and filed suit against him over the terms of this contract.  As a result of this litigation, Mr. White and the Eagles negotiated a new contract with the Eagles.

46.   Prior to the 1989 NFL season, Mr. White and the Eagles agreed on four one year contracts.  His last contract with the Eagles will expire on February 1, 1993.

47.   Mr. White will suffer severe and irreparable harm if he is prevented from having the freedom to offer his services to other NFL teams in a competitive market after his current contract expires on February 1, 1993.  He will be forced to accept compensation and other contractual terms that are substantially less valuable than he would receive in a competitive market, and he will be deprived of his freedom of movement.

48.   In addition, Mr. White is a minister who places great value on the trust he has in his employer.  Mr. White does not wish to be employed by Mr. Braman or the Eagles after the 1992 NFL season in a restrictive system that insulates Mr. Braman and the Eagles from competition in the market for player services.

Michael Buck

49.   Plaintiff Michael Buck has been a quarterback for the New Orleans Saints since 1990, and claims antitrust damages in this action for the 1992 NFL season.

50.   Prior to the 1992 NFL season, Mr. Buck was listed by the Saints as a restricted player under Plan B.  After considerable negotiations, Mr. Buck was forced to accept a one year contract with the Saints for approximately $215,000, substantially less than he would have received in a competitive

21

market.  The Saints advised Mr. Buck that he could either accept their offer or sit out the season.

51.  Mr. Buck is the second-string quarterback with the Saints and plays behind Bobby Hebert, a premier quarterback.  Mr. Buck beat out Steve Walsh for the second-string position, and plays ahead of Mr. Walsh.  Upon information and belief, Mr. Walsh receives more than $1 million per year in base salary from the Saints.  In addition, upon information and belief, the average salary in the NFL for second-string quarterbacks is more than $500,000.

52.  Mr. Buck wants the opportunity to receive his fair market value and to maximize his opportunities to start in the NFL.  Mr. Hebert has been the starting quarterback for the Saints since 1985 (with the exception of the 1990 NFL season), and Mr. Buck may not have the opportunity to start with the Saints for at least several years.

Hardy Nickerson

53.  Plaintiff Hardy Nickerson has been a linebacker for the Pittsburgh Steelers since 1987, and claims antitrust damages in this action for the 1992 NFL season.  Prior to that season, he was listed by the Steelers as a restricted player under Plan B.

54.  Mr. Nickerson has been a starting linebacker for the Pittsburgh Steelers for five years, since 1988.  During the 1989 NFL season, Mr. Nickerson and the Steelers agreed on two one year contracts for the 1989 and 1990 NFL seasons, with a third year at the option of the Steelers covering the 1991 NFL season.

22

55. After considerable negotiations, Mr. Nickerson and the Steelers could not agree upon a contract for the 1992 NFL season. The Steelers refused to offer Mr. Nickerson any contract shorter than two one year contracts with a third year at the option of the Steelers, despite his repeated requests that they do so. The Steelers advised Mr. Nickerson that he had the choice of signing two one year contracts with a third year at the option of the Steelers, or sitting out the season.

56. On May 22, 1992, the Steelers offered a one year contract to Mr. Nickerson at 105% of the salary in his 1991 contract, pursuant to the terms of Plan B. This amount was substantially less than Mr. Nickerson would have received in a competitive market. Indeed, the multi-year offer that the Steelers made to Mr. Nickerson under the restrictive and illegal Plan B system provided for payments of several hundred thousand dollars more for the 1992 season.

57. Having no alternative other than to bind himself to the Steelers for the next three seasons, Mr. Nickerson advised the Steelers that he would accept, under duress, the one year contract at 105% of his 1991 salary. That contract expires on February 1, 1993. Mr. Nickerson does not wish to be forced to sign another contract with the Steelers, and would prefer to be employed nearer to the West Coast where he was born and raised, where he has a home, where his family still lives, and where he plans to live and work after his NFL career.

23

## COUNT I

## Claims For Class-Wide Injunctive Relief

58. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 57.

59. There is a relevant market for the services of major league professional football players in the United States. The Plan B restrictions, in the 1990 NFL season and thereafter, substantially restrained and injured competition in that market, and continue to do so.

60. The Plan B restrictions, in the 1990 NFL season and thereafter, constitute an agreement among competitors to suppress competition for the services of major league professional football players in the United States, in violation of Section 1 of the Sherman Act. This system operates as a perpetual horizontal group boycott and/or horizontal division of markets, which is per se unlawful. It also constitutes an unreasonable restraint of trade under the rule of reason standard. Each of the NFL defendants is a participant in this unlawful combination or conspiracy.

61. A jury has found that these anticompetitive Plan B agreements violate Section 1 of the Sherman Act. Each of the plaintiffs and class members will sustain antitrust injury to his business or property by reason of the continuation of this unlawful combination or conspiracy. In the absence of the Plan B restrictions, each of the plaintiffs and class members would be

24

free to market his services to the NFL team of his choice at the end of the 1992 NFL season.

62.   Each of the plaintiffs and class members face threatened loss or damage by reason of defendants' continued violation of the antitrust laws when their contracts expire on February 1, 1993.  Even though the Plan B restriction have been found to constitute a violation of Section 1 of the Sherman Act, defendants have, upon information and belief, already indicated that they intend to in effect continue Plan B -- possibly under another name, such as "Plan C" -- with equally anticompetitive and unlawful restrictions.  For example, counsel for defendants publicly indicated after the McNeil verdict that "The jury said that 37 is too much.  Okay, so we'll protect 35 or 36."

