```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
                Civil No. 4-92-906(DSD)
```

Reggie White, Michael
Buck, Hardy Nickerson,
Vann McElroy and Dave
Duerson,

        Plaintiffs,

v.                                                                    **ORDER**

National Football League;
The Five Smiths, Inc.;
Buffalo Bills, Inc.;
Chicago Bears Football Club,
Inc.; Cincinnati Bengals, Inc.;
Cleveland Browns, Inc.; The
Dallas Cowboys Football Club,
Ltd.; PDB Sports, Ltd.; The
Detroit Lions, Inc.; The Green
Bay Packers, Inc.; Houston Oilers,
Inc.; Indianapolis Colts, Inc.;
Kansas City Chiefs Football Club,
Inc.; The Los Angeles Raiders, Ltd.;
Los Angeles Rams Football Company,
Inc.; Miami Dolphins, Ltd.;
Minnesota Vikings Football Club,
Inc.; KMS Patriots Limited Partnership;
The New Orleans Saints Limited Partnership;
New York Football Giants, Inc.; New York
Jets Football Club, Inc.; The Philadelphia
Eagles Football Club, Inc.; B & B Holdings,
Inc.; Pittsburgh Steelers Sports, Inc.;
The Chargers Football Company; The San
Francisco Forty-Niners, Ltd.; The
Seattle Seahawks, Inc.; Tampa Bay Area
NFL Football Club, Inc.; and Pro-Football,
Inc.;

        Defendants.

This matter is before the court on the appeal by the National Football League Management Council ("NFLMC") of Special Master

Stephen B. Burbank's decision dated November 16, 2006. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court affirms the decision of the Special Master.

**BACKGROUND**

This appeal arises out of a proceeding commenced by Class Counsel and the National Football League Players' Association ("NFLPA") concerning alleged violations of the Stipulation and Settlement Agreement ("SSA") by the Denver Broncos in connection with the contract of and a subsequent agreement reached with Ashley Lelie ("Lelie"). Lelie signed a five-year NFL Player Contract ("Contract") with the Broncos on July 25, 2002. Attachment II to the Contract ("Attachment"), effective the same date, included a provision that gave the Broncos an option to extend Lelie's contract for a sixth season through the 2007 League Year ("Option"). As additional consideration "for the exercise of the Option for the 2007 NFL season and for [Lelie's] adherence to all provisions of said Contracts," the Attachment included an option bonus of $1.1 million to be paid in two equal payments. Ultimate payment of both installments was subject to the provisions of Section II of the Attachment, which stated:

> In the event Player fails or refuses to practice or play with Club at any time for any reason other than due to injury or death ... or leaves Club without its consent during the

> contract years, then Player shall be in default, and upon demand by the Club, Player will return the proportionate amount of the bonus for the period of time effected [sic] by the default. Club shall have a right of setoff and recoupment with respect to any amounts owed to Club.

The Attachment further stated that none of the additional consideration was part of "any salary in [Lelie's] contract." The Broncos exercised the option and paid Lelie both installments of the option bonus in 2003.

Because of disagreements during the 2006 off-season, Lelie did not report to the Broncos' mandatory minicamp or preseason training camp. The team claimed that because of that conduct it was entitled to recover, among other amounts, $220,000 (one-fifth) of the option bonus pursuant to Section II of the Attachment. On August 23, 2006, the Broncos, Lelie, and Lelie's player representative executed an "Acknowledgment and Agreement" ("Acknowledgment") as a prelude to the assignment of Lelie's Contract to the Atlanta Falcons. In that document, Lelie acknowledged that he had breached the Contract and owed certain amounts to the Broncos, including $220,000 under the Attachment. He agreed to repay the $220,000 immediately and acknowledged an obligation to repay a portion of his signing bonus and other fines properly levied against him. In the Acknowledgment, the parties agreed that in exchange for the $220,000 and other acknowledgments, the Broncos would assign Lelie's Contract to the Falcons and that

3

the consideration provided by Lelie was the "but for" cause of the Contract assignment. Lelie also agreed that the Broncos could seek repayment of the designated amounts after the team assigned his Contract to the Falcons.

After executing the Acknowledgment, Lelie wrote a $220,000 check to the Broncos, and the Broncos assigned the Contract to the Falcons. On September 11, 2006, the NFLMC initiated a Non-Injury Grievance on behalf of the Broncos seeking payment by Lelie of the remaining amounts due under the Contract and as reflected in the Acknowledgment. The NFLPA denied that Grievance. Having been alerted by the NFLMC's Grievance to the $220,000 repayment and the Acknowledgment, Class Counsel commenced a proceeding with the Special Master to recover the repaid portion of the option bonus and have the Acknowledgment declared void under the SSA.

