UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 4-92-906(DSD)

Reggie White, Michael
Buck, Hardy Nickerson,
Vann McElroy and Dave
Duerson,

        Plaintiffs,

v.                                            **ORDER**

National Football League;
The Five Smiths, Inc.;
Buffalo Bills, Inc.;
Chicago Bears Football Club,
Inc.; Cincinnati Bengals, Inc.;
Cleveland Browns, Inc.; The
Dallas Cowboys Football Club,
Ltd.; PDB Sports, Ltd.; The
Detroit Lions, Inc.; The Green
Bay Packers, Inc.; Houston Oilers,
Inc.; Indianapolis Colts, Inc.;
Kansas City Chiefs Football Club,
Inc.; The Los Angeles Raiders, Ltd.;
Los Angeles Rams Football Company,
Inc.; Miami Dolphins, Ltd.;
Minnesota Vikings Football Club,
Inc.; KMS Patriots Limited Partnership;
The New Orleans Saints Limited Partnership;
New York Football Giants, Inc.; New York
Jets Football Club, Inc.; The Philadelphia
Eagles Football Club, Inc.; B & B Holdings,
Inc.; Pittsburgh Steelers Sports, Inc.;
The Chargers Football Company; The San
Francisco Forty-Niners, Ltd.; The
Seattle Seahawks, Inc.; Tampa Bay Area
NFL Football Club, Inc.; and Pro-Football,
Inc.;

        Defendants.

This matter is before the court on the appeals of Class Counsel and the National Football League Players' Association's

("NFLPA") from Special Master Stephen B. Burbank's decision dated October 9, 2007.  Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court declines to adopt the recommendations of the Special Master as to the issue of forfeiture.

**BACKGROUND**

This appeal arises out of a proceeding initiated by the National Football League Management Council ("NFLMC") on September 5, 2007, pursuant to Article XXII of the <u>White</u> Stipulation and Settlement Agreement and article XXVI of the Collective Bargaining Agreement ("CBA")[1].  The NFLMC sought a declaration that enforcement in a non-injury grievance of the contractual rights of the Atlanta Falcons ("Falcons") to recover amounts already paid to quarterback Michael Vick ("Vick") would not violate article XIV, § 9(c) of the CBA ("§ 9(c)"), which provides: "No forfeitures permitted (current or future contracts) for signing bonus allocations for years already performed, or for other salary escalators or performance bonuses already earned."

In 2004, Vick and the Falcons renegotiated and extended his player contract ("2004 Contract").  The 2004 Contract included two "Roster, Reporting and Playing Bonus" addenda - one for 2005 ("2005

---

[1] Henceforth, the court will refer only to the 2006 NFL CBA.

Roster Bonus") and another for 2006 ("2006 Roster Bonus"). The 2005 Roster Bonus stated:

> As additional consideration for the execution of NFL Player Contract(s) for the 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 League Year(s) ('Contract'), and for the Player's adherence to all provisions of said Contract(s), Player will earn a Roster Bonus in the amount of Twenty-Two Million Five Hundred Thousand Dollars ($22,500,000), if he is a member of the Club's 80-Man Roster on the fifth (5th) day of the 2005 League Year. The Roster Bonus, if earned, will be paid as follows:
>
> $4,500,000    Within 10 days after being earned, and
> $8,000,000    on October 15, 2005, and
> $10,000,000   on March 15, 2006.

(Greenspan Decl. Ex. E.). The 2006 Roster Bonus contained nearly identical language, setting forth a roster bonus of $7 million, to be paid, if earned, on March 15, 2007. (Id.) The Falcons guaranteed each of the roster bonuses for injury and included an option to guarantee each bonus for skill. The team could guarantee the roster bonus for skill at any time before the fifth day of the relevant league year, and if it did, the "Player agree[d] to promptly execute a new NFL Player Contract setting forth the terms and conditions of the Skill Guarantee." (Id.)

