IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
REGGIE WHITE, et al.,                        :
                                             :
                    Plaintiffs,              :
                                             :
        vs.                                  :
                                             :   No. 4:92-cv-00906-DSD
NATIONAL FOOTBALL LEAGUE, et al.,            :
                                             :
                    Defendants.              :
                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - -x
```

**CLASS COUNSEL'S AND THE NFLPA'S MEMORANDUM OF LAW IN
SUPPORT OF THEIR OBJECTION IN PART TO THE RECOMMENDATION
OF SPECIAL MASTER BURBANK REGARDING BROADCAST REVENUES**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................. 1

STANDARD OF REVIEW .................................................................. 5

ARGUMENT ................................................................................. 6

I.    THE SPECIAL MASTER'S LEGAL INTERPRETATIONS OF THE
      NFL'S SSA OBLIGATIONS ARE FUNDAMENTALLY FLAWED ................. 6

      A.    The Master Impermissibly Read The NFL's
            "Good Faith" Obligations Out Of The SSA ............................... 8

            1.    The Legal Error ............................................... 8

            2.    The Disregarded and Undisputed Evidence of Bad Faith ............ 13

      B.    The Master's Erroneous Interpretation Of "Sound Business
            Judgment" Negated Defendants' "Best Efforts" Obligations ............ 22

            1.    The Legal Error ............................................... 22

            2.    The Undisputed Evidence of the NFL's Decision to Make
                  *No* Effort to Increase TV Rights Fees in 2009 and 2010 ......... 29

      C.    The Special Master's Incorrect Interpretation Of "Total
            Revenues" Confuses Defendants' Choice To Seek Lockout
            Protection Instead Of Increased Revenues During The
            Term Of The SSA With "Front-Loading" .............................. 32

      D.    Injunctive Relief Is Essential To Remedy
            The SSA Violations Described Above ................................. 36

            1.    The Requested Injunctive Relief is Necessary
                  to Restore the Status Quo ..................................... 36

            2.    The *Dataphase* Factors are Satisfied .......................... 39

**EXHIBIT G-2**

II.    EVEN IF THE SPECIAL MASTER'S LEGAL INTERPRETATION
       OF THE NFL'S SSA OBLIGATIONS WERE CREDITED,
       INJUNCTIVE RELIEF AGAINST THE LOCKOUT PROVISIONS IN
       THE ESPN, NBC, CBS AND FOX AGREEMENTS SHOULD BE
       ORDERED ..................................................................................................... 41

       A.    At A Minimum, The Players Are Entitled To Injunctive Relief
             Against The Lockout Provisions In The ESPN And NBC
             Contracts........................................................................................... 42

       B.    The NFL Also Engaged In Impermissible "Back-Loading"
             In Its TV Contracts With FOX And CBS .................................... 44

III.   THE NORRIS-LAGUARDIA ACT DOES NOT BAR AN INJUNCTION......... 49

IV.    THE RED ZONE CHANNEL IS A RED HERRING ........................................... 52

Conclusion ..................................................................................................................... 55

**EXHIBIT G-3**

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                             **Page(s)**

*Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp.,*
   230 F.3d 569 (2d Cir. 2000)........................................................... 50

*Anytime Fitness v. Family Fitness of Royal,*
   No. 09-3503(DSD/JSM), 2010 WL 145259 (D. Minn. Jan. 8, 2010) ....................... 40

*Arthur Young & Co. v. Reves,*
   937 F.2d 1310 (8th Cir. 1991) .................................................... 37

*Bloor v. Falstaff Brewing Corp.,*
   454 F. Supp. 258 (S.D.N.Y. 1978)................................................. 22

*Bloor v. Falstaff Brewing Corp.,*
   601 F.2d 609 (2nd Cir. 1979)..................................................... 27

*Boys Markets, Inc. v. Retail Clerks Union, Local 770,*
   398 U.S. 235 (1970)............................................................. 49

*CAMOFI Master LDC v. Coll. P'ship, Inc.,*
   452 F. Supp. 2d 462 (S.D.N.Y. 2006)............................................. 13

*Capitol Records, Inc. v. Thomas-Rasset,*
   680 F. Supp. 2d 1045 (D. Minn. 2010)........................................... 40

*Cohen v. Board of Trustees of the Univer. of Med. & Dentistry,*
   867 F.2d 1455 (3d Cir. 1989) ................................................... 50

*Dataphase Sys. Inc. v. C.L. Sys.,*
   640 F.2d 109 (8th Cir. 1980) ............................................ 39, 51, 52

*Dist. Lodge 26 v. United Techs.,*
   689 F. Supp. 2d 219 (D. Conn. 2010)...................................... 27, 28, 50

*Dist. Lodge 26 v. United Techs.,*
   610 F.3d 44 (2d Cir. 2010)...................................................... 28

*Dist. 29, United Mine Workers of Am. V. New Beckley Mining Corp.,*
   895 F.2d 942 (4th Cir. 1989) .................................................. 49

**EXHIBIT G-4**

*Donaldson Co. v. Burroughs Diesel,*
   581 F.3d 726 (8th Cir. 2009) ..................................................................... 6

*Dunne v. Libbra,*
   330 F.3d 1062 (8th Cir. 2003) ................................................................. 44

*Farrand Optical Co. v. Local 475, Int'l Union of Elec. Radio & Mach. Workers,*
   143 F. Supp. 527 (S.D.N.Y. 1956) ........................................................... 50

*General Motors Corp. v. Harry Brown's, LLC,*
   563 F.3d 312 (8th Cir. 2009) ................................................................... 39

*Hansen v. Guyette,*
   814 F.2d 547 (8th Cir. 1987) ................................................................... 50

*Harrison Baking Co. v. Bakery & Confectionery Workers, Local No. 3,*
   777 F. Supp. 306 (S.D.N.Y. 1991) ........................................................... 49

*Howe v. Varity Corp.,*
   36 F.3d 746 (8th Cir. 1994), *aff'd on other grounds*, 516 U.S. 489 (1996) ............... 37

*In re Croton River Club, Inc.,*
   52 F.3d 41 (2d Cir. 1995) ......................................................................... 26

*Interbake Foods, L.L.C. v. Tomasiello,*
   461 F. Supp. 2d 943 (N.D. Iowa 2006) ................................................... 40

*Jackson v. NFL,*
   802 F. Supp. 226 (D. Minn. 1992) ............................................. 39, 51, 52

*Mamula v. Satrallow, Inc.,*
   578 F. Supp. 563 (S.D. Ohio 1983) ......................................................... 49

*Mylan Pharmaceuticals, Inc. v. American Cyanmide Co.,*
   Nos. 94-1502, 94-1472, 1995 WL 86437 (4th Cir. 1995). ........................ 25

*Nat'l Football League Players Ass'n v. NFL,*
   598 F. Supp. 2d 971 (D. Minn. 2008) ............................................. 41, 51

*Ozark Air Lines, Inc. v. Nat'l Mediation Bd.,*
   797 F.2d 557 (8th Cir. 1986) ................................................................... 49

*Perma Research & Dev. Co. v. Singer Co.,*
   308 F. Supp. 743 (S.D.N.Y. 1970) ........................................................... 22

**EXHIBIT G-5**

*Powell v. NFL*,
     690 F. Supp. 812 (D. Minn. 1988) ................................................................. 52

*Sander v. Alexander Richardson Investments*,
     334 F.3d 712 (8th Cir. 2003) ......................................................................... 44

*Schuck v. Gilmore Steel Corp.*,
     784 F.2d 947 (9th Cir.1986) .......................................................................... 49

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*,
     41 F.3d 1570 (2d Cir. 1994)........................................................................... 26

*Vonage Holdings Corp. v. Minnesota Pub. Util. Comm'n*,
     290 F. Supp. 2d 993 (D. Minn. 2004) ............................................................ 39

*White v. NFL (30% Rule)*,
     899 F. Supp. 410 (D. Minn. 1995) .................................................................. 7

*White v. NFL (Agents)*,
     92 F. Supp. 2d 918 (D. Minn. 2000) ....................................................... 5, 6, 51

*White v. NFL (Lelie)*,
     Civ. No. 4-92-906(DSD), 2007 WL 939560 (D. Minn. Mar. 26, 2007) ..................7, 24

*White v. NFL (Vick)*,
     533 F. Supp. 2d 929 (D. Minn. 2008) .............................................................. 8

*White v. NFL (Vick)*,
     585 F.3d 1129 (8th Cir. 2009) ....................................................................... 51

**STATE CASES**

*1-10 Indus. Assocs. v. Trim Corp. of Am.*,
     747 N.Y.S.2d 29 (App. Div. 2002) .......................................................... 11, 12, 21

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
     773 N.E.2d 496 (N.Y. 2002).......................................................................... 12

*Ashokan Water Servs., Inc. v. New Start, LLC*,
     807 N.Y.S. 2d 550 (Civ. Ct. 2006) .................................................................. 9

*Dialcom, LLC v. AT&T Corp.*,
     No. 12026/03, 2008 WL 2581876 (N.Y. Sup. Ct. Jun. 17, 2008) ........................ 10

*Gray & Assocs., LLC v. Speltz & Weis LLC*,
     No. 150446/2007, 2009 WL 416138 (N.Y. Sup. Ct. Feb. 2, 2009)........................ 13

**EXHIBIT G-6**

*Gross v. Empire Healthchoice Assurance*,
    No. 602848-2005, 2007 WL 2066390 (N.Y. Sup. Ct. Jul. 18, 2007) .............. 10, 11, 13

*Imprimis Invs. LLC v. Indus. Imaging Corp.*,
    QDS 22701503, 2008 N.Y. Misc. LEXIS 7384 (Sup. Ct. Sept. 7, 2008) ................... 32

*In re Lipper Holdings, LLC*,
    766 N.Y.S.2d 561 (App. Div. 2003) ......................................................................... 25

*Knudsen v. Lax*,
    842 N.Y.S.2d 341 (Cty. Ct. 2007) .......................................................................... 12

*Outback/Empire I Ltd. P'Ship v. Kamitis*,
    825 N.Y.S.2d 747 (App. Div. 2006) ....................................................................... 10

*Richbell Information Services v. Jupiter Partners*,
    765 N.Y.S.2d 575 (App. Div. 2003) .................................................................. 10, 11

*Richmond Shop Smart Inc. v. Kenbar Dev. Ctr., LLC*,
    820 N.Y.S.2d 124 (App. Div. 2006) ....................................................................... 13

*Silvermark Corp. v. Rosenthal & Rosenthal*,
    No. 602026/07, 2008 WL 283187 (N.Y. Sup. Ct. Jan. 25, 2008) .............................. 10

*Vivir v. Ehrenkranz*,
    No. 09-43523, 2010 WL 4551482 (N.Y. Sup. Ct. Oct. 14, 2010) ............................. 10

## FEDERAL STATUTES

29 U.S.C. § 104(c) .......................................................................................................... 49

29 U.S.C. § 107 .............................................................................................................. 51

## RULES

Fed. R. Civ. P. 30(b)(6) .................................................................................................. 21

**EXHIBIT G-7**

<u>**PRELIMINARY STATEMENT**</u>

The NFL Players ("Players" or "Class") object in part to Special Master Burbank's recommendation (the "Opinion") and request an immediate injunction preventing the NFL Defendants ("NFL" or "Defendants") from using or benefitting from their illegally obtained $4 billion lockout war chest and from further inflicting severe and irreparable harm on the Players.  The Players do not object to – and Defendants have not sought review of – Defendants' SSA breaches for which the Special Master awarded the Players $6.9 million in damages; however, the Players seek immediate injunctive relief for these now-*uncontested* SSA violations as well.

