UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 4-92-906(DSD)

Reggie White, Michael
Buck, Hardy Nickerson,
Vann McElroy and Dave
Duerson,

       Plaintiffs,

v.                                 **ORDER**

National Football League;
The Five Smiths, Inc.;
Buffalo Bills, Inc.;
Chicago Bears Football Club,
Inc.; Cincinnati Bengals, Inc.;
Cleveland Browns, Inc.; The
Dallas Cowboys Football Club,
Ltd.; PDB Sports, Ltd.; The
Detroit Lions, Inc.; The Green
Bay Packers, Inc.; Houston Oilers,
Inc.; Indianapolis Colts, Inc.;
Kansas City Chiefs Football Club,
Inc.; The Los Angeles Raiders, Ltd.;
Los Angeles Rams Football Company,
Inc.; Miami Dolphins, Ltd.;
Minnesota Vikings Football Club,
Inc.; KMS Patriots Limited Partnership;
The New Orleans Saints Limited Partnership;
New York Football Giants, Inc.; New York
Jets Football Club, Inc.; The Philadelphia
Eagles Football Club, Inc.; B & B Holdings,
Inc.; Pittsburgh Steelers Sports, Inc.;
The Chargers Football Company; The San
Francisco Forty-Niners, Ltd.; The
Seattle Seahawks, Inc.; Tampa Bay Area
NFL Football Club, Inc.; and Pro-Football,
Inc.;

       Defendants.

Mark Jacobson, Esq., Anthony N. Kirwin, Esq. and
Lindquist & Vennum, 4200 IDS Center, Minneapolis,
Minnesota 55402; David G. Fehr, Esq., Jeffrey L. Kessler,
Esq., David L. Greenspan, Esq., Eva W. Cole, Esq. and
Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New
York, NY 10019; James W. Quinn, Esq. and Weil, Gotshal &

Manges, 767 Fifth Avenue, New York, New York 10153; Heather McPhee, NFL Players Association, 1133 20th Street N.W., Washington, D.C. 20036; Timothy R. Thornton, Esq., and Briggs & Morgan, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, counsel for plaintiffs.

Daniel J. Connolly, Esq. and Faegre & Benson, Suite 2200, 90 South Seventh Street, Minneapolis, Minnesota 55402; Gregg H. Levy, Esq., and Covington & Burling, 1201 Pennsylvania Ave., N.W., P.O. Box 7566, Washington, D.C. 20044 and Shepard Goldfein, Esq. and Skadden, Arps, Slate, Meagher & Flom, Four Times Square, New York, NY 10036, counsel for defendants.

This matter is before the court upon the objection in part by Class Counsel and the National Football League Players' Association (collectively, Players or NFLPA) to the February 1, 2011, opinion of Special Master Stephen B. Burbank. Based on a review of the file, record and proceedings before the court, and for the reasons stated, the court adopts in part and overrules in part the recommendation of the special master.

## BACKGROUND

This appeal arises out of a proceeding commenced by the Players pursuant to Article XXII of the White Stipulation and Settlement Agreement (SSA).[1] See ECF No. 524. The Players allege that the National Football League, its member clubs and the National Football League Management Council (collectively, NFL)

---

[1] The parties amended the SSA in 1993, 1996, 2002 and 2006.

violated the SSA by ignoring the obligation to act in good faith and use best efforts to maximize total revenues for both the NFL and the Players for each SSA playing season.  In this appeal, the court must, in considering the special master's opinion, determine (1) what the SSA requires of the parties; and (2) whether the NFL violated the SSA when it extended and renegotiated broadcast contracts with DirecTV, CBS, FOX, NBC and ESPN (collectively, broadcasters).

## I.   Historical Context

On September 10, 1992, following a ten-week trial, a jury found the NFL in violation § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  See McNeil v. Nat'l Football League (Plan B Free Agency), No. 4-90-476, 1992 WL 315292, at *1 (D. Minn. Sept. 10, 1992).  Following the verdict, individual players sought injunctive relief to become free agents for the 1992 season.  See Jackson v. Nat'l Football League, 802 F. Supp. 226, 228 (D. Minn. 1992).  Based on the McNeil verdict, the court temporarily enjoined enforcement of Plan B.  Id. at 235.  Less than two weeks after the McNeil verdict, players Reggie White, Michael Buck, Hardy Nickerson, Vann McElroy and Dave Duerson brought an antitrust class action seeking injunctive relief in the form of total or modified free agency.  See White v. Nat'l Football League, 822 F. Supp. 1389 (D. Minn. 1993).  The parties decided to settle their financial and labor disputes, and a mandatory settlement class was certified for

damages and injunctive relief.   The NFLPA became the official exclusive bargaining authority for football players in March 1993. The NFL and the Players formed the SSA to bring an end to a wide range of litigation.   On April 30, 1993, the court approved the SSA.   The parties also entered into a Collective Bargaining Agreement (CBA) that mirrors the SSA.   The parties amended and extended the CBA in 1996 and 1998.   In 2006, the parties renegotiated the CBA for 2006-2012.