63.   The class representatives and class members are entitled to relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining each of the defendants from agreeing to or implementing:  (i) the First Refusal/Compensation rules of Plan B; (ii) any other restrictions having effects similar to those of the First Refusal/Compensation rules of Plan B, on the freedom of the class members to negotiate contracts with NFL teams after their contracts expire on February 1, 1993; or (iii) any other unreasonable restrictions by defendants on the freedom of class members to negotiate contracts with NFL teams after their contracts expire on February 1, 1993.  Plaintiffs and the

class members will suffer severe and irreparable injuries in the absence of such relief.

## COUNT II

### Individual Damage Claims Against the Plan B First Refusal/ Compensation System Under Section 1 of the Sherman Act

64.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 57.

65.   There is a relevant market for the services of major league professional football players in the United States.   The Plan B First Refusal/Compensation system, in the 1990 NFL season and thereafter, substantially restrained and injured competition in that market, and continues to do so.

66.   The Plan B First Refusal/Compensation system, in the 1990 NFL season and thereafter, constitutes an agreement among competitors to suppress competition for the services of major league professional football players in the United States, in violation of Section 1 of the Sherman Act.   This system operates as a perpetual horizontal group boycott and/or horizontal division of markets, which is per se unlawful.   It also constitutes an unreasonable restraint of trade under the rule of reason standard.   Each of the NFL defendants is a participant in this unlawful combination or conspiracy and is jointly and severally liable for the damages resulting therefrom.

67.   Mr. Buck sustained antitrust injury to his business or property by reason of this unlawful combination or conspiracy during the 1992 NFL season; Mr. Nickerson sustained antitrust injury to his business or property by reason of this unlawful

26

combination or conspiracy during the 1992 NFL season.  In the absence of the Plan B restrictions, both of these plaintiffs would have been free to market his services to the team of his choice and would have received substantially higher compensation for his services than he was forced to accept because of the Plan B restrictions.

## COUNT III

### Individual Claims for Treble Damages Resulting From Fixing and Reducing Medical Insurance Benefits

68.  Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 57.

69.  Upon information and belief, the NFL defendants entered into an agreement, beginning no later than the 1990 NFL season, to fix medical insurance benefits and medical insurance deductible amounts at a uniform level for all players in the NFL, including plaintiffs.  The level at which such benefits were set was lower, and the deductible amounts higher, than the NFL defendants had previously provided to players under the expired collective bargaining agreement.  Further, upon information and belief, the NFL defendants agreed not to negotiate with individual players for medical insurance benefits different from these uniform and reduced levels.

70.  The unilateral establishment by the NFL defendants of fixed levels of medical insurance benefits for all NFL players constitutes a horizontal agreement among competitors to suppress competition for the services of major league professional football players in the United States, in violation of Section 1

of the Sherman Act.  This agreement constitutes a per se violation and an unreasonable restraint of trade under the rule of reason.  Each of the NFL defendants is a participant in this unlawful combination or conspiracy, and each is jointly and severally liable for the damages resulting therefrom.

71.  There is a relevant market for the services of major league professional football players in the United States which is monopolized by the NFL defendants and which is substantially restrained by their agreement to establish fixed levels of medical insurance benefits.

72.  Each of the plaintiffs has sustained and is continuing to sustain antitrust injury to his business or property by reason of the establishment by defendants of fixed levels of medical insurance benefits.  Absent such an agreement, plaintiffs would have been able to obtain medical insurance benefits for their services in a competitive market in amounts higher than they are currently receiving.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment with respect to their Complaint as follows:

A.  That this Court adjudge and decree that defendants are preliminarily and permanently enjoined from agreeing to or implementing:  (i) the First Refusal/Compensation rules of Plan B; (ii) any other restrictions having effects similar to those of First Refusal/Compensation rules of Plan B, on the freedom of the class members to negotiate contracts with NFL

28

teams after their contracts expire on February 1, 1993; or (iii) any other unreasonable restrictions by defendants on the freedom of the class members to negotiate contracts with NFL teams after their contracts expire on February 1, 1993.

B.   That this Court adjudge and decree that the defendants violated § 1 of the Sherman Act in regard to the Plan B restrictions in the 1991 and 1992 NFL seasons, and that:   (i) Mr. Buck be awarded judgment for three times the damages which he sustained during the 1992 NFL season as a result; (ii) Mr. Nickerson be awarded judgment for three times the damages which he sustained during the 1992 NFL season as a result; and (iii) each of the plaintiffs be awarded the costs of this action including reasonable attorneys' fees.

C.   That this Court adjudge and decree that the defendants violated § 1 of the Sherman Act in regard to their agreements concerning provision of medical insurance in the 1990, 1991 and 1992 NFL seasons, and that each plaintiff be awarded judgment for three times the damages which he sustained as a result, plus the costs of this action including reasonable attorneys' fees.

D.   That the Court grant such other and further relief as may be appropriate.

## DEMAND FOR JURY

Pursuant to Rule 38 of the Federal Rules of Civil

Procedure, plaintiffs demand a trial by jury.

Dated:   September 21, 1992

James W. Quinn
Jeffrey L. Kessler
WEIL, GOTSHAL & MANGES
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

and

Edward M. Glennon, #35403
Carol T. Rieger, #155468
Charles J. Lloyd, #174257
LINDQUIST & VENNUM
4200 IDS Center
Minneapolis, Minnesota 55402
(612) 371-3211

ATTORNEYS FOR PLAINTIFFS

30