The primary issue addressed by the Special Master, now before the court, is whether Section I of the Attachment authorizes a "forfeiture" not permitted under Article XVII, § 9(c) of the SSA ("§ 9(c)"). Special Master Burbank concluded that § 9(c) prohibited the forfeiture and that Lelie was entitled to return of

the $220,000 he paid the Broncos.[1]  For the reasons stated, the court concurs with the Special Master and affirms his decision.

**DISCUSSION**

Because the appeal concerns the interpretation of the terms of the SSA, the parties agree that the standard of review is *de novo*. See White v. Nat'l Football League, 899 F. Supp. 410, 413 (D. Minn. 1995).  The parties do not dispute the relevant language of the SSA but rather its interpretation.  The interpretation of the SSA is governed by New York law.  As the court has previously stated,

> Under New York law, the terms of a contract must be construed so as to give effect to the intent of the parties as indicated by the language of the contract.  The objective in any question of the interpretation of a written contract, of course, is to determine what is the intention of the parties as derived from the language employed.  The court should also give the words in a contract their plain and ordinary meaning unless the context mandates a different interpretation.

Id. at 414.  Further, the court must give effect and meaning to each term of the contract, making every reasonable effort to harmonize all of its terms.  See Reda v. Eastman Kodak Co., 233

---

[1] The Special Master also determined that the Acknowledgment is void because it constitutes an agreement between a Player and Club concerning terms and conditions of employment that was not set forth in a Player Contract as soon as practicable, in violation of Article XVII, § 5(a)(i) of the SSA.  Neither party addressed this conclusion in their briefing papers or at oral argument.  The court therefore reserves judgment on whether the entire Acknowledgment is void.

5

A.D.2d 914, 915 (N.Y. App. Div. 1996). The court must also interpret the contract so as to effectuate, not nullify, its primary purpose. See id.

The disputed language is in Article XVII, § 9 of the SSA, which was added to the SSA in 2006 to address limitations on salary bonuses in player contracts. Specifically, § 9(c) states: "No forfeitures permitted (current and future contracts) for signing bonus allocations for years already performed, or for other salary escalators or performance bonuses already earned." Class Counsel maintains that Lelie's option bonus is a "salary escalator" that was "earned" at the time the Broncos exercised the option and therefore "already earned" when Lelie breached the Contract. The NFLMC asserts that the option bonus is not a "salary escalator" and was not "already earned" when Lelie breached. The court must therefore determine whether Lelie's option bonus qualifies as a "salary escalator" and, if so, whether Lelie had "already earned" the bonus at the time he breached his Contract.

I.  **"Salary Escalators"**

The NFLMC objects to the Special Master's determination that Lelie's option bonus is an "escalator" and argues that the option bonus does not fall under the auspices of the anti-forfeiture provision in § 9(c). As "escalator" is not defined in the SSA, the NFLMC argues that it must be given its plain and ordinary meaning. In this context, the NFLMC argues that "escalator" is a contract

clause - a standard or formula - that stipulates an increase or decrease in amount of rate of compensation.  It maintains that an option bonus does not fit such a definition.  The court disagrees.

The language of § 9(c) cannot be understood by looking at each word in isolation.  See Dore v. La Pierre, 226 N.Y.S.2d 949, 952 (N.Y. Sup. Ct. 1962) ("In interpreting a contract particular words should not be considered as isolated from the context.").  Instead of focusing strictly on "escalator," as the NFLMC does, the court looks to the entire phrase "other salary escalators" for meaning. In support of this analysis, the court notes that the NFLMC does not advocate splitting apart other phrases in § 9(c) - to focus, for example, only on "allocations" instead of "signing bonus allocations" or on "bonuses" instead of "performance bonuses" - because it realizes that doing so would distort the intended meaning of those phrases.  Likewise, "other salary escalators" would be distorted if only the word "escalators" was analyzed outside the entire phrase.

To understand the meaning of "other salary escalators," the court applies the rule of *noscitur a sociis* and looks to the rest of the sentence and the words surrounding the phrase for guidance. See Popkin v. Sec. Mut. Ins. Co. of N.Y., 48 A.D.2d 46, 48 (N.Y. App. Div. 1975).  In this case, § 9(c) states: "no forfeitures [are] permitted ... for signing bonus allocations for years already performed, or for other salary escalators."  The "or ... other"

7

means that a "signing bonus allocation" is a type of "salary escalator." Therefore, "salary escalators" include bonuses. This interpretation is supported by the drafters' use of "salary" instead of "Paragraph 5 salary"[2] to modify "escalators." Because Paragraph 5 salary excludes the concept of bonuses, Paragraph 5 salary escalators could not include option bonuses. However, as written in § 9(c), "salary" refers to all player compensation, including bonuses.