The 2005 and 2006 Roster Bonuses also discussed the possibility of default in a provision applicable to bonuses guaranteed for skill. The default section stated:

> In the event Player, during the 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014 League Year(s), for any reason whatsoever, fails or refuses to report to Club without its written consent, fails or refuses to practice or play with (except by reason of injury or

3

>death arising from performing football related services), leaves Club without its written consent (including, but not limited to Player's retirement), is suspended by the NFL or Club for Conduct Detrimental, or is suspended for violating any of the NFL's disciplinary policies or programs, including but not limited to, the NFL Policy and Program for Substance Abuse, the NFL Policy and Procedures for Anabolic Steroids and related Substances or the NFL Personal Conduct Policy, then Player shall be in default of this agreement.

(Id.) If in default, the player has "no right to receive any subsequent unpaid sums of [the] Roster Bonus" and, if the team demands it, "shall forfeit and shall immediately return and refund to Club the amount of said Roster Bonus proportionate to the number of regular season games of Club during the term of [the] contract remaining at the time of Player's default." (Id.)

The Falcons exercised the right to guarantee all of the 2005 Roster Bonus on February 26, 2005, prior to the March 6, 2005, date on which Vick satisfied the roster condition. Accordingly, the team paid Vick $22.5 million on the schedule set forth above. Similarly, on March 1, 2006, the Falcons guaranteed $3.4 million of the 2006 Roster Bonus - two weeks before the March 15, 2006, date upon which Vick satisfied the roster condition. The Falcons then paid Vick $7 million on March 15, 2007, as specified.

On August 20, 2007, Vick pleaded guilty to a federal criminal charge of Conspiracy to Travel in Interstate Commerce in Aid of Unlawful Activities and to Sponsor a Dog in an Animal Fighting Venture. Based on Vick's admission to the facts in the plea agreement, the Commissioner of the National Football League

concluded that Vick had violated the NFL's Personal Conduct Policy and suspended him indefinitely without pay, effective immediately, on August 24, 2007. Three days later, on August 27, 2007, the Falcons sent Vick a "Demand for Repayment" of $19.97 million, including $3.75 million of a $7.5 million signing bonus paid to him in 2004 and 2005, $13.5 million of the $22.5 million roster bonus paid to him in 2005 and 2006 and $2.72 million of the $7 million roster bonus paid to him in 2007.

Soon after, on September 5, 2007, the NFLMC initiated a non-injury grievance on behalf of the Falcons seeking enforcement of the default provisions contained in the 2006 player contract as well as any additional or alternative relief that the Arbitrator could order under Article IX, § 8 of the CBA. Class counsel and the NFLPA challenged the proposed roster bonus forfeitures pursuant to § 9(c). The parties completed briefing on the dispute, and Special Master Stephen B. Burbank held a hearing on the matter on October 4, 2007.

The two issues addressed by the Special Master, now before the court, are whether the Falcons seek a forfeiture not permitted under § 9(c) and whether, if forfeiture is disallowed, alternative relief exists. Special Master Burbank concluded that § 9(c) did not prohibit the forfeiture and that the Falcons were entitled to return of $19.97 million in bonuses paid to Vick. He also conditionally determined that the NFLMC's grievance provided no

grounds for alternative legal or equitable relief to recover any amount § 9(c) protects from forfeiture. For the reasons stated, the court adopts the recommendation of the Special Master in part.

## DISCUSSION

Because the appeal concerns the interpretation of the terms of the CBA, the parties agree that the standard of review is *de novo*. See White v. Nat'l Football League, 899 F. Supp. 410, 413 (D. Minn. 1995). The parties do not dispute the relevant language of the CBA but rather its interpretation. The interpretation of the CBA is governed by New York law. As the court has previously stated,

> Under New York law, the terms of a contract must be construed so as to give effect to the intent of the parties as indicated by the language of the contract. The objective in any question of the interpretation of a written contract, of course, is to determine what is the intention of the parties as derived from the language employed. The court should also give the words in a contract their plain and ordinary meaning unless the context mandates a different interpretation.

Id. at 414. Further, the court must give effect and meaning to each term of the contract, making every reasonable effort to harmonize all of its terms. See Reda v. Eastman Kodak Co., 233 A.D.2d 914, 915 (N.Y. App. Div. 1996). The court must also interpret the contract so as to effectuate, not nullify, its primary purpose. See id.