This proceeding presents the most egregious violations of the *White* Stipulation and Settlement Agreement ("SSA") and the Final Consent Judgment ("FCJ") in the seventeen years since this Court approved and ordered Defendants to abide by their terms.  The fundamental question raised by this Objection is whether the SSA allows Defendants, under the banner of "sound business judgment," or any other legal theory, to:

    (i)        Develop and execute a plan to forego maximizing revenues during the term of the SSA in order to use the NFL's TV Contracts – and the shared Total Revenues therefrom – to build a $4 billion fund to finance and sustain a lockout as "leverage" against the Players;

    (ii)      Use that plan to inflict immediate, continuing and irreparable harm on the Players; and

    (iii)    Carry out that scheme by ignoring Defendants' express SSA obligations to "in good faith act and use their best efforts, consistent with sound business judgment, so as to maximize Total Revenues for each playing season during the term of this Agreement."

The Master found that the SSA provided no protection for the Players against this unlawful conduct and thus denied the Players the injunctive relief that is essential to prevent Defendants from using the fruits of their illegal scheme – their $4 billion lockout war chest – to inflict immediate and overwhelming harm on the Players. This conclusion, as a matter of law, is fundamentally wrong. Indeed, the Master only reached this result through a wholesale rewriting of the SSA.

As this Court knows, in 1993 the SSA was carefully negotiated, and the FCJ entered, to impose an obligation upon Defendants to act in "good faith" and use "best efforts" to "maximize" Total Revenue during the term of the SSA. (SSA, Art. X, § 1(a) (hereinafter "Section 1(a)").) This obligation was specifically intended to prevent the NFL, in the course of generating Total Revenues, from pursuing its own business interests at the expense of the interests of the Players. The SSA clearly was not intended, as the Master's Opinion concluded, to constitute an agreement by the Class that Defendants may structure TV Contracts – the largest source of shared Total Revenues, by far – to intentionally inflict economic harm on the Players. Nor would this Court, as the guardian of the Class, have ever approved such an agreement.

Specifically, this case is about Defendants' illegal efforts to sacrifice shared SSA revenue from their TV Contracts – DIRECTV, FOX, CBS, NBC, and ESPN – during the term of the SSA to obtain leverage over and harm the Players during and after the SSA. Rather than using legal means to obtain such leverage, Defendants, in bad faith and in lieu of maximizing Total Revenues in 2009 and 2010, obtained Lockout Provisions, which pay the NFL over $4 billion during a lockout to gain and "shift leverage" in

**EXHIBIT G-9**

bargaining and alter the status quo. The NFL stated as far back as October 2008 that "Key Considerations Related to NFL *Labor Situation*" included the "NFL's ability *to use media revenues to fund work stoppage.*" (Ex. 104.) [1] The Lockout Provisions thus became the ██████ of the TV Contract renegotiations. (Ex. 143.) And, Commissioner Goodell testified that he "decided" that the NFL "would not ask for any more money for 2009 or for 2010" or ask "how much more [the broadcasters] would pay if [the NFL] dropped [its] insistence on these work stoppage payment provisions." (Trial Tr. at 667:4-9, 695:18-696:3.) Why? "We did not, *because we did not think it was in the best interest of the NFL.*" (*Id.*) Yet, the Master's Opinion barely mentions this deliberate scheme to gain leverage over and harm the Players. The reason, as demonstrated below, is that the Master accepted Defendants' invitation to rewrite the SSA by eviscerating its Player protections, and thereby found the uncontroverted record of Defendants' improper motive, bad faith, and lack of best efforts to be legally irrelevant.

The Opinion thus avoids any material analysis of the Players' core claim:  that Defendants' undisputed use of the TV Contracts to obtain overwhelming bargaining leverage against and harm the Players, rather than to maximize Total Revenues in 2009 and 2010, constituted a breach of Defendants' SSA pledges. Self-dealing, an intent to

---

[1] Unless otherwise indicated, emphasis is added to quotations, and internal quotations, citations, brackets, and ellipses are omitted. References to "Ex. __" are to admitted joint trial exhibits, filed with the Record in this matter. Excerpts of certain key exhibits and testimony have been filed concurrently herewith and attached to the Declaration of David Greenspan and Appendix to Class Counsel's and the NFLPA's Objection in Part to the Recommendation of the Special Master Regarding Broadcast Revenues.

**EXHIBIT G-10**

injure the Players, and *no* effort to increase TV rights fees for those years, cannot be "good faith" or "best efforts" to maximize revenues during the SSA's term.

To reach his erroneous result, Special Master Burbank committed multiple, legal errors of SSA interpretation: *First*, the Opinion impermissibly concluded that the express "good faith" requirement in Section 1(a), and each of the pledges in Article XIX, Section 6, add *nothing* to the SSA. The Opinion treats these terms as meaningless surplusage and thus violates a cardinal rule of SSA construction. As a consequence of this legal error, the Master disregarded the overwhelming evidence of Defendants' deliberate and admitted plan to opportunistically use the TV Contracts to "shift leverage" to the owners. (Point I.A.)

*Second*, the Opinion improperly concluded that the "sound business judgment" language of Section 1(a) trumps every other SSA promise and pledge, allowing Defendants to, at their unilateral discretion, make *no* effort to maximize Total Revenues during the term of the SSA, and to inflict economic harm on the Players, whenever it is in Defendants' own business interests to do so. Such an interpretation of "sound business judgment" renders Defendants' "best efforts" obligations illusory. *No* effort cannot be a "best effort" as a matter of law. (Point I.B.)

*Third*, the Opinion improperly concluded that the SSA definition of "Total Revenues" somehow excused Defendants from even trying to monetize in 2009 or 2010 the value the NFL instead sought in the form of Lockout Provisions exercisable in 2011 (a *post*-SSA year). As such, the Opinion ignores the testimony of DIRECTV's then-CEO that ████████████████████████████████████

4

**EXHIBIT G-11**

████████████████████████████████████████████

███████████████████████████████ (Point I.C.)

Even with all of these legal errors, the Special Master *still* found that Defendants

breached the SSA in two TV Contract negotiations.  Defendants do not contest the

Opinion's conclusion that they impermissibly "back-loaded" Total Revenues to *post*-SSA

years in renegotiating the ESPN and NBC contracts.  These uncontested violations –

which involved the NFL granting new rights *during* the term of the SSA to receive

Lockout Provisions and other benefits *after* the SSA – can only be effectively remedied

through the requested injunction.  (Point II.A.)  Moreover, that determination necessarily

leads to the conclusion that Defendants committed additional SSA breaches in

renegotiating their TV contracts with FOX and CBS, since both contracts establish as a

matter of law that the NFL granted new rights in 2009/2010 to receive economic benefits

*after* the SSA expires.  (Point II.B.)

Finally, the only effective remedy that can return the parties to the status quo prior

to Defendants' SSA breaches is an injunction precluding Defendants from accessing their

unlawfully obtained $4 billion war chest.  As the guardian of the Class, this Court has the

authority and the duty to grant that relief which is necessary to protect the Players from

the continuing, enormous and incalculable harm caused by Defendants' SSA violations.

(Points I.D and II.)

### STANDARD OF REVIEW

Conclusions of law, including interpretations of the SSA and other legal rulings,

are reviewed *de novo*.  *White v. NFL (Agents)*, 92 F. Supp. 2d 918, 920 (D. Minn. 2000);

**EXHIBIT G-12**

SSA Art. XXII § 2.  Findings of fact are reviewed for clear error, and this Court has held

that "fail[ure] to consider uncontradicted evidence" is "clearly erroneous." *White*

*(Agents)*, 92 F. Supp. 2d at 920, 926.  Similarly, this Court gives no deference to

recommendations of relief if "based upon clearly erroneous findings of fact, incorrect

application of the law, or abuse of discretion." (SSA Art. XXII § 2.) "[M]ixed questions

of law and fact are reviewed *de novo*." *Donaldson Co. v. Burroughs Diesel*, 581 F.3d

726, 731 (8th Cir. 2009).

## ARGUMENT

## I.   THE SPECIAL MASTER'S LEGAL INTERPRETATIONS OF THE NFL'S SSA OBLIGATIONS ARE FUNDAMENTALLY FLAWED

Total Revenues determine, among other things, the Salary Cap, the Rookie Pool,

Minimum Team Salary and Guaranteed League-wide Salary.  (*See* SSA, Art. X, §§ 2-4.)

Indeed, even in Uncapped Years, higher Total Revenues led to higher Player

compensation.[2]  The Players therefore insisted that the SSA contain strict and

extraordinary requirements upon Defendants with respect to their generation of Total

Revenues:

> The NFL and each NFL Team shall in good faith act and use their best
> efforts, consistent with sound business judgment, so as to maximize Total
> Revenues for each playing season during the term of this Agreement.

(Section 1(a).)  The Players further insisted that Defendants:

---

[2] The Master concluded that, of the ███████ in Total Revenues left on the table in
2010 (an Uncapped Year) by virtue of the NFL receiving no payment for ███████
███████████████████████  57.5% of it would have been paid to Players.
(*See* Opinion at 47-48.)

**EXHIBIT G-13**

> [P]ledge their best efforts and cooperation . . . to implement the provisions
> of the Agreement in a manner consistent with good faith and fair dealing.

(SSA, Art. XIX, § 6.)

The meaning of these provisions is plain. With respect to Section 1(a), the NFL

must meet each requirement to satisfy its SSA obligations: "good faith," "best efforts,"

*and* "sound business judgment." Significantly, because the SSA does not last forever and

because Players' careers are precariously short, Defendants' Total Revenue maximization

duties are specifically tied to "the term of this Agreement." The NFL has a clear conflict

of interest in seeking to maximize value for years *after* the SSA expires, but Section 1(a)

does not permit this. Moreover, the term "sound business judgment" in Section 1(a) must

be interpreted in connection with the words with which it appears: "consistent with

sound business judgment, *so as to maximize Total Revenues for each playing season*

*during the term of this Agreement.*" *White v. NFL (Lelie)*, Civ. No. 4-92-906(DSD), 2007

WL 939560, at *3 (D. Minn. Mar. 26, 2007) (applying *noscitur a sociis*). Thus, whatever

self-interested, long-term "business judgments" the NFL might have had for seeking

Lockout Provisions to gain leverage over and harm the Players, this language does not

help Defendants in this proceeding because obtaining Lockout Provisions plainly was not

a "sound business judgment, *so as to maximize Total Revenues* [in 2009 and 2010]."[3]

The Master's Opinion, however, accepted Defendants' invitation to drastically re-

write the SSA and this Court's FCJ, leading to multiple errors of law and to the disregard

---

[3] The restrictions upon NFL conduct in this provision are similar in kind to SSA
provisions that limit the ability of players to push Salary outside of the SSA's term, such
as the 30% Rule which this Court has previously interpreted. *See White v. NFL (30%*
*Rule)*, 899 F. Supp. 410 (D. Minn. 1995).

**EXHIBIT G-14**

of overwhelming and uncontradicted evidence of Defendants' bad faith and SSA breaches.

**A.    The Master Impermissibly Read The NFL's "Good Faith" Obligations Out Of The SSA**

**1.    The Legal Error**

The Master's Opinion erred as a matter of law by conflating Section 1(a)'s "good faith" and "best efforts" obligation into a single "best efforts" obligation.[4] (Opinion at 13.)  It further erred by concluding that Article XIX, Section 6(ii)'s requirement that Defendants use "best efforts and cooperation . . . to implement the provisions of the [SSA] in a manner use consistent with *good faith and fair dealing*" (SSA, Art. XIX, § 6) adds "nothing." (Opinion at 16.)  These SSA interpretations are entitled to no deference.

The Players' "good faith" claim – and Defendants' "good faith" obligations – are *not* the same as the Players' "best efforts" claim or Defendants' "best efforts" obligations. Whether or not Defendants made "best efforts" to maximize Total Revenues in 2009/2010 (they did not), their acting with the intent to use a source of shared SSA revenues to inflict immediate economic and bargaining injury on the Players is a *separate* breach – the breach of good faith.  The Master, however, treated "good faith" in the SSA as meaningless verbiage.  This is a fundamental legal error.  *See, e.g., White v. NFL (Vick)*, 533 F. Supp. 2d 929, 932 (D. Minn. 2008) ("court must give effect and meaning to each term of the contract" and "interpret the contract so as to effectuate, not nullify, its primary purpose").