On May 20, 2008, the NFL opted out of the final two years of the current CBA and SSA because, among other reasons, it believed that the current agreement "does not adequately recognize the costs of generating the revenues of which the players receive the largest share," and other elements of the deal "simply are not working." Ex. 77.[2]   As a result, the SSA and CBA expire on March 4, 2011. The NFL recognized that a lockout was "realistically" possible in order to achieve a new agreement more favorable to its interests. Tr. 771; see Ex. 221.

Soon after opting out of the CBA, the NFL began to negotiate extensions of its broadcast contracts.   Rights fees in the broadcast contracts generate approximately half of the NFL's total revenues.   Goodell Direct Test. 4.   Existing broadcast contracts

---

[2] "Ex." refers to joint trial exhibits submitted at the hearing before the special master.   "Tr." refers to the transcript of the hearing before the special master.   "Direct Test." refers to direct testimony declarations.   "Op." refers to the special master's February 1, 2011, opinion.

effectively prevented the NFL from collecting revenue during a lockout in 2011 because the contracts did not require broadcasters to pay rights fees during a lockout or required the NFL to repay lockout fees in 2011.  Op. 20–21, ¶¶ 12–22; Ex. 228, at 00065812. Moreover, some of the NFL's loan obligations include "average media revenues" covenants which provide that an "event of default" occurs if average annual league media revenues fall below a specified value.  Op. 20, ¶ 9; id. at 21, ¶ 11; Siclare Direct Test. 1, 3. The NFL worried that its creditors could argue that a default event had occurred if the NFL locked out the Players in 2011, the same year that some broadcast contracts were set to expire, and that a default would give the Players bargaining power in labor negotiations.  Op. 21, ¶ 23; Goodell Direct Test. 3.  In light of "market conditions and strategic considerations," the NFL understood that it was "prudent to consider [broadcast contract] extension alternatives today."  Ex. 228, at 00065812.

## II.  Broadcast Contracts

In May 2008, the NFL had broadcast contracts with DirecTV for the 2006-2010 seasons, with CBS, FOX and NBC, respectively, for the 2006-2011 seasons, and with ESPN for the 2006-2013 seasons (collectively, previous contracts).

### A.  DirecTV

The NFL's contract with DirecTV was to expire at the end of the 2010 season.  The previous contract had no work-stoppage

provision.   As a result, the NFL would receive no revenue if it locked out the Players.   DirecTV had the exclusive right to broadcast a "Red Zone" channel featuring scoring opportunities from every regular-season Sunday afternoon game.   The NFL wanted to offer its own version of the Red Zone.   Op. 22, ¶ 31; Rolapp Direct Test. 4.

The NFL and DirecTV began negotiations in July 2008.   The extended contract provides that DirecTV will pay a substantial fee if the 2011 season is not cancelled and up to 9% more, at the NFL's discretion, if the 2011 season is cancelled.   Of the total amount payable in the event of a cancelled season, 42% of that fee is non-refundable and the remainder would be credited to the following season.   Op. 27, ¶¶ 71-72; Goodell Direct Test. 11.   As a result, the NFL could receive substantially more from DirecTV in 2011 if it locks out the Players then if it does not.   DirecTV would have considered paying more in 2009 and 2010 "to have [the work-stoppage provision] go away."   Tr. 410.

In the extended contract, DirecTV: (1) gained the right to distribute Sunday Ticket via broadband; (2) gained packaging flexibility; (3) maintained the exclusive right to carry out-of-market games (Sunday Ticket); and (4) maintained the nonexclusive right to carry programming that features year-round, 24-hour football programming (the NFL Network) through the end of the 2014 season.   Op. 27, ¶ 74; Tr. 379; Goodell Direct Test. 15.   The NFL

gained the immediate right to distribute "look-ins" of Sunday Ticket games as part of its Red Zone channel. Op. 27, ¶ 74; Tr. 381. DirecTV agreed to pay an increased average rights fee for 2011 through 2014. The NFL did not seek an increase in rights fees for the 2009 and 2010 seasons, and those fees remained unchanged. Op. 26, ¶ 62; Goodell Direct Test. 7.

### B.   CBS & FOX

The NFL's contracts with CBS and FOX were to expire at the end of the 2011 season. Under the previous contracts, CBS and FOX had to pay rights fees in the event of a work stoppage. The NFL and the networks would then negotiate a refund and, if necessary, resolve disputes through arbitration. If refunds were due, the NFL had to repay fees for the first three cancelled games during the affected season, with the remainder due the following season. If a work stoppage occurred in 2011, the final year of the contract, the NFL had to repay CBS and FOX that same year. The NFL began simultaneous negotiations with CBS and FOX in April 2009.