For these reasons, the court concludes that Lelie's option bonus is a salary escalator subject to the anti-forfeiture provision in § 9(c) of the SSA. Accordingly, forfeiture of the option bonus is prohibited if Lelie had "already earned" the option bonus.

**II. "Already Earned"**

The NFLMC argues that even if Lelie's option bonus is a "salary escalator" he is not protected from forfeiture because the option bonus was not "already earned." The NFLMC contends that because "already earned" is not defined in the SSA its meaning is found in Attachment II. That agreement directs that the option bonus is earned when two conditions are satisfied: (1) the team exercises the option and (2) Lelie adheres to "all provisions of [his] Contracts." The NFLMC acknowledges that the Broncos met the first condition when the team exercised the option and extended

---

[2] As defined in Article I of the SSA.

Lelie's contract through the 2007 season.  However, it argues that Lelie failed to satisfy the second condition when he refused to report and practice with the club before the 2006 season.  That conduct, the NFLMC asserts, violated the provisions of Lelie's Contract; accordingly, the option bonus was not "already earned" as required by § 9(c).  Again, the court disagrees.

As an initial matter, the NFLMC's reliance on the language of Attachment II to define "already earned" is misplaced because the terms of the Contract do not dictate the meaning of the SSA (See SSA, art. XVII, §§ 3(a), 4.).  Moreover, Lelie's Contract, drafted in 2002, does not supersede § 9(c), which was added as an amendment to the SSA in 2006.  Therefore, the language of Attachment II cannot create a nexus between the option bonus and player performance.  Further, conditioning the option bonus on Lelie's performance improperly conflates "signing bonus allocations" with "other salary escalators."  Only "signing bonus allocations" hinge on player performance, and the deliberate use of two different terms - "performed" versus "earned" - demonstrates that the drafters intended two different standards.  Thus, if not "performed," a team can demand repayment or forfeiture of a signing bonus allocation without running afoul of § 9(c).  Forfeiture of other salary escalators, however, is not dependent upon performance

but rather upon whether they have been "earned." To the extent that Lelie's Contract conditioned the option bonus on his performance, § 9(c) invalidates it.

Time is "of the essence" in an option contract, as an option must be exercised within a specified time. La Ponte v. Dunn, 17 A.D.3d 539, 539 (N.Y. App. Div. 2005). It runs counter to the nature of such a contract to draw out its completion over an extended period - the result if the option bonus was contingent on Lelie's performance. Lelie's option bonus was instead "earned" upon exercise of the option. The option bonus served as consideration for holding the option open, and the Broncos reaped benefits merely by exercising the option. First, exercise of the option adjusted Lelie's pay scale and allowed the team to work more freely with its Rookie Allocation and Salary Cap. Second, the option exercise extended Lelie's contract with the team, delaying Lelie's free agency. This delay proved important given the eventual trade with the Falcons. Had the Broncos not exercised the option in 2003, Lelie would have been a free agent in 2006, and he could have signed with another team without the Broncos realizing any benefit from his departure. Instead, the Broncos received two high-round draft selections in return for assigning Lelie's contract to the Falcons. There is no inequity in finding that Lelie earned the option bonus upon the team's exercise of the

option. At that point, there had been a bargained-for exchange and each side received benefit.

The NFLMC argues that interpreting "already earned" in this manner means that players could breach contracts after the exercise of options and payment of option bonuses yet suffer no consequences. This assertion fails to account for the myriad ways teams can punish players for failing to comply with the performance terms of their contracts. For example, the NFL Collective Bargaining Agreement allows teams to fine players for missing training camp, team meetings and practices. These fines increased in 2006 to coincide with the addition of the anti-forfeiture provision contained in § 9(c). The team is also free to seek recoupment of signing bonus allocations which, pursuant to § 9(c), depends on player performance. Between the fines and signing bonus money, the Broncos stand to recover over $800,000 from Lelie for his failure to perform and subsequent trade. Thus, while § 9(c) forecloses forfeiture of option bonuses already earned as a means of punishing players for failing to perform provisions of their contracts, teams have other avenues to penalize such behavior.

For these reasons, after a *de novo* review, the court affirms Special Master Burbank's decision that Lelie's option bonus was a "salary escalator ... already earned." Therefore, the bonus is protected from forfeiture pursuant to § 9(c), and Lelie is entitled

to return of the $220,000 he paid to the Broncos under the Acknowledgment.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that the objections of the NFLMC are overruled and the decision of the Special Master is affirmed.

Dated:  March 26, 2007

                                            <u>s/David S. Doty</u>
                                            David S. Doty, Judge
                                            United States District Court