**I.   Forfeiture**

The Special Master determined that upon the Falcons' decision to guarantee Vick's roster bonus for skill the bonus became a "signing bonus allocation" subject to § 9(c)'s "years already performed" test. The Special Master reasoned that the treatment of guaranteed roster bonuses as signing bonuses in CBA article XXIV, § 7(b)(iv) dictated identical treatment for the purposes of § 9(c). Class Counsel and the NFLPA argue that the roster bonuses, even if guaranteed, are not signing bonus allocations. The court agrees with Class Counsel and the NFLPA.

In considering whether Vick's roster bonuses were eligible for forfeiture under § 9(c), the Special Master first noted that the "question of interpretation has no clearly correct answer, ... [leaving him] to try to ascertain a meaning of the language used in Section 9(c) that best gives effect to the contracting parties' intent." (Special Master Opinion of October 9, 2007, at 6.) To discern that intent, the Special Master looked to CBA article XXIV, § 7(b)(iv)(15), which states that "[f]or purposes of determining Team Salary under the foregoing, the term 'signing bonus' shall include ... any roster bonus or Paragraph 5 Salary that the Club had the right to guarantee for skill, when the Club subsequently exercises the right to guarantee such bonus or Paragraph 5 Salary for skill." Based on § 7(b)(iv), the Special Master concluded that once guaranteed, Vick's roster bonus was best classified as a

7

signing bonus allocation subject to forfeiture under § 9(c)'s "years already performed" standard.

The court finds that the meaning of § 9(c) gains little clarity from reference to § 7(b)(iv). The sections are not found in the same CBA article. Section 7(b)(iv) is in an article on Guaranteed League-Wide Salary, Salary Cap, and Minimum Team Salary; § 9(c) is in an article on the NFL Player Contract. As described in article XXIV, section 7(b)(iv) classifications are meant "for the purposes of determining Team Salary" - not for the purposes of determining forfeitures. Therefore, ascribing meaning to the § 7(b)(iv) classification of guaranteed roster bonuses as signing bonuses in the context of § 9(c) is improper. Further, using § 7(b)(iv) to interpret contract terms for the purposes of § 9(c), as the NFLMC advocates, countermands the court's decision in White v. NFL (*In re* Ashley Lelie). (See Order of Mar. 26, 2007, Doc. No. 549.)

Pursuant to § 7(b)(iv), "[a]ny consideration, when paid, or guaranteed, for option years" is also treated as a signing bonus for purposes of determining team salary. CBA art. XXIV, § 7(b)(iv)(3). Under this definition, the option bonus would be treated as a signing bonus. In Lelie, however, the court rejected that conclusion. It determined that an option bonus was not a "signing bonus allocation" subject to the "years already performed" test but rather an "other salary escalator" subject to the "already

8

earned" test.  (Order of Mar. 26, 2007, Doc. No. 549.) Accordingly, the use of § 7(b)(iv) to classify player incentives for the purposes of § 9(c) is contrary to precedent and the common law of the CBA.

The NFLMC makes much of the guaranteed/nonguaranteed status of Vick's roster bonuses.  Although the guaranteed/nonguaranteed distinction may be important for salary cap purposes, it does not dictate the outcome in a forfeiture context.  Both the nonguaranteed and guaranteed for skill provisions require that the player earn the bonus by making the team's 80-man roster on the fifth day of the relevant league year. (Greenspan Decl. Exs. E, F, G.) (Nonguaranteed: "Player will earn a Roster Bonus ... if he is a member of the Club's 80-Man Roster on the Fifth (5th) day of the ... League Year."  Guaranteed: "Player will receive a Roster Bonus ... if he is a member of Club's 80-Man Roster on the fifth (5th) day of the ... League Year.")  In each provision, making the team's 80-man roster is a condition upon which the receipt of the roster bonus hinges.  With the skill and injury guarantees in place, there was little to keep Vick from satisfying that condition.  However, until he actually made the roster, he did not earn the bonuses, and if the Falcons had terminated his contract for reasons other than skill or injury before the fifth day of the new league year, Vick would not have received his roster bonuses.  Therefore, the roster bonuses - even when guaranteed for skill - required Vick to

9

actually be a part of the yearly 80-man roster. Once he did so, he earned the roster bonuses, and the Falcons cannot demand their forfeiture under § 9(c)'s "years already performed" test.