---

[4] An obligation itself erroneously nullified by the Master's interpretation of "sound business judgment." (*See* Point I.B, *infra*.)

**EXHIBIT G-15**

The Opinion supports this impermissible SSA interpretation on the ground that, first, some courts attempting to define "best efforts" have said it requires more than the good faith implied in every contract, and second, other courts have said one cannot maintain a claim for breach of the *implied* covenant of good faith if it is duplicative of a breach of contract claim. Neither point affords the Master license to disregard the express and stand alone "good faith" requirements agreed to and expressed with care in the SSA, much less ignore the mountains of actionable bad faith evidence.

On the first point, even assuming, *arguendo*, that best efforts imposes on Defendants a "broader" standard of conduct, one could fail to prove a violation of that "broader" standard, but still prove a violation of the very different standard of "good faith."[5]  Indeed, *Ashokan Water Services, Inc. v. New Start, LLC*, on which the Opinion relies, states:

> Good faith connotes an actual state of mind – a state of mind motivated by proper motive. It encompasses, among other things, an honest belief, the absence of malice and the absence of a design to defraud or to seek an unconscionable advantage. The fact that a person could have adopted a more prudent course than the course taken does not prevent him from establishing that the course taken was one taken in good faith.

807 N.Y.S.2d 550, 554 (Civ. Ct. 2006).  Nowhere does the Opinion analyze the claims and uncontroverted evidence on Defendants' state of mind, improper motives, and design to seek an unconscionable advantage. Yet, the SSA language – which the Master was not

---

[5] The Opinion also stated that "any breach of the duty of good faith will also constitute a failure to exert best efforts, although the converse is not true." (Opinion at 13.) This too is erroneous because the Master should have considered whether Defendants breached their duty of good faith (thereby also breaching "best efforts" under the Opinion's theory).

**EXHIBIT G-16**

free to hold superfluous – expressly imposed such "good faith" obligations on Defendants.

On the second point, the Players' good faith claims – both express and, if necessary, implied[6] – are not duplicative of their other contract claims, and, contrary to the Opinion's reasoning, New York courts in fact "have repeatedly affirmed that a claim for breach of the implied covenant of good faith can stand on its own, independent of a breach of contract claim, where a plaintiff alleges that a defendant has exercised its rights under the contract in bad faith in order to deprive the other party of the fruit of its bargain." *Silvermark Corp. v. Rosenthal & Rosenthal*, No. 602026/07, 2008 WL 283187, at *3 (N.Y. Sup. Ct. Jan. 25, 2008) (collecting cases).[7] As the court in *Gross v. Empire Healthchoice Assurance* explained:

> [T]he oft-cited rule that a claim for breach of an implied duty of good faith and fair dealing cannot stand alone if it only substitutes for a nonviable breach of contract claim . . . does not bar plaintiffs' good faith claim, where plaintiffs have alleged that defendants acted in bad faith as part of scheme to deny them of the benefit of their bargain. . . .  [The court in *Richbell Information Services v. Jupiter Partners*, 765 N.Y.S.2d 575 (App. Div. 2003)] upheld the plaintiffs'

---

[6] The implied covenant in every New York contract (*Outback/Empire I Ltd. P'Ship v. Kamitis, Inc.*, 825 N.Y.S.2d 747 (App. Div. 2006)) supplies an alternate/additional basis to grant the Players the full award of relief requested. *If* Defendants' *express* "good faith" obligations somehow do not limit Defendants' ability to engage in a deliberate scheme to used shared SSA revenues to inflict harm on the Players, the implied covenant of good faith and fair dealing necessarily does.

[7] *See also, e.g., Vivir v. Ehrenkranz*, No. 09-43523, 2010 WL 4551482 (N.Y. Sup. Ct. Oct. 14, 2010); *Dialcom, LLC v. AT&T Corp.*, No. 12026/03, 2008 WL 2581876, at *10 (N.Y. Sup. Ct. Jun. 17, 2008) ("[d]efendants' actions were designed to deprive [plaintiff] of the benefits of the [contract] and frustrated his rights and reasonable expectations to receive such benefits under the [contract].  Therefore, while plaintiff's [implied claim] and its breach of contract claims involve some overlap, they consist of distinct, non-duplicative, independent claims.").

**EXHIBIT G-17**

cause of action for breach of implied covenant of good faith and fair dealing, alleging that the defendant had exercised its contractual right malevolently, for its own gain, as part of a purposeful scheme designed to deprive the plaintiffs of the benefits of their contract. Such a claim 'do[es] not create new duties that negate the [party]'s explicit rights under a contract, but rather, seek[s] imposition of an entirely proper duty to eschew this type of bad faith targeted malevolence in the guise of business dealings.' [*Id* at 587.] In such circumstances, the claim for breach of an implied duty of good faith and fair dealing does not depend on a breach of the contract; therefore, a plaintiff may bring such a claim, whether or not there is a viable breach of contract claim.

No. 602848-2005, 2007 WL 2066390, at *4-5 (N.Y. Sup. Ct. Jul. 18, 2007). Here, the Players' position is even stronger due to express covenants that cannot be read out of the SSA.

The fundamental point is that, regardless of other contract provisions, Defendants cannot use the TV Contracts – the principal source of shared SSA revenues – to deliberately harm the Players' interests. The undisputed evidence shows this is exactly what Defendants did. Indeed, the NFL even claimed that its desire to exert leverage over the Players, *i.e.*, harm the Players, was a justification for its behavior. (Trial Tr. 203:11-21 (NFL Opening Statement), discussed in Point I.B, *infra*.)

The covenant of good faith affords the Players a "right to receive the fruits" and "benefit[s]" of the SSA. *1-10 Indus. Assocs. v. Trim Corp. of Am.*, 747 N.Y.S.2d 29, 31 (App. Div. 2002). That right "encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included in the agreement." *Id*. Through the SSA, the Players subjected themselves to a Salary Cap system that artificially restrained their compensation. A critical *quid pro quo* of their agreement to do so was Defendants' agreement to act in "good faith" (and use "best

H

**EXHIBIT G-18**

efforts") to maximize Total Revenues during the term of the SSA.  It is therefore reasonable and justifiable that the Players understood and expected that Defendants were promising in the SSA not to forego Total Revenues to purchase a labor weapon for Defendants' sole benefit to use as leverage against the Players both during and after the term of the SSA.  Indeed, the Master himself found that one of Defendants' objectives when negotiating these TV Contracts was to *"shift[] leverage away from the players during a potential lockout."*  (Opinion, FOF ¶ 7.)[8]

Defendants' promises of good faith "prohibit" them "from doing anything which will have the effect of . . . injuring the right of the [Players] to receive the fruits of the" SSA. *1-10 Indus.*, 747 N.Y.S.2d at 31.  It "forbid[s] the kinds of opportunistic behavior" enabled by the parties entering into "a mutually dependent, cooperative relationship," *i.e.,* a pledge "not to take opportunistic advantage" of the counterparty. *Knudsen v. Lax*, 842 N.Y.S.2d 341, 348 (Cty. Ct. 2007).  Defendants had a duty to not take steps to deprive the Players of the benefits of the SSA; nor to take an opportunistic advantage over the Players; nor to harm, injure, subvert, frustrate, threaten, thwart, or undermine a fundamental goal of the SSA or the Players' bargain or interests under the SSA. *See 511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500-01 (N.Y. 2002) (good faith prohibits "defeat[ing] the purpose of the contract" or "subvert[ing]" or

---

[8] The Players do not dispute that the owners could take steps to prepare for the expiration of the SSA that are unrelated to their "good faith" and "best efforts" obligations to maximize Total Revenues during the term of the SSA.  In this case, however, Defendants chose to forsake their SSA obligations and to prepare for a lockout at the expense of the Players' SSA rights.

**EXHIBIT G-19**

"undermin[ing] a fundamental objective" of the contract).[9]

## 2.    The Disregarded and Undisputed Evidence of Bad Faith

Because the Master improperly read the SSA's "good faith" requirements out of existence, his Opinion completely disregarded the mountain of uncontroverted evidence which established Defendants' "bad faith" plan to use the principal source of shared revenues to immediately gain bargaining leverage against, and inflict severe injury upon, the Players. What follows is a mere sampling of that uncontradicted evidence:

On May 20, 2008 Defendants terminated the SSA and CBA two years early, complaining that these agreements were "simply . . . not working" because, "as interpreted by the courts," they had caused "simply irrational and unfair" results. (Ex. 77.) Defendants concluded that "in order for [them] to be able to get a [new labor] deal that worked for the owners, [they] need to be able to sustain a lockout, which requires financing and requires proper planning." (Noto Tr. at 140:13-22; *see also* Trial Tr. at 640:6-645:16 (Goodell).) In the words of Dallas Cowboys' owner Jerry Jones, Defendants "need[ed] to realistically assume [they we]re locking out in 2011" to get a CBA that worked for them. (Ex. 221 at 00003887; *see also* Trial Tr. at 724:14-725:13

---

[9] *See also, e.g., Richmond Shop Smart Inc. v. Kenbar Dev. Ctr., LLC*, 820 N.Y.S.2d 124, 125 (App. Div. 2006) (prohibits "frustrat[ing] . . . rights and reasonable expectations"); *Gray & Assocs., LLC v. Speltz & Weis LLC*, No. 150446/2007, 2009 WL 416138 (N.Y. Sup. Ct. Feb. 2, 2009) (prohibits using "revenue stream" to "facilitate" promisors' own interests and "put their interests above [promisee's] interests"); *Gross*, 2007 WL 2066390, at *4 (prohibits exercising "contractual right malevolently, for its own gain, as part of a purposeful scheme designed to deprive the plaintiffs of the benefits of their contract"); *CAMOFI Master LDC v. Coll. P'ship, Inc.*, 452 F. Supp. 2d 462, 478 (S.D.N.Y. 2006) (prohibits "threaten[ing counterparty], directly and through third parties, with financial harm" and to "tak[e it] down").

**EXHIBIT G-20**

(Goodell); *id.* at 771:3-7 (Rolapp).)

However, Defendants also concluded, as reflected in a memorandum on the very day they opted out (Ex. 76) and in many documents thereafter, that since the CBS, FOX and NBC contracts had 2012 expirations, those contracts "prevent[ed the] NFL from collecting payments if [a] work stoppage [occurred] in 2011" since there was "no deal in 2012 for [a] 'rebate'." (Ex. 228 at 00065812; *see also, e.g.,* Ex. 176 at 00004308.) Further, the DIRECTV contract had no work stoppage provisions and expired in 2011, and, while the ESPN contract ran to 2014, it ███████████████████████████████ ███████████████████████████████████████████████████████ (Noto Tr. at 178:10-181:6.)

Defendants thus created and executed a deliberate plan to harm the Players by renegotiating their TV Contracts, during the SSA's term, to achieve their admitted purpose of using the TV Contracts to gain immediate leverage over the Players in bargaining by securing $4 billion in funding for a 2011 lockout, rather than to maximize revenues in 2009/2010. (*See, e.g.,* Opinion, FOF ¶ 7.) In the words of DIRECTV's then-CEO Chase Carey, the Lockout Provisions ████████████████████████ ██████████ (Opinion, FOF ¶ 86), and in the words of the NFL, the omission of Lockout Provisions would have been a "deal breaker" and "clearly a deal we would never do." (Ex. 163.)

Defendants' undisputed objective in using the TV Contracts to obtain leverage against the Class, as opposed to maximizing revenues during the term of the SSA, is stated in numerous NFL documents:

**EXHIBIT G-21**

- Over the summer of 2008, they stated a "key consideration" for the TV Contract negotiations was the "NFL strategic concerns" regarding a "CBA" (Ex. 94 at 00061942) and a "rationale" for an early DIRECTV extension was "lock[ing] in rights fee with favorable work stoppage provisions" (Ex. 85 at 00004488) as the "solution" for "guaranteed payments in NFL work stoppage" (Ex. 98 at 00062684-86).[10]

- In October 2008, they stated that *"Key Considerations Related to NFL Labor Situation"* included the *"NFL's ability to use media revenues to fund work stoppage."* (Ex. 104 at 00062872; *see also* Ex. 102 at 00004675, 86, 94.)[11]

- In February 2009, an NFL memorandum to the owners on Defendants' broadcast, finance and labor committees stated, in preparation for an unusual joint meeting of these three Committees: "The specific *goals* under consideration relating to the timing for key decisions include" – *"Securing revenue streams that will provide the necessary financial flexibility to remain committed to the **right** long-term labor agreement."* (Ex. 119 at 00004591.)