The NFL and CBS and FOX, respectively, extended the contracts through the 2013 season. Under the extended contracts, the new work-stoppage provision: (1) eliminates the requirement that the NFL repay rights fees attributable to the first three lost games in the affected season; (2) allows the NFL to request less than the full rights fee; and (3) allows the NFL to repay the funds, plus money-market interest, over the term of the contract. Op. 32,

¶ 126.  If an entire season is cancelled, the contracts extend for an additional season.  Id. ¶ 127.  Initially, FOX expressed reluctance to pay rights fees during a work stoppage.  Goodell Direct Test. 19.  The NFL considered opposition to the work-stoppage provision a "deal breaker[]."  Ex. 163.

CBS and FOX gained highlight rights, streaming rights and advertising flexibility for the 2009-2010 seasons.  See Op. 30, ¶¶ 106, 107-08, 119; Goodell Direct Test. 21; Rolapp Direct Test. 11.  The NFL gained the immediate right to distribute "look-ins" of CBS and FOX games for its Red Zone channel and the right to distribute highlights through its wireless provider.  See Op. 30, ¶ 103; Rolapp Direct Test. 11.  CBS and Fox agreed to pay increased rights fees for the 2012 and 2013 seasons.  The NFL did not seek increased rights fees for the 2009, 2010 and 2011 seasons, and they remained unchanged.  CBS, FOX and the NFL approved the respective contract extensions in May 2009.

### C.   NBC

The NFL's broadcast contract with NBC was to expire at the end of the 2011 season.  The previous contract contained a work-stoppage provision identical to the provisions in the previous CBS and FOX contracts.  The NFL and NBC began negotiations in March 2009.

The NFL extended NBC's contract through the 2013 season. Under the extended contract, the new work-stoppage provision:

8

(1) eliminates the requirement that the NFL repay rights fees attributable to the first three lost games in the affected season; (2) allows the NFL to request less than the full rights fee; and (3) allows the NFL to repay the funds, plus money-market interest, over the term of the contract. Op. 39, ¶ 190; Goodell Direct Test. 21, 24. If an entire season is cancelled, the contract extends for one year with the right to broadcast the Super Bowl that year. Op. 39, ¶ 191; Goodell Direct Test. 24.

In extension negotiations, NBC felt that the NFL was "hosing" it by its rights fees demand. Op. 39, ¶ 185; Tr. 1339. To "bridg[e] the gap," the NFL agreed to award NBC an additional regular-season game for the 2010-2013 seasons. Op. 38, ¶ 181; Tr. 1048-1050, 1339. The NFL did not seek additional rights fees for the 2009, 2010 and 2011 seasons, and they remained unchanged. NBC agreed to pay increased rights fees for the 2012 and 2013 seasons.

NBC gained limited digital and advertising rights for the 2009-2010 seasons. The NFL gained the immediate right to stream Sunday Night Football via its wireless partner and certain "look-in" rights. The NFL and NBC approved the contract extension in May 2010.

D. **ESPN**

The NFL's contract with ESPN for Monday Night Football was to expire in 2013. This contract was not extended, but the work-stoppage provision was amended. Op. 40, ¶ 194; id. at 41,

¶¶ 204-05; Goodell Direct Test. 25-26.  The previous contract contained a work-stoppage provision similar to the provisions in the previous CBS, FOX and NBC contracts, except that the NFL could be required to repay damages incurred by ESPN due to lost subscription fees.  ESPN wanted to obtain additional digital rights from the NFL.  Op. 40, ¶ 195.  The NFL and ESPN negotiated digital rights and a new work-stoppage provision in fall 2009.  Op. 40, ¶¶ 198-200; Goodell Direct Test. 25.

In the event of a cancelled season, the new work-stoppage provision provides that: (1) ESPN would, at the NFL's discretion, pay up to the full rights fee; (2) a credit for the first three games of the season would be applied the same year; (3) the NFL may request less than the full rights fee; and (4) the NFL would repay the funds, with LIBOR interest plus 100 basis points, over the term of the contract.  Op. 42, ¶¶ 214-15; Tr. 302-03.  If an entire season is cancelled, the contract extends for an additional season.  Op. 42, ¶ 213; Rolapp Direct Test. 17.  The NFL is not liable to repay more than ESPN's yearly rights fee.

ESPN gained (1) the right to use NFL footage in linear distribution of regular programming across digital platforms (excluding the right to distribute live Monday Night Football wirelessly); (2) the right to stream live Monday Night Football highlights on its website; (3) the right to show game highlights online; (4) incremental international rights; and (5) broad

wireless rights.   Op. 40, ¶ 199; Rolapp Direct Test. 16-17.   The NFL gained the right to distribute in-progress highlights of ESPN's Monday Night Football game on NFL.com and wireless devices.