Accordingly, the court does not adopt the recommendations of the Special Master as to Vick's roster bonus forfeiture. The court determines that the Falcons' unchallenged recovery of $3.75 million of Vick's 2006 signing bonus, however, does not violate § 9(c).

## II. Alternative Relief

Anticipating the possibility of appeal and reversal on the issue of forfeiture, the Special Master also considered the NFLMC's claim for additional or alternative relief. He recommended that "reliance on circumstances constituting an alleged default to recover amounts that Section 9(c) protects from forfeiture is prohibited." (Special Master Opinion of October 9, 2007, at 9.) Reasoning that state law inconsistent with the CBA is preempted and federal common law cannot be hostile to or inconsistent with the CBA, the Special Master determined that the NFLMC may not rely on "any ground that would be an occasion of default in the roster bonus addenda ... as a predicate for relief involving the repayment of protected amounts ... under any theory or relief, legal or equitable, ... whether under state law or federal common law." (Id.)

The Special Master, however, made this declaration "conditionally," raising the specter of an advisory opinion, which the court is loath to endorse. Nevertheless, because it did not adopt the Special Master's recommendations on the issue of forfeiture, the court now addresses the possibility of alternative relief. The NFLMC objects that § 9(c) applies only to contractual forfeiture provisions and argues that it may pursue money damages on legal or equitable grounds. Specifically, the NFLMC seeks a declaration that the Falcons may recover Vick's bonuses under state law fraud or fraudulent inducement claims. Class Counsel and the NFLPA maintain that § 9(c) prohibits any forfeiture of the specified bonuses – not just the kind described in contractual default provisions. The court agrees with Class Counsel and the NFLPA.

As noted, § 9(c) provides "No forfeitures permitted (current and future contracts) for signing bonus allocations for years already performed, or for other salary escalators or performance bonuses already earned." The NFLMC asserts that the reference to "current and future contracts" in § 9(c) limits the scope of the forfeiture protection to contractual forfeiture procedures. This is not so; the parenthetical serves to grandfather in the "no forfeitures" declaration, not to limit it. While other subparts of § 9 refer to "forfeiture provisions" or "forfeiture clause[s]," § 9(c)'s "forfeitures" does not qualify a contract provision or

clause but rather stands alone. Cf. NFL CBA art. XIV, §§ 9(f), 9(b). Under the canon of *expressio unius est exclusio alterius*, § 9(c)'s unqualified use of "forfeitures" signifies its application beyond forfeiture provisions or forfeiture clauses. Thus, § 9(c) bars all forfeitures - whether described in the contract or not - of signing bonus allocations for years already performed, or for other salary escalators or performance bonuses already earned. Accordingly, the Falcons may not pursue state law claims in an attempt to recover the bonuses in question.

In addition, the Falcons may not use state law - even in the context of a CBA-authorized Grievance procedure - to seek forfeiture. It is well established that state law does not exist as an independent source of private rights to enforce collective bargaining agreements. See Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers, 390 U.S. 557, 559-60 (1968). Indeed, federal law preempts state law claims that are based directly on rights created by the CBA as well as claims substantially dependent on analysis of the agreement. See Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 410 (1988). Claims are substantially dependent if they derive or are implied from contract rights established under a CBA and if evaluation of the claim is "inextricably intertwined" with a consideration of terms of the agreement. Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 213 (1985). The proposed state law claims are substantially

12

dependent on the CBA, as any successful fraud or fraudulent inducement claim requires examination of the contract and the terms set forth in the CBA.  See Trs. of Twin City Bricklayers Fringe Benefit Funds v. Superior Waterproofing, Inc., 450 F.3d 324, 333-34 (8th Cir. 2006) (state law fraud claims preempted); Williams v. George P. Reintjes Co., 361 F.3d 1073, 1074 (8th Cir. 2004) (same).

For these reasons, after *de novo* review, the court adopts the recommendations of the Special Master as to the availability of alternative relief.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1. Recovery in the Atlanta Falcons' non-injury grievance of roster bonus money already paid to Michael Vick violates article XIV, § 9(c) of the CBA.

2. The Atlanta Falcons may not pursue other legal or equitable theories advanced in the non-injury grievance to recover amounts protected from forfeiture under § 9(c).

Dated:  February 1, 2008

s/David S. Doty
David S. Doty, Judge
United States District Court