- On March 5, 2009, the presentation at the joint meeting of those committees stated that a key factor for Defendants' negotiation decision making was their "Cash Needs During Lockout" and indicated, in their Decision Tree, that the only reason for going forward with the new TV Contracts "Now" was because "Deal Completion Advance[s] CBA Negotiating Dynamics":

---

[10] This section contains only a very small sample of the record support for each point; for the Court's reference, the Players' Proposed Finding of Fact, dated January 19, 2011, is a complete guide to the uncontradicted record evidence.

[11] As further evidence of their bad faith, Defendants even discussed in strategy sessions that it might be better for them if they *lowered* or *avoided* revenues because too much TV Contract money could "embolden NFLPA's $$$ demands" in bargaining. (Ex. 104 at 00062872; *see also, e.g.*, Noto Tr. at 39:19-25; Schroeder Tr. at 36:24-37:5; Ex. 140 at 0003167.)

**EXHIBIT G-22**



(Ex. 131 at 00060303; *see also id.* at 00060284-90, 305-06.)

- On the same day, Defendants' Broadcast Committee also met and the presentation at that meeting stated a *"Key Current NFL Media Objective"* was *"Greater Leverage In Upcoming Labor Negotiations"*[12]:



(Ex. 228 at 00065813.)  Further, a planning slide for that meeting stated a *"rationale"* for Defendants to pursue the short-term (two-year) CBS and FOX extensions was:  *"Shifts leverage in labor negotiations away from Union . . .*

---

12 ████████████████████████████████████████████████████ "Media Objectives"; it is silent about maximizing revenues in the short term, *i.e.*, 2009 and 2010, the then-remaining years of the SSA.

**EXHIBIT G-23**

*ability to pull money into a Work Stoppage year*," and not a SSA year:



(Ex. 228 at 00065841; *see also id.* at 00065870, 83.)

- On March 22, 2009, the Broadcast Committee met to approve the DIRECTV extension reached several days earlier and to consider and justify their pursuit of other extensions. On the latter, a planning slide for that meeting stated that a "*rationale*" for negotiating short-term CBS, FOX, and NBC extensions was "*labor*" – including: "*Leverage in negotiations . . . no 'hold-up' value for union*":



(Ex. 141 at 00063787; *see also id.* at 00063778, 785-86, 93.) Further, the presentation at that committee meeting justified pursuit of extensions by stating, from the "NFL Perspective," they would provide a "*Strengthened*

**EXHIBIT G-24**

*position in labor negotiations*":



(Ex. 142 at 00063885.)

Defendants, moreover, executed their plan to secure lockout funding by renegotiating TV Contracts to pay Defendants, and only Defendants, if Defendants decide to lock out in 2011 in order to cause injury to the Players in their labor negotiations:

- On March 23, 2009, the owners voted 32-0 to approve the DIRECTV extension, and the presentation for that vote stated that "DTV pays NFL up to ███████ for cancelled season" (which is more than the "██████ if the 2011 season is *not* cancelled)[13] and that a "*Rationale*" was "*[s]trengthened position in labor negotiations*." (Ex. 211 at 00065275, 78; Ex. 145 at 00007581-85.)

- On May 19, 2009, the owners unanimously approved the CBS/FOX extensions, following April-May negotiations, securing ████ and ████ million, respectively, for a 2011 lockout;[14] and the presentation for that vote stated that

---

[13] $ ████ million of which is 100% *non*-refundable and the remaining $ ████ million is an interest-free loan. (*See, e.g.*, Exs. 133, 138; Bornstein Tr. at 153:14-25.)

███ ████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
████████████████████████████████████████████

Defendants' *"objective" of "labor positioning" was "achieved" by "NFL receiv[ing] financial flexibility in the event of potential work stoppage"*:



(Ex. 201 at 00004268-69, 71-73, 76; *see also id.* at 00004266, 70; Ex. 202 at 00007622-27; Exs. 193, 198.)

- On August 19, 2009, the owners voted 32-0 to approve the NBC extension, following May-August negotiations, giving NBC, *inter alia*, ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**EXHIBIT G-26**

█████ and securing $████ million for a 2011 lockout; the presentation for that vote reflected Commissioner Goodell's directions to emphasize: "*Allows NFL to focus on obtaining a fair CBA*" that works for the owners. (Ex. 240 at 00066265; *see also id.* at 00066262-64, 66; Ex. 238 at 00007650, 53; Ex. 234; Schroeder Tr. 52:16-53:21.)

- On March 23, 2010, Defendants amended the Monday Night Football broadcast agreement with ESPN to provide for a $████ million lockout "loan" and also to amend language that eliminated a perceived risk of █████████████ ███████████████████████████████████ (*See, e.g.*, Exs. 283, 284, 329; Noto Tr. at 178:10-181:6.) Defendants simultaneously entered into a Digital & International Rights Agreement with ESPN, "linked" to the broadcast Amendment, that provided for an *additional* ████████████████████████████ in the event of a lockout. (*Id.*)

- On April 1, 2010, Defendants entered into a Sponsorship Agreement with Verizon Wireless that similarly provided for ███████████████████ ███████ during a lockout. (Ex. 335 at 00082398-99; Opinion, FOF ¶ 230.)

All told, Defendants secured a more than $4 billion commitment from its TV Partners during the term of the SSA – either through significantly below-market interest "loans" or outright guaranteed payments without any games – to create a lockout fund to harm the Players in bargaining:



And, when the Players inquired about the Lockout Provisions in the TV Contracts

**EXHIBIT G-27**

(after public reports about them), the NFL further evidenced bad faith by misleading the

Players, telling them in a letter from NFL General Counsel Jeffrey Pash that the "terms of

the amended contracts . . . are no different" than those in place in prior agreements "for

decades." (Ex. 349.)  In truth, the NFL knew that its new Lockout Provisions were

"materially different" than those in prior contracts.  (Bornstein Tr. at 168:21-25 (Rule

30(b)(6) representative).)

       Considered under the correct interpretation of Defendants' "good faith" SSA

obligations, the uncontradicted evidence conclusively establishes that Defendants "acted

in bad faith to thwart" the Players' rights under the SSA and "depriv[ed]" them "of an

intended benefit of the" SSA (the NFL's "good faith" efforts to maximize Total

Revenues as a *quid pro quo* for the Players' agreement to a Salary Cap system). *1-10*

*Indus.*, 747 N.Y.S.2d at 31.  Because the Master erroneously read the express "good

faith" language of the SSA to be superfluous, he simply ignored – and did not even

discuss – the undisputed evidence which established Defendants' admitted plan to forego

revenue maximization during the SSA term in favor of using their TV Contracts to

support a sustainable lockout of the Players (Noto Tr. at 140:13-22), which would in turn

be used as a "weapon" against the Players (Bornstein Tr. at 94:17-24) in order to

restructure NFL economics against the Players and in favor of the owners.  (Trial Tr. at

1104:22-1105:3 (NFL expert Pilson).)  It follows, and is undisputed, that the "lockout

payment provisions *are to the disadvantage of the players*," (*id.* at 1088:5-7), and served

their purpose as such from the moment the Lockout Provisions were secured.  (*Id.* at

1091:8-23; Rolapp Tr. at 8:19-9:7; 77:9-17; Bornstein Tr. at 94:17-24.)

**EXHIBIT G-28**

This Court should not adopt the Master's legal errors but instead apply the "good faith" provisions to find that the NFL's plan to injure the Players through the TV Contracts, at the expense of maximizing Total Revenues during the term of the SSA, was a clear SSA violation pervading *all of* the contracts in which Lockout Provisions were obtained (DIRECTV, FOX, CBS, NBC, ESPN, ESPN Digital & International Rights and Verizon Wireless).

**B.    The Master's Erroneous Interpretation Of "Sound Business Judgment" Negated Defendants' "Best Efforts" Obligations**

**1.    The Legal Error**

The Opinion correctly articulated the basic "best efforts" standard:

> Under New York law, a best efforts clause requires a party to work towards the contract's object to the extent of its *total capabilities*. *Bloor v. Falstaff Corp.*, 454 F. Supp. 258, 266-67 (S.D.N.Y. 1978). Total capabilities encompasses a promisor's financial resources as well as its expertise and experience. *Id.* Whether a party has exerted best efforts 'necessarily takes its meaning from the circumstances' of the case. *Perma Research & Dev. Co. v. Singer Co.*, 308 F. Supp. 743, 748 (S.D.N.Y. 1970).

(Opinion at 12.)[15] However the Master then negated his own statement of the law by adopting an interpretation of "sound business judgment" that eviscerated Defendants' "best efforts" obligations. According to the Opinion, the words "sound business judgment" "grant[ed] the [Defendants] discretion in determining how to use [] best efforts" (Opinion at 15), permitted Defendants to "consider its long-term interests" as

---

[15] The Opinion, however, was incorrect to suggest that "best efforts" is a "subjective" standard, to the extent the Master was suggesting that a party's "best efforts" are measured through the eyes of the actor itself. (Opinion at 12.) A party's efforts are not measured by whether it believes it has engaged in best efforts, but whether – based on the party's "total capabilities" and circumstances of the case – it has done so. *Bloor*, 454 F. Supp. at 266-67.

**EXHIBIT G-29**

long as Defendants do not "disregard or nullify [their] short-term obligations," and function as a "qualification" on Defendants' "best efforts" (and "good faith") obligations. (*Id.* at 14-15.) The Master's erroneous interpretation of the SSA language improperly granted Defendants *carte blanche* to inflict economic harm on the Players, rather than honor their SSA obligations, whenever Defendants conclude that the infliction of such harm serves *their own* business interests.

In a nutshell, Defendants' contention – adopted wholesale by the Master's recommendation – is that their desire to gain greater leverage over (and harm) the Players through the acquisition of a $4 billion war chest was a more "important business purpose" than maximizing Total Revenues for the benefit of the Players in 2009 and 2010, and therefore this purely self-interested objective justified Defendants' decision not to fulfill their "best efforts" or "good faith" SSA obligations. As Defendants said in their opening statement at trial:

> The union cannot prove and has not made a serious effort to argue that any telecasters . . . would have paid the League enough in incremental dollars in 2009 or 2010 *to reach a point where sound business judgment would have warranted the League's forfeiting and foregoing **the work stoppage provisions, which served an important business purpose.***

(Trial Tr. 203:11-21; *see also* NFL Pre-Hearing Br. at 16-17 ("As an initial matter, giving up the work stoppage provisions would have aggravated – not diminished – the risk of a covenant default. It would be impossible to reconcile taking on such a risk – *even if it resulted in a modest increase in revenues and even if a portion of such revenues were properly allocable to TR for 2009 and 2010* – with the notion of sound business judgment.").)

**EXHIBIT G-30**

The Master's adoption of the NFL's interpretation of "sound business judgment" –
and the resulting wholesale failure to consider Defendants' conceded intention to injure
the Players – cannot be reconciled with the SSA language or New York law.  Indeed,
whether one (correctly) views "sound business judgment" as Defendants' *obligation*, or
(incorrectly) as a *limitation* on Defendants' obligations, the result is the same:  "sound
business judgment" cannot justify or excuse Defendants' conduct.  The Opinion erred as
a matter of law in concluding otherwise.