ESPN agreed to pay rights fees for July 2010 through July 2014.  Op. 40, ¶ 198; Goodell Direct Test. 25.  ESPN requested that the fee not be payable in the event of a work stoppage, but the NFL rejected the request.   Goodell Direct Test. 25.   The NFL stated that the digital deal and the work-stoppage provisions were "linked."  Op. 41, ¶ 208; Tr. 889-90.  To secure ESPN's agreement to the work-stoppage provision, the NFL granted the right to a Monday Night Football "simulcast" via the wireless partner.  Op. 41, ¶ 209; Tr. 891-92.

### E.   Comcast & Verizon

In 2008, the NFL was engaged in litigation with cable provider Comcast over limited carriage of the NFL Network.  Op. 34, ¶ 141; Goodell Direct Test. 12.  After securing contract extensions with CBS and Fox, the NFL concluded a carriage agreement with Comcast, whereby Comcast agreed to carry the NFL Network on an expanded digital tier, leading to an 8-million subscriber increase in distribution.  Op. 34, ¶¶ 1447-48; id. at 35, ¶ 150; Goodell Direct Test. 22; Tr. 1038.  As a result, the NFL Network revenue increased substantially from 2008 to 2009.  Op. 35, ¶ 150; Siclare Direct Test. 14.

In February 2010, Verizon Wireless (Verizon) became the NFL's wireless partner.  Op. 43, ¶ 220; Rolapp Direct Test. 15.  Verizon agreed to pay higher fees than the NFL's previous wireless partner, resulting in large increases in direct and indirect value.  Op. 43, ¶¶ 223, 225; Rolapp Direct Test. 15.  Access to the NFL's Red Zone channel, Sunday night football streaming, in-progress highlights, and post-season live audio helped the Verizon deal move forward.  Op. 43, ¶ 228; Rolapp Direct Test. 15-16.  In the event of a work stoppage, Verizon is obligated to pay a non-refundable rights fee.  Op. 44, ¶ 230; Rolapp Direct Test. 3.

In total, the NFL negotiated access to over $4 billion in rights fees in 2011 if it locks out the Players.  Of that sum, it has no obligation to repay $421 million to the broadcasters.

## III.  Present Action

On June 9, 2010, the Players sought a declaration that the NFL violated Article X, § 1(a)(i) and Article XIX, § 6 of the SSA when it extended and renegotiated broadcast contracts without satisfying its duty to maximize total revenues in SSA years 2009 and 2010, which would inure to the benefit of both the Players and the NFL.  The special master held a trial on January 4-7 and 13, 2011.  On February 1, 2011, the special master found that the NFL violated Article X, § 1(a)(i) when it granted NBC an additional regular-season game in the 2010 season and granted ESPN an additional right in the 2010 season in exchange for an amended work-stoppage

provision.   Op. 46, ¶¶ 15-16.   The special master granted the Players $6.9 million in damages for the NBC violation, and determined that the Players had not met their burden of demonstrating damages with respect to the ESPN violation.  Op. 47-48.  The special master found that the NFL did not otherwise breach the SSA.   The Players objected in part to the special master's opinion.   The court now considers the objection.

## DISCUSSION

On appeal, the special master's conclusions of law are reviewed de novo and factual findings are reviewed under the clearly erroneous standard.   See White v. Nat'l Football League (Rob Moore), 88 F. Supp. 2d 993, 995 (D. Minn. 2000); see also Fed. R. Civ. P. 53(f)(3)(A)-(4) (factual findings reviewed for clear error and legal conclusions reviewed de novo).   New York law governs interpretation of the SSA.   As the court has previously stated:

> Under New York law, the terms of a contract must be construed so as to give effect to the intent of the parties as indicated by the language of the contract. The objective in any question of the interpretation of a written contract, of course, is to determine what is the intention of the parties as derived from the language employed.   The court should also give the words in a contract their plain and ordinary meaning unless the context mandates a different interpretation.

See White v. Nat'l Football League (30% Rule), 899 F. Supp. 410, 414 (D. Minn. 1995).   Further, the court must give effect and

meaning to each term of the contract, making every reasonable effort to harmonize all of its terms.  See Reda v. Eastman Kodak Co., 649 N.Y.S.2d 555, 557 (N.Y. App. Div. 1996).  The court must also interpret the contract so as to effectuate, not nullify, its primary purpose.  See id.  Here, the primary purpose of the SSA was to settle numerous labor and financial disputes between the Players and the NFL, and to secure revenue for their mutual benefit.  The SSA and the CBA have been amended several times to continue labor harmony between the parties.

## I.   Alleged SSA Violations

Article X, § 1(a)(i) of the SSA provides that:

> The NFL and each NFL team shall in good faith act and use their best efforts, consistent with sound business judgment, so as to maximize Total Revenues for each playing season during the term of this Agreement....