To begin with, pursuant to *noscitur a sociis*, "sound business judgment" must be
interpreted with the words with which it appears:  "consistent with sound business
judgment, *so as to maximize Total Revenues for each playing season during the term of
this Agreement.*"  *White (Lelie)*, 2007 WL 939560, at *3.  Here, however, the NFL's self-
interested, long-term "business judgment" for seeking Lockout Provisions to use against
the Players plainly was not a "sound business judgment, *so as to maximize Total
Revenues* [in 2009 and 2010]."  *Id.*  In fact, it was just the opposite – *i.e.*, conduct that left
Total Revenues on the table in 2009/2010 and was designed to harm the Players.

Moreover, under the Opinion's illogical interpretation of the SSA language,
Defendants' *post-hoc* invocation of "business judgment" controls:  they are permitted to
inflict harm and forego using best efforts to maximize Total Revenues during the term of
the SSA if they come up with a business justification to do so.  According to the NFL,
harming the Players is such a justification.  Adopting the Master's recommendation
would effectively mean that the Players, in agreeing to the SSA, and this Court, in
entering the FCJ, agreed that under the banner of "sound business judgment" Defendants

**EXHIBIT G-31**

could ignore all of their other SSA obligations to use best efforts and act in good faith to

maximize Total Revenues during the term of the SSA, to harm the Players. Such an

interpretation leads to an "absurd and commercially unreasonable" result that is not

legally sustainable. *In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 562 (App. Div.

2003).[16]

Correctly interpreted, "sound business judgment" is an independent obligation on

Defendants, just like "good faith" and "best efforts." The term means what it says:

Defendants promised to avoid *un*sound business judgments that could not reasonably be

expected to maximize Total Revenues during the term of the SSA. Thus, if Defendants

first satisfy their "good faith" and "best efforts" duties (here, they did not), then "sound

business judgments" to enter into, *e.g.*, licensing agreements with Reebok rather than

Nike, could not be further challenged. In other words, Defendants are not subject to

Monday morning quarterbacking for failing to in fact maximize Total Revenues during

the term of the SSA, so long as they made "best efforts," in "good faith," "consistent with

sound business judgment, so as" to try to do so.

---

[16] Defendants argued below that Section 1(a) is similar to the contract provision at issue
in *Mylan Pharmaceuticals, Inc. v. American Cyanmide Co.*, Nos. 94-1502, 94-1472, 1995
WL 86437 (4th Cir. 1995). (*See* NFL Pre-Hearing Br. at 24-25.) But it is the
*dis*similarity between these provisions that is most probative. In *Mylan*, the contract
specified that the defendant could act "consistent with *its overall* business objectives."
*Id.* at *6. Here, by contrast, Section 1(a) requires the NFL to use "sound business
judgment, so as to maximize Total Revenues for each playing season during the term of
this Agreement." (SSA, Art. X, § 1(a).) The parties to the SSA could have included a
provision, like in *Mylan*, permitting the NFL to consider "*its*" "*overall*" business
objectives – but they did not.

**EXHIBIT G-32**

But, even if, under the Master's interpretation, "sound business judgment" is read as a "qualification" on Defendants' "best efforts" and "good faith" obligations, the Opinion's conclusions are erroneous. "[S]ound business judgment" cannot possibly mean that Defendants' conduct is beyond scrutiny so long as it is premised on their own formulation of a self-serving "business judgment" to forsake SSA obligations and inflict economic harm on the Players. (Opinion at 10-11.) In addition to the plain SSA language, New York law compels this result. *See Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570 (2d Cir. 1994) (rejecting business judgment defense because defendant's conduct was entirely self-interested and not in good faith); *In re Croton River Club, Inc.*, 52 F.3d 41 (2d Cir. 1995) (even the business judgment rule applicable to directors of a public corporation does not protect bad faith conduct).

Two additional aspects of the Master's erroneous interpretation bear emphasis. First, the NFL's desire ▮▮▮▮▮ during a lockout is not a "sound business" justification for its decision to make *no* efforts to increase TV rights fees in 2009 or 2010 and injure the Players. According to Defendants, they were motivated by the fact that if they locked out the Players they would be ▮▮▮▮▮ requiring the NFL to ▮▮▮▮▮ In other words, the NFL's *self-interested lockout plan to harm the Players* would be jeopardized by the NFL's *self-interested and self-inflicted* ▮▮▮▮▮ unless the NFL took action. Instead of ▮▮▮▮▮ on the NFL's own dime, however, Defendants used the principal source of shared Total Revenues, and violated their obligations to use best efforts to maximize those revenues

26

**EXHIBIT G-33**

during the term of the SSA, to fix their self-inflicted problem. This conduct had nothing to do with "sound business judgment, *so as to* maximize Total Revenues [in 2009 and 2010]" and cannot excuse the NFL's SSA breaches.

Second, the Opinion correctly recited case law that a party under a "best efforts" obligation may give *some* practical consideration to its own interests, but that it "may not privilege its own interests without fair consideration of the effect on the promisee," and that "a claim that a party exercised good faith business judgment will fail where the evidence establishes that the party in fact acted from an improper motive." (Opinion at 13.) When *applying* these legal principles, however, the Master erred as a matter of law by granting Defendants' virtually unbounded discretion to consider their own self-interest as a basis for deciding not to make any effort – let alone a best effort – to seek additional revenues during the term of the SSA instead of Lockout Provisions: "the NFL may consider its long-term interests, as long as it does not thereby *disregard or nullify* its short-term obligations under Article X, section 1." (*Id.* at 15.) But the law does not sanction Defendants' prioritizing their own long-term financial well-being, even to the manifest harm of the Players, so long as they do not *completely abandon all* efforts to maximize Total Revenues during the SSA's term.

New York law does not come close to affording Defendants such extraordinary leeway. In *Bloor*, cited by the Opinion, the court rejected the notion that it was enough for a defendant required to exercise "best efforts" to treat a plaintiff's brand "as well as its own." *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614 (2d Cir. 1979). Similarly, in *District Lodge 26 v. United Technologies*, 689 F. Supp. 2d 219 (D. Conn. 2010)

**EXHIBIT G-34**

("*District Lodge I*") (Connecticut law), a case relied upon by the NFL and the Master, the

court rejected a defense based on the long-term business interests of a defendant who had

agreed to preserve jobs during the short term of a CBA, even though the contract

*expressly permitted* the defendant to give "reasonable consideration" to its *own* interests

(the SSA says no such thing):

> To the extent that [defendant] advances an interpretation of [the agreement] that would allow it to consider its long-term interests without any limit, that interpretation is unsupported by the language. [Defendant's] interpretation would do nothing less than render [the agreement's] workplace promises illusory. If [defendant] could consider its long-term interests without any regard for its short-term, [agreement] obligations, [defendant] could circumvent [the agreement's] limitations on its authority to transfer bargaining unit work merely by formulating a business case that promised recurring savings far into the future, and demanding that [the union] find savings for an equivalently long duration.

*Id. See also Dist. Lodge 26 v. United Techs.*, 610 F.3d 44, 51-52 (2d Cir. 2010) ("*District

Lodge II*") ("Each party fully exercises its business judgment by voluntarily entering into

an agreement, thereby surrendering, to some extent, its free exercise thereafter . . . [and

thus] Defendants cannot, then, by invoking the business judgment rule, effectively

insulate from review whether it engaged in good faith.").

Applying these legal principles to the "best efforts" requirements of the SSA, it

becomes clear, based upon the undisputed facts set forth below, that the Master

committed legal error by not finding that each of the NFL's renegotiated TV Contracts

violated its SSA obligations.

**EXHIBIT G-35**

**2.    The Undisputed Evidence of the NFL's Decision to Make _No_ Effort to Increase TV Rights Fees in 2009 and 2010**

There is no dispute that Defendants made a strategic choice not to even try to increase TV rights fees in 2009 or 2010.  As Commissioner Goodell testified:

> Q.    You decided at that moment in time that you would not ask for any more money for 2009 or for 2010.
>
> A.    That is correct.
>
> Q.    You decided that.
>
> A.    That is correct.
>
> *     *     *
>
> Q.  And similarly, you didn't ask FOX or any of the other broadcasters how much more they would pay if you dropped your insistence on these work stoppage payment provisions?
>
> A.  We did not, because we did not think it was in the best interest of the NFL.
>
> SPECIAL MASTER BURBANK:  I'm sorry, I didn't hear that.
>
> THE WITNESS:  _We did not think it was in the best interest of the NFL._

(Trial Tr. at 667:4-9, 695:18-696:3.)

In fact, oblivious to their SSA obligations, the NFL's lead negotiators – Messrs. Bornstein and Rolapp – testified that they had _no objective_ to maximize Total Revenues in 2009 or 2010 as opposed to any other year:

> Q.    There was no specific objective here to maximize revenues in 2009 and '10, short term; right?
>
> A.    No, those contracts were already locked.
>
> *     *     *
>
> Q.    But you had no objective to try to ask the network for more cash in –
>
> A.    No, CBS, FOX, no.
>
> Q.    Or NBC?

29

**EXHIBIT G-36**

A.     Or NBC or DIRECTV.

          *          *          *

Q.     [D]id you have any understanding that there was any reason at all why you should think about, Can I get more revenue in '9 and '10, as opposed to future years?  Did that ever occur to you at all?

A.     No.  I focused on measuring value.

(Bornstein Tr. at 128:16-20, 140:19-141:11, Trial Tr. at 799:5-800:5 (Rolapp).)[17]

The following presentation slide for the May 19, 2009 owners' meeting epitomizes

the NFL's strategy:  in the *short-term* (during the SSA), the NFL's objective was "labor,"

whereas only in the *long-term* (after the SSA expired) was "Maximize revenue" a goal:



(Ex. 201 at 00004273; *see also* Rolapp Tr. at 234:23-236:15.)

The Master nevertheless side-stepped this undisputed evidence by adopting the

NFL's erroneous legal position that the "best efforts" obligations did not require it to

---

[17] Nor was this surprising, as the lead NFL TV Contract negotiators (Bornstein and Rolapp), and the chair of its Broadcast Committee, New England Patriots owner Robert Kraft, testified that they had *no knowledge* of their SSA duties. (Bornstein Tr. 279:15-280:17; Rolapp Tr. 101:18-103:7; Kraft Tr. at 23:24-27:24, 34:7-17.)

**EXHIBIT G-37**

even *ask* for increased rights fees for 2009 or 2010 because of "the poor market conditions at the time" and "the networks' financial difficulties." (NFL Pre-Hearing Br. at 2; Trial Tr. at 202:16-203:4 (NFL Opening Statement).) But what the NFL cannot explain, and what the Opinion does not address, is why best efforts did not require at least *some* effort. Moreover, the Opinion does not explain why it would have been so harmful to the NFL's business interests merely to *ask* for an increase in rights fees during 2009 and 2010 when the TV Contracts were renegotiated when it was apparently not harmful at all for the NFL to renegotiate an existing contract year – 2011 – to provide for the new and costly Lockout Provisions.

The Master "finds it difficult to believe" that the SSA would require an "unvarnished duty to maximize Total Revenues" such that Defendants would have a duty to "constantly badger" its TV Partners for more money, with respect to rights "already under contract," "without offering anything in return." (Opinion at 15.) The Master missed the point. This case is not about whether Defendants have an obligation to continuously hector its TV Partners for more money, even after a deal is done. It is about how Defendants should conduct themselves when they do decide, during the SSA, to exchange economic value with their TV Partners – whether it is in the context of a deal already in place, or a new deal.

Defendants *in fact* opened up the TV Contracts in 2009/2010 to obtain new rights, including most prominently the valuable Lockout Provisions that were the reason why they sought to re-open those contracts in the first place. Indeed, *Defendants' motivation* for setting out to renegotiate those deals, and *Defendants' conduct* in connection with

**EXHIBIT G-38**

those negotiations, gave rise to the claims herein.  Defendants have an obligation use "best efforts," in "good faith," to maximize SSA revenues for the Players' benefit when they negotiate during the term of the SSA.  Engaging in a series of economic transactions in which – notwithstanding the indisputable opportunity to attempt to obtain additional revenues to share with the Players – Defendants instead bargained for assets designed to harm the Players, has *everything* to do with bad faith and a failure to exercise "best efforts" for the benefit of the Players, and *nothing* to do with whether Defendants have a general obligation to "constantly badger" their TV Partners to pay more while offering nothing in return.