SSA Art. X, § 1(a)(i).  The SSA defines total revenues as:

> "Total Revenues" ("TR") means the aggregate revenues received or to be received on an accrual basis, for or with respect to a League Year during the term of this Agreement, by the NFL and all NFL Teams (and their designees), from all sources, whether known or unknown, derived from, relating to or arising out of the performance of players in NFL football games ....

Id.

The Players argue that the special master erred by concluding that the NFL did not breach the SSA, finding that the good-faith requirement adds nothing to the SSA, erroneously interpreting "sound business judgment" and total revenues, and declining to issue an injunction.  The Players "bear the burden of demonstrating

by a clear preponderance of the evidence that the challenged conduct was in violation of Article X."  SSA Art. XV, § 3.

## A.    Consistent with Sound Business Judgment

The court first considers the meaning of the words "consistent with sound business judgment" because this language is essential to interpreting the meaning of "good faith" and "best efforts" in Article X.  The special master found that "consistent with sound business judgment" qualifies the duty to act in good faith and use best efforts to maximize total revenues, thereby rejecting the Players' argument that it imposes an additional obligation.  Op. 14.

The language of § 1(a)(i) cannot be construed by looking at each word in isolation.  See Dore v. La Pierre, 226 N.Y.S.2d 949, 952 (N.Y. Sup. Ct. 1962) ("In interpreting a contract, particular words should not be considered as isolated from the context.").  The court looks to the entire sentence and the words surrounding the phrase for guidance.  See Popkin v. Sec. Mut. Ins. Co. of N.Y., 367 N.Y.S.2d 492, 495 (N.Y. App. Div. 1975).  In this case, applying the principle of *noscitur a sociis* and considering punctuation and grammatical structure, the court agrees with the special master that "consistent with sound business judgment" qualifies the duties to act in good faith and use best efforts.

The special master erred, however, in his application and analysis of "consistent with sound business judgment."  He reasoned

15

that "it would be absurd and commercially unreasonable" to allow the Players to substitute their own business judgment for that of the NFL, Op. 13-14, because he relied on cases that interpret the business-judgment rule as it applies to fiduciary duties of corporate directors.  See In re Lipper Holdings, LLC, 766 N.Y.S.2d 561, 562 (N.Y. App. Div. 2003) (reviewing limited partnership agreement); Auerbach v. Bennett, 47 N.Y.2d 619, 629-30 (N.Y. 1979) (reviewing corporate action).  The rationale for the business-judgment rule does not apply here.  In a corporate context, the business-judgment rule exists to insulate corporate directors from personal liability when they take good-faith risks on behalf of a corporation.  The rule protects directors from actions by stockholders (owners) and others.  Unlike corporate directors and stockholders, whose interests generally align, the interests of management (owners) and labor are adversarial.  Therefore, in the SSA, the words "sound business judgment" do not grant the same discretion enjoyed by corporate directors.

The special master should have considered the intent of the parties and the context from which this language arose.  The NFL and Players formed the SSA to avoid the consequences of the jury verdict finding the NFL in violation of antitrust law.  The level of discretion allowed by the SSA is constrained by the context and hard bargaining which establish the intent of the parties and the meaning of that language.

The court must construe the SSA in light of the language agreed to by the parties and New York law. The phrase "consistent with sound business judgment" qualifies, and is qualified by, the SSA requirement that the parties act in good faith and use best efforts to maximize total revenues for the joint benefit of the Players *and* the NFL. Indeed, "consistent with sound business judgment" allows the NFL to consider its long-term interests provided it does so while acting in good faith and using best efforts to maximize total revenues for each SSA playing season. Accord Dist. Lodge 26 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp., 689 F. Supp. 2d 219, 242 (D. Conn. 2010) (considering contract's "every reasonable effort" provision).[3] "Sound business judgment" does not allow the NFL to pursue its own interests at the expense of maximizing total revenues during the SSA. Therefore, the special master committed legal error in his interpretation of "sound business judgment," which effectively nullified pertinent terms of the SSA.

**B.   Good Faith**

Good faith and best efforts are distinct obligations:

> Good faith is a standard that has honesty and fairness at its core and that is imposed on every party to a contract. Best efforts is a standard that has diligence at its essence and is imposed on those contracting

---

[3]   "New York courts use the term reasonable efforts interchangeably with best efforts." Monex Fin. Servs. Ltd. v. Nova Info. Sys., Inc., 657 F. Supp. 2d 447, 454 (S.D.N.Y. 2009) (citation and internal quotation marks omitted).

> parties that have undertaken such performance.  The two
> standards are distinct, and that of best efforts is the
> more exacting ....