As a matter of law, *no* effort cannot be a "best effort." *Imprimis Invs. LLC v. Indus. Imaging Corp.*, QDS 22701503, 2008 N.Y. Misc. LEXIS 7384, at *10 (Sup. Ct. Sept. 7, 2008) (holding that no "effort at all to comply with defendant's obligation" was a failure to use "best efforts" as a matter of law").

**C.    The Special Master's Incorrect Interpretation Of "Total Revenues" Confuses Defendants' Choice To Seek Lockout Protection Instead Of Increased Revenues <u>During The Term Of The SSA With "Front-Loading"</u>**

Defendants do not seriously dispute that they could have generated greater Total Revenues in 2009/2010 if they had not insisted upon using the TV Contracts to purchase the Lockout Provisions.  Indeed, it should be self-evident that the TV Partners – who are not in the business of issuing loans – would have paid some amount of incremental dollars in 2009 or 2010 to eliminate the enormous risk of collectively loaning Defendants $4 billion in a season with no NFL games to televise.  This is especially true

**EXHIBIT G-39**

considering that part of the Lockout Provision money is *never* repaid,[18] and the portion

that *is* repaid is done so at below market interest rates at a time of the NFL's choosing.

(*Id.* ¶¶ 71, 72, 126, 190-91, 214-15.) [19]  Further, the Master himself found that obtaining

such "[f]inancing from other sources would also have been enormously costly to the

League, potentially costing hundreds of millions of dollars." (*Id.* ¶ 21.)

      DIRECTV's CEO at the time, Chase Carey, testified that ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

(Trial Tr. at 408:21-410:13.)  This testimony should have been dispositive as to the

NFL's SSA breaches vis-à-vis the DIRECTV contract, but the Master improperly

concluded, as a matter of law, that the NFL had no obligation to make *any* effort to

monetize the Lockout Provisions during the SSA's term, and the Opinion therefore

ignores this testimony that DIRECTV would have ██████████████████████

---

[18] The NFL's Lockout Provisions include a $██ million *non*-refundable payment from
DIRECTV, $██ million in *non*-refundable payments (the full amount) from the ████
████████████████████ and $████████ in *non*-refundable payments
from████████████ in the event of a lockout. (*See* Trial Exs. 138 at 00001717 (2009
DIRECTV contract), 331 at 00001766 (2010 ESPN Digital & International rights
agreement), (Ex. 335 at 00082398-99 (Verizon Wireless contract), Opinion, FOF ¶ 230.)

[19] (*See also* Trial Exs. 138 (2009 DIRECTV contract), 231 (2009 NBC contract), 257
(2009 CBS contract), 263 (2009 FOX contract), 331 (2010 ESPN Digital/International
rights agreement), 332 (2010 ESPN work stoppage amendment); *see also* Schulte Direct
Decl. at 7-8 (NFLPA expert testifying that the interest subsidy provided by the
broadcasters – when comparing their own borrowing rates to the ████████ and
████████ interest rates they would charge the NFL – amounted to a ████████
████████

**EXHIBIT G-40**

███████████████   *Id.*

Mr. Carey's testimony is not at all surprising.  The 2009 DIRECTV contract is perhaps the most egregious example of the NFL's disregard for its SSA obligations.  In addition to negotiating for a $██ million non-refundable lockout payment (*supra*), the NFL structured the DIRECTV contract ████████████████████████████ ████████████████████ (Trial Tr. 441:14-442:24; Trial Ex. 138 at 00001717-18, 00001722-23.)  Moreover the NFL pays ██ interest on the up to $██ million that the NFL can borrow in the event of a lockout.  (*See* Trial Tr. 442:6-20; Trial Ex. 138 at 00001717-18.)

The Opinion nevertheless rubber stamps this NFL choice to seek Lockout Provisions instead of higher Total Revenues in 2009 and 2010 by making the erroneous legal conclusion that because the Lockout Provisions would not pay out until 2011, "they are not subject to the duty to maximize."  (Opinion, COL at 16.)  Just a few sentences later, however, the Master correctly recognizes that *if* "the NFL had traded the [Lockout Provisions] that it sought, which are applicable in 2011 and beyond, for additional cash in 2009 or 2010, *the money received would have been treated as Total Revenues for these years.*"  (*Id.*)

This is a critical – and uncontested – point:  the Lockout Provisions, designed to *injure* the Players, were obtained at the expense of Total Revenues in 2009 and 2010 that would have *benefitted* Players.  And this is true not only for DIRECTV, but for each of the NFL's TV Partners.  Precisely how much they would have paid to make those multi-billion dollar contingent financing provisions "go away" does not matter, because

**EXHIBIT G-41**

both Defendants' SSA violations and the harm to the Players flows from the Lockout Provisions.[20]

The Opinion sustains Defendants' choice to leave money on the table in 2009/2010 in order to secure the Lockout Provisions by characterizing the alternative – foregoing the Lockout Provisions in order to secure higher rights fees in 2009 or 2010 – as "front-loading" not required by the SSA. (Opinion, COL at 16.)  The Master supports this legal conclusion by reference to a hypothetical:

> I agree with the NFL that "it would be wholly unreasonable to interpret the SSA as requiring the NFL to sell in 2009 or 2010, presumably at a discount, 2011 tickets or sponsorship rights for the purpose of receiving *now* a lesser amount of money than it could obtain for the same rights later."

(*Id.*)  This reasoning and hypothetical have no conceivable analogy to Defendants' acquisition of Lockout Provisions in this case.  (*See* NFLPA Post-Trial Br. at 5.)

The critical distinction between the Master's hypothetical and reality is that, in the hypothetical, no rights or benefits are granted during the term of the SSA.  Here, in stark contrast, the NFL renegotiated TV Contracts for years *within* the term of the SSA (2009 and 2010), granted ██████████████████████████████████ ██████ and obtained the *immediate* benefit of the Lockout Provisions during the term of

---

[20] Defendants may argue that ████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████ (Opinion, FOF ¶ 133
             ¶ 189 (NBC, same).)

**EXHIBIT G-42**

the SSA.[21]  Moreover, in the Master's hypothetical, the discount is not being used to

finance a weapon to use against the other beneficiary of those ticket payments.

On the point of the *immediate* benefit to the NFL of the Lockout Provisions,

Professor Kevin Murphy (one of the NFLPA's expert economists) testified, without

challenge or even cross-examination, that the NFL enhanced its bargaining power

against the Players merely by securing the Lockout Provisions, *i.e.*, the Lockout

Provisions benefitted the NFL *immediately* and regardless of whether they are drawn

upon in 2011.  (*See* Murphy Decl. at 4; *id.* at Ex. 1 at 2-3, 23-25; *see also* Schulte Decl.

¶ 13.)  Accordingly, and contrary to the Master's legal conclusion, the Lockout

Provisions clearly are rights "for or with respect to" years within the term of the SSA.

(Opinion, COL at 16.)

These fundamental legal errors provide an additional basis to reject the Master's

recommendation and award the requested relief.

**D.      Injunctive Relief Is Essential To Remedy
          The SSA Violations Described Above**

**1.      The Requested Injunctive Relief is
          Necessary to Restore the Status Quo**

Defendants' bad faith and improper use of shared SSA revenues to gain leverage

over, and irreversibly inflict a bargaining injury on, the Players can only be fully

remedied through an injunction.  Due its legal errors, the Opinion improperly failed to

engage the just and fair need for injunctive relief.  Defendants' SSA breaches irreparably

---

[21] (Trial Exs. 138 (2009 DirecTV contract) at §§ 2(e)-(g); 231 (2009 NBC contract) at §§
3(a), 4, 8; 257 (2009 CBS contract) at §§ 2(a), 4, 8; 263 (2009 FOX contract) at §§ 2(a),
4, 8.)

**EXHIBIT G-43**

harmed the Players not just by depriving them of shared SSA during the term of the SSA, but also by providing Defendants with economic leverage that is being used to cause irreparable harm to the Players.  Indeed, as shown above, inflicting this injury on the Players was the ████████ for the owners in obtaining the Lockout Provisions.  (Opinion, FOF ¶ 86.)  This harm will be both severe and irreparable in the absence of injunctive relief designed to restore the status quo prior to Defendants' violations.

It is fundamental that a court of equity attempts as much as possible to restore the status quo that existed before the violations at issue occurred.  *See, e.g., Howe v. Varity Corp.*, 36 F.3d 746, 756 (8th Cir. 1994) ("Equity will treat that as done which ought to have been done.  Or, to put it in words that fit the present case more precisely, equity will disregard that which ought not to have been done. . . . [Plaintiffs] are restored to their rightful position."), *aff'd on other grounds*, 516 U.S. 489 (1996); *Arthur Young & Co. v. Reves*, 937 F.2d 1310, 1336 (8th Cir. 1991) ("equity requires the wrongdoer to restore the victim to the status quo").  This is exactly the result that would be achieved by granting the injunctive relief proposed by the Players.

Moreover, the injunction requested would restore the parties to a status quo that was entirely of Defendants' own making.  It was the NFL Defendants who:  (i) negotiated ███████████ that arguably required them to ██████████████████ ██████████████████████ (ii) terminated the CBA two years early, making 2011 a possible lockout year, even though their existing TV Contracts would require them to repay any broadcast revenues received that year in the absence of games due to a lockout, and (iii) chose not to seek to renegotiate their ████████ to free themselves

of any constraints on their ability to conduct a lockout.  (Point I.B, *supra*.)  The

consequence was that Defendants found themselves economically restricted in their

ability to conduct a lockout, but that constraint was entirely of their own making, and

Defendants were not entitled to alter that status quo by violating the terms of the SSA.

At trial, Professor Murphy presented an economic analysis as to the most efficient

form of injunctive relief which would restore the status quo.  Professor Murphy

concluded that, while Defendants' violations have scrambled the eggs to an extent that

perfect injunctive relief is not possible, the injunctive remedy proposed by the Players

should have the ability to restore the status quo in the negotiation process that would have

prevailed but for the NFL's SSA violations.  (Murphy Decl., Ex. 1 at 29-35.)  The NFL

did not cross-examine Professor Murphy at trial, nor present any economic or other

evidence to otherwise rebut his testimony.  (Tr. 339:21-41, 1516:3-12.)  His testimony

and conclusions are entirely unrebutted.

Under the proposed injunctive relief, the non-refundable revenues received by the

NFL during a lockout █████████████████████████████████████████████

███████████████████████████ would be placed into an escrow account that

would be shared between the owners and the Players, after any lockout has ended,

according to the most recent historical split of revenues under the expiring SSA.  As for

the balance of the funds attributable to the Lockout Provisions (*i.e.*, the ███████████

██████████████ lockout "loans"), Defendants would be enjoined from drawing

upon these enormous below-market interest rate loans unless they can reach an agreement

with the Players on an equitable split of these revenues.  (Murphy Decl., Ex. 1 at 33-35.)

**EXHIBIT G-45**

This injunctive remedy would prevent Defendants from continuing to use the Lockout Provisions, which they obtained in violation of the SSA, to exercise leverage against the Players which they could not otherwise wield absent their SSA violations. This injunctive remedy also distributes the economic benefits from the Lockout Provisions between Defendants and Players to mitigate the bargaining advantage that Defendants otherwise would gain through their wrongful conduct.  By relying on negotiations between Defendants and the Players to determine how to divide the economic value of the Lockout Provisions, the proposed injunction also makes it unnecessary for the Court to determine the precise value of the Lockout Provisions, and thus reduces the need for fact finding on an issue that could be difficult, if not impossible, to quantify with reasonable precision.  (*Id.*)

### 2.    The *Dataphase* Factors are Satisfied

In determining whether to grant permanent injunctive relief, courts consider:  (1) the threat of irreparable harm; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; and (3) the public interest.  *Vonage Holdings Corp. v. Minnesota Pub. Util. Comm'n*, 290 F. Supp. 2d 993, 996 (D. Minn. 2004) (citing *Dataphase Sys. Inc. v. C.L. Sys.*, 640 F.2d 109, 113 (8th Cir. 1980) (en banc)).  Each requirement is satisfied here.

Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.  *General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009); *Jackson v. NFL*, 802 F. Supp. 226, 230-31 (D. Minn. 1992) ("The existence of irreparable injury is

**EXHIBIT G-46**

underscored by the undisputed brevity and precariousness of the players' careers in professional sports, particularly in the NFL."). Here, the likelihood of a lockout being imposed has substantially increased as a result of Defendants' wrongful conduct, thereby clearly exacerbating the threat of irreparable and incalculable injury to the Players. (Murphy Decl., Ex. 1 at 18, 24-25.)

When balancing harms, the court must examine the threat to each of the parties' rights that would result from granting or denying the injunction. *Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943, 976 (N.D. Iowa 2006). Here, the Players face an increased risk of a lockout as a result of Defendants' wrongful conduct, as well as an outcome in bargaining that will be adversely affected by the additional leverage that Defendants have wrongfully obtained through the Lockout Provisions. (*See* Murphy Decl., Ex. 1 at 20-23.) The Defendants' hardship claim seems to be that the requested injunction would alter their ability to impose a lockout free of the constraints that existed at the status quo ante, but these complaints are not cognizable as a matter of law. *See, e.g., Capitol Records, Inc. v. Thomas-Rasset,* 680 F. Supp. 2d 1045, 1060 (D. Minn. 2010).

Public interest heavily favors issuing an immediate injunction. In considering the public's interest, courts consistently have recognized that it is served by upholding contractual obligations. *See, e.g., Anytime Fitness v. Family Fitness of Royal*, No. 09-3503(DSD/JSM), 2010 WL 145259, at *4 (D. Minn. Jan. 8, 2010). Additionally, this District has found the public interest factor weighs in favor of injunctive relief where the conduct being enjoined is bad faith. *Nat'l Football League Players Ass'n v. NFL*, 598 F.

**EXHIBIT G-47**

Supp. 2d 971, 983 (D. Minn. 2008) ("*StarCaps*").  There also is a strong public interest in favor of the requested injunctive relief as the SSA is a court-ordered class action settlement agreement and the public has an interest in making sure that such settlements are adhered to.  There is no public interest in permitting the NFL to profit from its violation of the SSA by gaining an increased ability to impose a lockout free from constraints of its own doing, which will not only injure the Players, but NFL fans and the public as well.

## II.  EVEN IF THE SPECIAL MASTER'S LEGAL INTERPRETATION OF THE NFL'S SSA OBLIGATIONS WERE CREDITED, INJUNCTIVE RELIEF AGAINST THE LOCKOUT PROVISIONS IN THE ESPN, NBC, CBS AND FOX AGREEMENTS SHOULD BE ORDERED

The Master concluded, and the NFL conceded, that the SSA prohibits the NFL from "back-loading" money and other economic benefits, *i.e.*, delaying receipt of such benefits until *after* the SSA expires, at which time the NFL expects to enjoy a greater share of such revenues.  The Master also concluded, and Defendants have accepted without objection, that this violative conduct is exactly what Defendants did in negotiating its TV Contracts with ESPN and NBC, *i.e.*, Defendants granted the networks rights *during* the term of the SSA to obtain Lockout Provisions and other benefits *after* the SSA expires.[22]

The $6.9 million damages award recommended by the Master for these two uncontested SSA violations is, however, woefully insufficient to redress the harm that the Lockout Provisions were designed to inflict, and have inflicted, upon the Players.  For the

---

[22] (*See* Opinion, COL at 15, FOF ¶¶ 180-183, 209, MFFL ¶ 15, 16.)

**EXHIBIT G-48**

same reasons as those described above (Point I.D, *supra*), only an injunction prohibiting

Defendants from benefitting from the Lockout Provisions borne out of its unchallenged

SSA breaches can put the Players in the position they would have been in had the NFL

complied with its SSA duties.

In addition, the Special Master erroneously applied his own legal standard by

ignoring undisputed evidence of virtually *identical* "back-loading" in Defendants'

renegotiation and extension of the FOX and CBS TV Contracts.  These clear SSA

breaches also require injunctive relief preventing the NFL from exercising the Lockout

Provisions contained in those contracts.

### A.   At A Minimum, The Players Are Entitled To Injunctive Relief Against The Lockout Provisions In The ESPN And NBC Contracts

As to the ESPN contract, the Master determined that the NFL's SSA breach

enabled it to wrongfully obtain the ESPN Lockout Provisions, a violation that the NFL

has not appealed.  (Opinion, FOF ¶ 209 ("the NFL agreed to grant ███████████

███████████████████████████ *in order to secure ESPN's agreement to the*

*work stoppage language in the Monday Night Football contract.  The NFL did not ask*

*for, and did not receive, any additional consideration for this right.*"), Mixed Finding of

Fact & Law ("MFFL") ¶ 16█████████████████████

███████████████████████ *in return for ESPN's agreement to*

*amend the work stoppage provisions in the Monday Night Football agreement,*

constituted a breach of the duties imposed by SSA Article X, section 1.").)  The Master's

failure to consider injunctive relief here is baffling, because he stated that the Players had

**EXHIBIT G-49**

not met their "burden of demonstrating damages for 2010" (Opinion at 47) as to the

ESPN violation, but did not discuss at all the Players' request for injunctive relief, which

was requested precisely due to the absence of an adequate remedy at law for this

violation.

In no event, however, could damages restore the status quo prior to Defendants'

ESPN violation because Defendants would not have obtained the revised ESPN Lockout

Provision to inflict harm against the Players but for its uncontested SSA breach, as the

Master specifically found.  (Opinion, FOF ¶ 209, MFFL ¶ 16.)  An injunction is thus

essential to redress that violation and return the parties to the status quo.

With respect to the NBC contract, the Master found that Defendants breached the

SSA by giving away for free ███████████████ to NBC in order to acquire the NBC

Lockout Provision and other post-SSA economic benefits.  This violation is also

uncontested by the NFL.  But the Master then merely estimated the value of ████████

████████ at $█ million (which itself is far too low), and awarded the Players

damages of $6.9 million (57.5% of the █████ value, based on Professor Noll's testimony

that the Players would have received at least 57.5% of any lost revenue); he did not give

any consideration to the need for injunctive relief.  (Opinion at 47-48.)

The Master thus completely ignored the indisputable fact, conceded by ████

███████████████████████████████████████████████

███████████████████████████████████

████████████████████████████ (Opinion,

EXHIBIT G-50

FOF ¶181.) Thus, as with the ESPN contract, the NFL would not have acquired the Lockout Provisions but for its uncontested SSA breach.

This Court should thus ask itself whether the award of $6.9 million places the parties back in the status quo before the violation occurred. Clearly, it does not, since the status quo prior to the violation was one in which the NFL did not have the revised NBC and ESPN Lockout Provisions to inflict harm against the Players. The only way to restore the parties to the status quo prior to Defendants' uncontested SSA breaches is to issue injunctive relief against those provisions.

### B.  The NFL Also Engaged In Impermissible "Back-Loading" In Its TV Contracts With FOX And CBS

The undisputed evidence, which the Special Master did not address, also establishes that the NFL engaged in the exact same type of impermissible "back-loading" in its renegotiation and extension of the FOX and CBS contracts as it did in the ESPN and NBC deals. These additional "back-loading" violations are unequivocally proven by the FOX and CBS contracts themselves and the Special Master committed legal error by not finding these breaches, a result which this Court should review *de novo*. *Sander v. Alexander Richardson Investments*, 334 F.3d 712, 714 -715 (8th Cir. 2003) (construction of contract relevant to below proceeding is legal issue subject to de novo review); *Dunne v. Libbra*, 330 F.3d 1062, 1063 (8th Cir. 2003) ("Our review on this legal issue of contract construction is de novo.").

Defendants granted FOX and CBS &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608; for 2009 and 2010 (*i.e.*, during the term of the SSA) as well as for 2011-2013 (*i.e.*, after the term of the

**EXHIBIT G-51**

SSA).  (*See* Exs. 257 (2009 CBS contract) at §§ 4, 8 and 263 (2009 FOX contract) at §§

4, 8.)  However, Defendants did not ask for, and did not receive, any incremental

revenues for these rights in 2009 or 2010.  (*See, e.g.*, Opinion, FOF ¶ 106.)[23]  Instead, the

FOX contract expressly provides that the rights fees for 2012/2013 (after the SSA

expires) "███████████████████████████████████████████

██████" which includes the rights granted for *2009/2010*.  (Ex. 263 at 00001754, 1757-

59.)  The CBS contract likewise provides that CBS obtained the ██████████████

████████████ pursuant to rights fees it does not pay until 2012/2013. (Ex. 257 at

00001738.)  This is unequivocal, prohibited "back-loading" established as a matter of law

by the FOX and CBS contracts.

    As a result of the Master's failure to correctly interpret the FOX and CBS

contracts, the Opinion also ignores the extra-contractual evidence of Defendants' back-

loading.  For FOX, the following NFL presentation deck shows how it used █████

████████████████████████████████████████████████

████████████████████ – to persuade FOX to agree to the

"New Deal Total Rights" that Defendants wanted for the post-SSA extension years (2012

and 2013):

---

[23] The Master found that "*the NFL regarded* █████████████████████████████
██████████████] as consideration for the █████████████████████████████"
(Opinion, FOF ¶ 106.)  As shown above, however, the FOX and CBS contracts plainly
establish as a matter of law that█████████████████████ were paid for by rights
fees in 2012 and 2013 notwithstanding the Master's finding about what "the NFL
regarded" the consideration to be. (*Id.*)

**EXHIBIT G-52**

## Fox Potential Rights Fee: 2 Year Deal



(Ex. 167 at 00003737; Trial Tr. at 858:23-859:22 (Rolapp).)

The Master also disregarded uncontroverted evidence establishing that Defendants used the 2009-2010 "Additional Rights" granted to FOX as part of their negotiated exchange to obtain Lockout Protection. When FOX demanded that there be *no* Lockout Provisions in the extension, the NFL negotiator, Mr. Rolapp, admitted at trial that he told FOX that to get the "right term" █████ and "the work stoppage protection in" the deal, Defendants would, *inter alia,* "give" FOX new ████████ (Exs. 160, 163, 170; Trial Tr. at 866:5-877:9 (Rolapp).)

For CBS, the following presentation deck illustrates how Defendants again used the grant of ████████████ for 2009/2010 – which they valued at $█

**EXHIBIT G-53**

million per year ($▮ million total) for CBS – to obtain the rights fees it wanted for 2012/2013:

## CBS Potential Rights Fee: 2 Year Deal





(Ex. 167 at 00003736.)  Once again, the NFL's TV Contract negotiator, Mr. Rolapp, explained the following about the exchange shown in this slide:

> Q.     And you were preparing this [Exhibit 167] to potentially use this to justify to CBS why they should pay $▮ million in 2012?
>
> A.     Yes, we were using to try to anchor ourselves, prepare ourselves for how we were going to negotiate the deal. . . .
>
> Q.     And what that means is you didn't seek anything in this chart that you would argue to CBS today for new rights in '09 to '11, but that you could use it to justify getting ▮ in '12.  That's what this chart says.



*This is anchoring our negotiation.*

**EXHIBIT G-54**

(Trial Tr. at 857:8-858:22; *see also* Trial Tr. at 1146:22-1147:16 (Defendants' industry expert witness admitting that such a swap of rights in '09-10 for revenues in '12-13 could not be "best efforts" to maximize revenue during the term of the SSA:  "If no revenues were being driven by that in '9 and '10, it wouldn't be best efforts.").)

\*       \*       \*

The only relief that can restore the status quo for the NFL's "back-loading" of Total Revenues in the FOX and CBS contracts is an injunction preventing the NFL from drawing upon the Lockout Provisions in those contracts.  (Points I.D and II.A, *supra*.)