2 E. Allan Farnsworth, Farnsworth on Contracts § 7.17c (3d ed. 2004) (citation omitted); see also Grossman v. Melinda Lowell, Attorney at Law, P.A., 703 F. Supp. 282, 284 (S.D.N.Y. 1989) (best efforts imposes additional obligation); Ashokan Water Servs., Inc. v. New Start, LLC, 807 N.Y.S.2d 550, 556 (N.Y. Civ. Ct. 2006) ("A best efforts requirement must be reconciled with other clauses in the contract to the extent possible, not used as a basis for negating them.") (citation and internal quotation marks omitted). The special master correctly stated that best efforts imposes a "higher obligation" than good faith.  Op. 12-13 (citing Ashokan Water Servs., 807 N.Y.S.2d at 555); see also Kroboth v. Brent, 625 N.Y.S.2d 748, 814 (N.Y. App. Div. 1995) ("'best efforts' requires more than 'good faith'").  However, the special master then declined to analyze the SSA's good faith obligation because he reasoned that "under New York law, any breach of the duty of good faith will also constitute a failure to exert best efforts, although the converse is not always true." Op. 12-13.  The failure to separately analyze good faith constitutes legal error.

Good faith "connotes an actual state of mind ... motivated by proper motive" and "encompasses, among other things, an honest belief, the absence of malice and the absence of a design to defraud or to seek an unconscionable advantage." Ashokan Water

Servs., 807 N.Y.S.2d at 554 (citation and internal quotation marks omitted).  In addition, good faith requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  511 W. 232nd Owners Corp. v. Jennifer Realty Co., 773 N.E.2d 496, 500 (N.Y. 2002) (citation omitted).

Broadcast contracts are an enormous source of shared revenue for the Players and the NFL.  Under the SSA, the Players rely on the NFL to negotiate these contracts on behalf of *both* the NFL's own interests *and* the interests of the Players.  In May 2008, the NFL opted out of the final two years of the CBA, and recognized that a lockout in 2011 would help achieve a more favorable CBA. Thereafter, the NFL sought to renegotiate broadcast contracts to ensure revenue for itself in the event of a lockout.  See, e.g., Exs. 98, 102, 110, 131, 228.  The record shows that the NFL undertook contract renegotiations to advance its own interests and harm the interests of the players.[4]  The NFL argues that the SSA does not require it to act in good faith in 2011 or subsequent seasons, that lockouts are recognized bargaining tools and that it

_____

[4] The NFL's "Decision Tree" is one glaring example of the NFL's intent and consideration of its own interests above the interests of the Players.  See Ex. 216, at 00081969.  Moving forward with a deal depended on the answer to the question: "Does Deal Completion Advance CBA Negotiating Dynamics?"  If yes, the NFL should "Do Deal Now"; if no, the NFL should "Deal When Opportune." Id.

is entitled to maximize its post-SSA leverage.  The court agrees.[5] However, under the terms of the SSA, the NFL is not entitled to obtain leverage by renegotiating shared revenue contracts, during the SSA, to generate post-SSA leverage and revenue to advance its own interests and harm the interests of the Players.  Here, the NFL renegotiated the broadcast contracts to benefit its exclusive interest at the expense of, and contrary to, the joint interests of the NFL and the Players.  This conduct constitutes "a design ... to seek an unconscionable advantage" and is inconsistent with good faith.  See Ashokan Water Servs., 807 N.Y.S.2d at 554 (citation and internal quotation marks omitted).

The NFL next argues that any injury to the Players' interests will occur after the termination of the SSA.  The court disagrees. As a result of the broadcast contract renegotiations, the NFL demanded and received "material[ly]" different, immediately effective work-stoppage agreements.  See, e.g., Bornstein Dep. 168-69.  Moreover, at least one broadcaster would have considered paying more in the 2009-2010 seasons "to have [the work-stoppage provision] go away," Tr. 410, indicating that the NFL's inflexibility with respect to lockout provisions resulted in less total revenues for the 2009-2010 seasons.  The NFL also argues that

---

[5] The court notes, however, that a lockout is usually an economic weapon employed in response to a strike.  See 48B Am. Jur. 2d Labor & Labor Relations § 2652 ("A lockout is a legitimate move by an employer in the face of a strike....").

the broadcast contracts were renegotiated to avoid defaulting under certain loan covenants.  That fact alone substantiates value to the NFL without a corresponding increase in total revenues.  Moreover, the value of the renegotiated contracts far exceeds the amount needed to satisfy loan covenants, and the DirecTV contract creates a financial incentive to institute a lockout.  Further, the decision to lockout the Players is entirely within the control of the NFL, thereby rendering a debt default also entirely within its control.  Lastly, the debt covenants are of the NFL's own making. The risk of debt default brought about by a lockout does not excuse or justify a breach of the SSA.  Therefore, construing the good faith obligation as modified by "consistent with sound business judgment," the NFL breached the SSA by failing to act in good faith so as to maximize total revenues for each SSA playing season.[6]  The