In addition, the Court should issue a damages award for the value of the "back-loaded" ███████████████  just as the Master correctly issued a damages award for the value of the "back-loaded" ████  granted to NBC.  As described above, Defendants internally valued those rights at a total of $██████  (Ex. 167 at 00003736-37; *see also* Ex. 160 at 00003822 (valuing the ████████████████████

████████████████████████████████████████████

████ ) With respect to Defendants' valuations, the Master found that "in an effort to provide the network executives with a strategy to 'sell' the new contract terms internally – the NFL developed liberal estimates, *although at the time they nonetheless believed that these estimates were reasonable.*"  (Opinion, FOF ¶ 110.)  The Master also concluded that 57.5% of such monies left on the table in 2009 and 2010 would have been paid to the Players.  (*Id.* at 48.)  Accordingly, damages in the amount of $██ million (57.5% of $██ million) should be awarded for these SSA breaches.

48

**EXHIBIT G-55**

## III.   THE NORRIS-LAGUARDIA ACT DOES NOT BAR AN INJUNCTION

The NFL argued below, and will argue again here, that the Norris-LaGuardia Act (the "Act") prevents the Court from issuing the requested injunctive relief.  The Master did not address this issue in his recommendation, but there clearly is no merit to Defendants' position.

Defendants argued that the requested injunction would violate Section 104(c) of the Act, which precludes an injunction against the payment of "any strike or unemployment benefits or insurance, or other moneys or things of value" to any person participating in a labor dispute.  29 U.S.C. § 104(c).  That is not correct.  The only cases to apply this section of the Act have consistently held that the phrase "moneys or things of value" must be read in the context of Section 104(c)'s express reference to "strike or unemployment benefits or insurance."  As a result, the prohibition does not apply where, as here, the funds at issue are not related to "strike benefits" or "strike insurance." *Mamula v. Satrallow, Inc.*, 578 F. Supp. 563 (S.D. Ohio 1983); *Schuck v. Gilmore Steel Corp.*, 784 F.2d 947, 949 (9th Cir.1986); *District 29, United Mine Workers of Am. V. New Beckley Mining Corp.*, 895 F.2d 942 (4th Cir. 1989).

Moreover, the Act does not apply in disputes involving employer-employee relationships where, as here, such relief does not undermine federal labor policy.  *See, e.g., Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235 (1970); *Ozark Air Lines, Inc. v. Nat'l Mediation Bd.,* 797 F.2d 557, 562-63 (8th Cir. 1986); *Harrison Baking Co. v. Bakery & Confectionery Workers, Local No. 3,* 777 F. Supp. 306, 310

EXHIBIT G-56

(S.D.N.Y. 1991) (issuing injunction in labor dispute because order reinstating employee is not barred by the Act, which is "primarily concerned with injunctions against strikes").

The prohibitions of the Act simply do *not* apply where employers or employees are seeking an injunction against violations of a consent or settlement agreement between them, as is the case here. *See Farrand Optical Co. v. Local 475, Int'l Union of Elec. Radio & Mach. Workers,* 143 F. Supp. 527 (S.D.N.Y. 1956); *Hansen v. Guyette*, 814 F.2d 547, 552-53 (8th Cir. 1987). The Act does not preclude injunctive relief to enforce binding contracts such as the SSA, and, just this past year, the Second Circuit affirmed the issuance of an injunction to enforce a collective bargaining agreement, with the authority to issue an injunction being so clear there was no need to even discuss the Act. *See Dist. Lodge I,* 689 F.Supp.2d at 268 ("[T]his court has jurisdiction to issue an injunction to enforce the collective bargaining agreement."), *aff'd,* 610 F.3d 44, 55 (2d Cir. 2010); *see also Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp.*, 230 F.3d 569, 580 (2d Cir. 2000) ("The decisions of both the Supreme Court and this court suggest that injunctive relief is permitted under circumstances that do not implicate the abuses the [Act] was enacted to prevent.").

Further, as this Court knows, the SSA expressly provides that the Court has full authority to remedy any violations of the Agreement, including, "without limitation," through specific performance. SSA, Art. XXII, § 2; *see Cohen v. Board of Trustees of the Univ. of Med. & Dentistry*, 867 F.2d 1455, 1468 (3d Cir. 1989) ("At least since *Penn v. Lord Baltimore,* ch. 1750, 1 Vesey Senior 444, specific enforcement of contractual undertakings by an order against the person has been regarded as a classic form of

**EXHIBIT G-57**

equitable relief."). Thus, during the nearly two decades the SSA has been in force, the

Special Master and this Court have repeatedly issued remedial orders in the form of

equitable and injunctive relief – including at the request of the NFL – directing the parties

to act, or not act, in specified ways in order to enforce the terms of the SSA.[24]

In fact, the obligations the Players are seeking to enforce are enshrined in an

injunction issued by the Court after it rejected the NFL's claim that injunctive relief was

barred by the Act in a related proceeding. *See Jackson*, 802 F. Supp. at 234 ("It would be

ironic if a statute that had been enacted to protect the rights of individual employees from

improper actions by employers and the courts were turned against those employees and

used to justify the continued application of a system found illegal under the Sherman

Act."). It makes absolutely no sense that the Act, or any federal labor policy, would be

adversely implicated by the issuance of equitable relief to enforce the SSA which the

Special Master and the Court have repeatedly enforced with non-monetary relief over the

past seventeen years as part of the injunctive relief class action settlement agreement,

which was approved by this Court and the Eighth Circuit. Finally, even if the Act did

apply to this proceeding (it does not), "injunctive relief may *still* issue" "based on an

evaluation of the traditional factors underlying such relief." *Jackson*, 802 F. Supp. at 234

(citing 29 U.S.C. § 107); *see also StarCaps*, 598 F. Supp. 2d at 978 (granting injunctive

relief consistent with federal labor policy). As discussed above (Point I.D, *supra*), the

Players more than meet the *Dataphase* test for granting the requested injunctive relief.

---

[24] *See, e.g., White v. NFL (Vick)*, 585 F.3d 1129, 1141 (8th Cir. 2009) (affirming that
Falcons could not take action to try to recover disputed bonuses); *White (Agents)*, 92 F.
Supp. 2d at 926 (issuing order against agents at request of NFL as well as NFLPA).

**EXHIBIT G-58**

*See id.* ("[S]hould the NFLPA succeed in establishing the *Dataphase* factors listed above, preliminary injunctive relief is appropriate.").[25]

## IV.   THE RED ZONE CHANNEL IS A RED HERRING

Finally, the Players feel compelled to briefly address Defendants' arguments about the Red Zone, a new program channel produced by the NFL, attributable in part to consent rights the NFL obtained from the 2009 DIRECTV, CBS, FOX and NBC TV Contracts. (*See* Opinion, FOF ¶¶ 32-33.) The Court likely will hear much about the Red Zone channel in Defendants' opposition brief. It is, however, a legally irrelevant red herring that has no bearing on the Players' Objection.

The Master concluded that Defendants' negotiations to free up Red Zone rights through the TV Contracts constituted a best effort, in good faith, consistent with sound business judgment, to maximize Total Revenues for 2009 and 2010. (*Id.*, MFFL ¶ 8.) Although the Players disagree with this conclusion (we believe the evidence shows that the Red Zone was in fact a *long*-term investment by Defendants with no impact on Total Revenues during the term of the SSA), for purposes of this Objection, it does not matter.

---

[25] The NFL argued below that this Court's decision in *Powell v. NFL*, 690 F. Supp. 812 (D. Minn. 1988), indicates that the Act bars the requested injunctive relief. This is not correct. The decision in *Powell* preceded the players giving up their union after the Eighth Circuit's decision in that action, was rendered well before the filing of the *White* case and the resulting SSA, and before this Court's subsequent decision holding the Act inapplicable in *Jackson*. The requested injunctive relief in *Powell* was also in the form of preliminary injunctive relief to grant the players unrestricted free agency and bears no resemblance to the relief requested in this proceeding to remedy a contractual violation of the SSA.

**EXHIBIT G-59**

All of the Master's findings with respect to the Red Zone are *irrelevant* to the SSA breaches before the Court.

Regarding Defendants' SSA obligations to make "best efforts" to "maximize" Total Revenues during 2009/2010, it is clear that *some* efforts by the NFL and its Clubs to obtain Red Zone rights during those years cannot alone discharge their duties. As the Master correctly found, by using the word "maximize" Total Revenues, the parties meant "to make as great as possible; increase to a maximum." (Opinion at 11.) Thus, no matter what lengths Defendants took to try to increase Total Revenues in 2009/2010 via Red Zone, such efforts cannot excuse Defendants' failure to make any effort, let alone best efforts, to maximize other sources of revenues during those years. In particular, the Red Zone cannot magically excuse Defendants' failure to make *any* effort to monetize the value of the Lockout Provisions (Point I.C, *supra*) or its back-loading of revenues and other value in the ESPN, NBC, CBS and FOX contracts until after the term of the SSA. (Point II, *supra*). The Master correctly recognized this by finding SSA violations in connection with the ESPN and NBC contracts notwithstanding Defendants' Red Zone efforts. Indeed, the Red Zone channel is no more a defense for the NFL's failure to use best efforts to maximize Total Revenues during the term of the SSA with respect to the Lockout Provisions than the Minnesota Vikings' efforts to increase revenues by trying to sell more tickets.

Likewise, Red Zone supplies no defense to Defendants' overarching bad faith, specifically, their use of shared Total Revenues to build a lockout "war chest" to use *against* the Players rather than to maximize revenues *for* the Players. Even if one were to

**EXHIBIT G-60**

accept the Master's finding that Defendants' negotiations for the rights to produce the Red Zone channel were made in "good faith," such behavior could not remedy the NFL's other breaches of its "good faith" SSA obligations.  Any other legal conclusion would lead to the absurd result that so long as the NFL acted in "good faith" in any of its SSA activities, it could otherwise act in bad faith in violation of the SSA with impunity.

In sum, Defendants' conduct with respect to the Red Zone cannot singularly satisfy its duties of "best efforts" and "good faith" and therefore such conduct is legally irrelevant to the Objection before the Court.

**EXHIBIT G-61**

**Conclusion**

For all of the foregoing reasons, the Players respectfully request that this Court

enter an order granting judgment in favor of the Players and against Defendants in this

proceeding, as provided in the Proposed Order submitted herewith.

Dated: February 11, 2011                    Respectfully submitted,


New York, New York

DEWEY & LEBOEUF LLP


By: s/ Mark A. Jacobson
    Jeffrey L. Kessler (*pro hac vice*)
    David G. Feher (*pro hac vice*)
    David L. Greenspan (*pro hac vice*)

1301 Avenue of the Americas
New York, New York 10019-6092
Telephone:  (212) 259-8000
Facsimile:  (212) 259-6333
jkessler@dl.com
dfeher@dl.com
dgreenspan@dl.com


Minneapolis, Minnesota

LINDQUIST & VENNUM, PLLP

Mark A. Jacobson, #188943
Anthony N. Kirwin, #387847
4200 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone: (612) 371-3211
Facsimile: (612) 371-3207
mjacobson@lindquist.com
akirwin@lindquist.com

*Class Counsel and Attorneys for the NFLPA*     Chicago, Illinois

55

EXHIBIT G-62

LATHAM & WATKINS LLP


Thomas J. Heiden (*pro hac vice*)
David A. Barrett (*pro hac vice*)
James R. Barrett (*pro hac vice*)

233 South Wacker Drive
Suite 5800
Chicago, IL 60606
Telephone:  (312) 876-6564
Facsimile:  (312) 993-9767
thomas.Heiden@lw.com
david.Barrett@lw.com
james.Barrett@lw.com


Minneapolis, Minnesota

BRIGGS & MORGAN, PA

Timothy R. Thornton, #109630
2200 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone: (612) 977-8400
Facsimile: (612) 977-8650
pvolk@briggs.com


CH\1223815.1

**EXHIBIT G-63**