---

[6] The NFL rankles under the restriction to its enormous market power imposed by the White settlement after the jury in McNeil found that the NFL had abused its power in unlawful restraint of trade.  The facts underlying this proceeding illustrate another abuse of that market power wherein various broadcasters of NFL games were "convinced" to grant lucrative work-stoppage payments to the NFL if the NFL decides to institute a lockout.  Typical work-stoppage provisions anticipate a strike by players, not a work stoppage created by the NFL itself.  Whether the contract provisions insuring these payments might ultimately be deemed unenforceable because of their potentially collusive nature is not an issue before this court, but the court does consider the abuse of the NFL's market power when finding that it did not act in good faith to benefit both itself and the Players, as required by the SSA.

special master committed legal error by failing to properly interpret the good faith provision and by finding no breach.[7]

## C. Best Efforts

"There is, of course, no more significant context for a 'best efforts' obligation than the agreement of which it is a part or is made so." Ashokan Water Servs., 807 N.Y.S.2d at 556. Best efforts "necessarily takes its meaning from the circumstances." Bloor v. Falstaff Brewing Corp., 454 F. Supp. 258, 266 (S.D.N.Y. 1978) (citation and internal quotation marks omitted). Under New York law "a best efforts clause imposes an obligation to act with good faith in light of one's own capabilities." Bloor v. Falstaff Brewing Corp., 601 F.2d 609, 613 n.7 (2d Cir. 1979) (internal quotation marks omitted). Capability "is a far broader term than financial ability" and "must take into account [the promisor's] abilities and opportunities which it created or faced." Bloor, 454 F. Supp. at 267 (internal quotation marks omitted).

A party obligated to give best efforts maintains the "right to give reasonable consideration to its own interests," Bloor, 601 F.2d at 614, and is allowed a "reasonable variance ... in the exercise of sound business judgment," Bloor, 454 F. Supp. at 269. Although a best-efforts provision does "not require [a promisor] to spend itself into bankruptcy," it does prohibit a promisor from

---

[7] As a result, the court need not analyze whether the NFL also violated SSA Article XIX, § 6.

"emphasizing profit *uber alles* without fair consideration of the effect" on the promisee.  Bloor, 601 F.2d at 614.  A best-efforts clause requires the promisor to do more than treat a promisee's interest "as well as its own."  Id.

The special master failed to analyze the total capabilities and the market power of the NFL because he found it "difficult to believe that" the parties intended best efforts to "require the NFL to seek additional consideration for rights already under contract." Op. 15.  This is another example of importing corporate law to a sui generis agreement that was forged at the anvil of litigation, threatened repercussions and hard bargaining.[8]

Moreover, although the rights fees for the 2009-2010 seasons were already agreed upon, the renegotiated contracts materially changed almost every other aspect of the previous contracts. Further, the NFL gave digital rights in 2009 and 2010 without incremental payments to convince two broadcasters to agree to work-stoppage provisions.  See Op. 46, ¶ 16; Exs. 160, 163, 170; Tr. 866-77.  The NFL gave digital and other rights in 2009 and 2010

---

[8] The special master noted that "a signed writing is sufficient to overcome the traditional refusal to enforce a promise to pay more in the absence of additional consideration."  Op. 15. The special master erred in relying on the preexisting duty rule. The rule does not apply where, as here, the parties do, or promise to do, something in addition to their preexisting duties.  See, e.g., Care Travel Co., Ltd. v. Pan Am. World Airways, Inc., 944 F.2d 983, 990 (2nd Cir. 1991) (airline promised that it would not terminate contract within 90 days, even though it had right to do so, and agency agreed to operate as nonexclusive agent).

without incremental payments to convince other broadcasters to pay increased rights fees in 2012 and subsequent seasons.  See Op. 46, ¶ 15; Ex. 167, at 00003736.  The NFL made no effort to maximize total revenues in 2009-2010 in exchange for those rights.

The court agrees with the special master that the best-efforts clause does not require the NFL to "constantly badger[] its broadcast ... partners for more money" without offering anything in return.  Op. 15.  However, the SSA requires the NFL to use best efforts to maximize total revenues for the 2009-2010 seasons when it enters into widespread and lucrative contract renegotiations.[9] As the special master noted, the law disfavors "those who come to regret deals they have made and seek to switch the locus of risk ex post."  Op. 15.  However, by actively renegotiating broadcast contracts to ensure favorable changes for itself and disadvantage the Players, the NFL did precisely that.  As a result, the failure of the NFL to seek revenue for modifications to the broadcast contracts in the 2009-2010 seasons is inconsistent with best efforts.

In applying the total-capabilities analysis, the court finds that the NFL's capabilities are formidable and extensive.

---

[9] The court rejects the argument that such an interpretation hypothetically requires the NFL to sell tickets or sponsorship rights for a future season in 2009 or 2010.  Unlike the hypothetical scenario, here the NFL renegotiated contracts for years within the term of the SSA and obtained immediate benefits from those renegotiations.

"Capability is a far broader term than financial ability" and includes the NFL's market power and "the opportunities which it created or faced."  Bloor, 454 F. Supp. at 267.  Along with favorable lockout protection and digital rights agreements, the NFL secured annual rights fees increases large enough to be considered an "enormous accomplishment."  Goodell Direct Test. 10, 20-21, 24; see Op. 22, ¶¶ 25-26.  According to one network executive, "[y]ou know you've reached the absolute limits of your power as a major network ... [when] the commissioner of the National Football League calls you ... and says ... [w]e're done, pay this or move on ....  [the NFL has] market power like no one else, and at a certain point in time, they'll tell you to pack it up or pay the piper."  Tr. 1346.  The record indicates that, using its market power, the NFL had substantial capability to maximize total revenues for the 2009 and 2010 playing seasons when it entered into broadcast contract renegotiations.

To the extent that "consistent with sound business judgment" modifies the best efforts requirement, the NFL may consider its long-term interests but not at the expense of maximizing total revenues for each SSA season for the joint benefit of itself and the Players.  A promisor's consideration of its own interests becomes unreasonable when it is manifestly harmful to the party to which it has obligations.  See Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co., 281 N.E.2d 142, 145 (N.Y. 1972); accord

Dist. Lodge 26, 689 F. Supp. 2d at 242.  "Consistent with sound business judgment" does not permit the NFL to enhance its long-term interests at the expense of its present obligations.[10]  The record shows, however, that the NFL did just that.  In considering broadcast contract renegotiations, the NFL consistently characterized gaining control over labor as a short-term objective and maximizing revenue as a long-term objective.  See, e.g., Exs. 142, 201, 228.  The NFL used best efforts to advance its CBA negotiating position at the expense of using best efforts to maximize total revenues for the joint benefit of the NFL *and* the Players for each SSA playing season.  Moreover, at least three networks expressed some degree of resistance to the lockout payments.  As it renegotiated the contracts, the NFL characterized network opposition to lockout provisions to be a deal breaker and "clearly a deal" it would not consider.  Ex. 163.  To the contrary, the evidence shows that maximizing total revenues for SSA seasons was, at best, a minor consideration in contract renegotiations.  Therefore, the court finds that the NFL breached Article X,

---

[10] The NFL urges the court to follow an unpublished Fourth Circuit case, which held that the duty to use best efforts "consistent with its overall business objectives" allows the defendant "to act in accordance with its own objectives if they conflict with those of [plaintiff]." Mylan Pharm., Inc. v. Am. Cyanamid Co., Nos. 94-1502, 94-1472, 1995 WL 86437, at *6 (4th Cir. 1995).  This unpublished case is not persuasive or controlling authority. See 8th Cir. R. 32.1A; 2d Cir. R. 32.1. Moreover, it provides no analysis or substantive reasoning for its interpretation.

§ 1(a)(i) in extending or renegotiating its broadcast contracts. Accordingly, the special master committed legal error in failing to properly interpret the SSA's requirement to act in good faith and use best efforts, consistent with sound business judgment, to maximize total revenues for each SSA playing season, and thus finding no breach.

## II.  Remedies

In his "recommendations of relief," the special master did not consider injunctive relief.  See Op. 46-48.  The special master's failure to consider injunctive relief constitutes legal error.  The court considers four factors in determining whether an injunction should issue: (1) the threat of irreparable harm to the movant in the absence of relief, (2) the balance between that harm and the harm that the relief may cause the non-moving party, (3) the likelihood of the movant's ultimate success on the merits and (4) the public interest.  Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc).[11]  Irreparable harm occurs when a party has no adequate remedy at law because its injuries cannot be fully compensated through money damages.  See Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009).  The issue of the extent to which, and whether, money

_____

[11] The factors are the same for a permanent injunction except that the movant must show actual success on the merits.  See Vonage Holdings Corp. v. Minn. Pub. Util. Comm'n, 290 F. Supp. 2d 993, 996 (D. Minn. 2003) (citing Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n.12 (1987)).

damages can compensate the Players has not been fully briefed or argued before the court.  Therefore, the court determines that additional briefing and a hearing concerning remedies are warranted before it issues its final order.

## CONCLUSION

**IT IS HEREBY ORDERED** that:

1.    The court adopts the special master's "recommendations for relief" paragraphs 1 and 2, <u>see</u> Op. 47, as there is no objection to these findings and recommendations before the court;

2.    The court overrules the special master's findings as to the NFL's breach of the SSA relating to its contracts with DirecTV, CBS, FOX, NBC and ESPN, and holds that the NFL breached the SSA as to those contracts; and

3.    The court orders that a hearing be held concerning relief to be granted to the Players arising from the NFL's breach of the SSA.  The hearing shall consider the award of both money damages and equitable relief, including injunction.  District of Minnesota Local Rule 7.1(b) will dictate briefing schedules and related procedures.

Dated:  March 1, 2011

s/David S. Doty
David S. Doty, Judge
United States District Court