IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
REGGIE WHITE, *et al*.,                          :
                                                         :
                   Plaintiffs,          :
                                                         :   No. 4:92-cv-00906-DSD
     vs.                                           :
                                                         :
NATIONAL FOOTBALL LEAGUE, *et al*.,   :
                                                         :
                  Defendants.        :
                                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PETITION TO REOPEN AND ENFORCE
## STIPULATION AND SETTLEMENT AGREEMENT

Pursuant to the Final Consent Judgment of August 20, 1993 (Dkt. 318) and the

Stipulation and Settlement Agreement, as amended August 8, 2006 (Dkt. 524) ("SSA")

incorporated therein, the National Football League Players Association ("NFLPA") and

Class Counsel hereby petition to reopen this Action and enforce the SSA through an

enforcement proceeding against the National Football League ("NFL") and its 32 Clubs

and their owners (collectively, "Clubs" or "Owners") and allege as follows (unless

otherwise indicated, capitalized terms herein have the meanings set forth in the SSA):

### NATURE OF PROCEEDING

1.    This proceeding arises from a conspiracy.  Pursuant to the SSA, the NFL and

the Owners explicitly agreed that the 2010 season would not be subject to a salary cap

and that they would not engage in any prohibited collusion or circumvention of the SSA.

The NFL and the Owners, however, engaged in a secret, recently-revealed collusive and

circumventing agreement, whereby each of the 32 Clubs agreed to suppress player salaries – including by imposing a secret $123 million per-Club salary cap for that *un*capped 2010 season.

2.     Information about this conspiracy did not come to light until on or about March 12, 2012, when it was revealed in the media that four of the 32 Clubs (Washington Redskins, Dallas Cowboys, Oakland Raiders, and New Orleans Saints) did not fully abide by secret NFL rules to suppress player salaries in 2010.  New York Giants Owner John Mara – who is Chair of the NFL Management Council Executive Committee (a.k.a., the CEC) – subsequently confirmed the existence of the conspiracy in his statements to the media regarding penalties imposed by the NFL on those four Clubs.  The NFLPA and the players also later learned that, according to internal NFL calculations, those four Clubs did not adhere to the league-wide conspiracy, at least not fully, in exceeding the secret salary cap during the uncapped 2010 season by the following amounts:  Redskins: $102,833,047; Cowboys:  $52,938,774; Raiders:  $41,914,060; Saints:  $36,329,770.

3.     On information and belief, each of the other 28 Clubs fully or materially honored the conspiracy, which violated the SSA, including its anti-collusion and anti-circumvention provisions, and resulted in actual damages to the players of up to $1 billion, if not substantially more.  (Pursuant to the SSA, the players are entitled to compensatory damages and an additional amount equal to two times such compensatory damages, which would result in SSA damages of up to $3 billion or more.  (*See* SSA Art. XIII § 9.))

4.     The SSA's mandate that the 2010 season be uncapped was a negotiated provision intended to benefit the players.  Among other things, an uncapped year – *i.e.*, a season with no ceiling on aggregate player compensation – created the potential for dramatic increases in player income for the 2010 season.  In conspiring to suppress player salaries in 2010, however, it is self-evident that the NFL's and the Owners' actions were dictated solely by self-interest, unconstrained by their clear and unambiguous SSA obligations.[1]  The NFLPA and Class Counsel therefore bring this enforcement action under the Final Consent Judgment and the SSA to remedy the NFL's and the Owners' illegal, collusive agreement to abide by a salary cap during the uncapped 2010 season. Specifically, in entering the collusive arrangement, the NFL and the Owners:

a.     Violated the SSA's Anti-Collusion provisions (SSA Art. XIII § 1);

b.     Circumvented the SSA's provisions mandating that the Final League Year generally and the 2010 League Year specifically be an Uncapped Year (SSA Art. XV § 2);

c.     Breached their contractual obligation and pledge to use their best efforts and cooperation to implement the SSA's provisions in a manner consistent with good faith and fair dealing (SSA Art. XIX § 6); and

d.     Breached their implied covenant of good faith and fair dealing.

---

[1]     The NFL has disregarded its SSA obligations in the past.  *See, e.g., White v. NFL (TV Revenues)*, 766 F. Supp. 2d 941, 951 (D. Minn. 2011) (addressing other SSA breaches by the NFL that were "unconscionable" and "inconsistent with good faith").

5.     The NFLPA and Class Counsel accordingly seek (i) compensatory damages in an amount to be proven at trial, (ii) SSA "non-compensatory" damages of at least two times the amount of compensatory damages, and/or (iii) other relief consistent with the SSA and the law.

## JURISDICTION

6.     This Court has exclusive jurisdiction over this enforcement proceeding pursuant to the Final Consent Judgment, which provides:

> ORDERED AND ADJUDGED, that . . . this court retains exclusive jurisdiction over this action to effectuate and enforce the terms of the Stipulation and Settlement Agreement, as amended, and this Judgment.

(Dkt. 318 at 6), and the SSA, which provides:

> Pursuant to the Final Consent Judgment in this Action, the Court shall retain jurisdiction over this Action to effectuate and enforce the terms of this Agreement and the Final Consent Judgment.

 (SSA Art. XX § 1.)

7.     This enforcement proceeding is properly before this Court pursuant to SSA Article XIII § 17, which provides:  "In the absence of a Special Master, the complaining party shall file such claim with the Court."  There is presently no Special Master under the SSA.

8.     Prior to the initiation of this enforcement proceeding, the NFLPA and Class Counsel conferred by telephone with counsel for the NFL and the Clubs in accord with SSA Article XIII § 18.

## FACTUAL ALLEGATIONS

### The NFL's And The Owners' History Of Collusive Conduct

9.     The SSA, as the Eighth Circuit recognized, "represent[s] the resolution to a decades-old dispute" in which the NFL and the Owners colluded and "worked together to minimize labor costs" and the players' share of the game's success.  *White v. NFL*, 585 F.3d 1129, 1133-34 (8th Cir. 2009).

10.    Specifically, "[o]n September 10, 1992, following a ten-week trial, a jury found the NFL in violation § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1."  *White v. NFL (TV Revenues)*, 766 F. Supp. 2d 941, 944 (D. Minn. 2011) (citing *McNeil v. NFL (Plan B Free Agency)*, No. 90-476, 1992 WL 315292, at *1 (D. Minn. Sept. 10, 1992)).

11.    "Following the verdict, individual players sought injunctive relief to become free agents for the 1992 season."  *White*, 766 F. Supp. 2d at 944 (citing *Jackson v. NFL*, 802 F. Supp. 226, 228 (D. Minn. 1992)).  "Based on the *McNeil* verdict," this Court "enjoined" the NFL and the Owners from continuing certain restrictive practices against players.  *White*, 766 F. Supp. 2d at 944 (citing *Jackson*, 802 F. Supp. at 235).  "Less than two weeks after the *McNeil* verdict, players . . . brought [this] antitrust class action seeking injunctive relief in the form of total or modified free agency."  *White*, 766 F. Supp. 2d at 944 (citing *White v. NFL*, 822 F. Supp. 1389 (D. Minn. 1993)).

12.    Then, "[t]he parties decided to settle their financial and labor disputes, and a mandatory settlement class was certified for damages and injunctive relief. . . .  The NFL and the Players formed the SSA to bring an end to a wide range of litigation.  On April 30, 1993, the court approved the SSA."  *White*, 766 F. Supp. 2d at 944.  The Court

approved amendments to the SSA in 1993, 1996, 1999, 2002, and 2006, with the 2006

amendment covering League Years 2006-2012.

**The SSA's Anti-Collusion, Anti-Circumvention, And Anti-Bad Faith Provisions**

13.    In view of the NFL's and the Owners' historic bad faith, collusive conduct,

and other illegal acts, the SSA provides a series of protections for the players, including

provisions to prevent and police the NFL and the Owners from engaging in collusive

conduct, from circumventing the SSA and its provisions, and from otherwise acting in

bad faith.

14.    Specifically, SSA Article XIII is titled "Anti-Collusion," and § 1 thereof

provides:

> **Prohibited Conduct:**  No Club, its employees or agents,
> shall enter into any agreement, express or implied, with the
> NFL or any other Club, its employees or agents, to restrict or
> limit individual Club decision-making as follows:
>
> (a) whether to negotiate or not to negotiate with any player;
>
> (b) whether to submit or not to submit an Offer Sheet to any
>     Restricted Free Agent;
>
> (c) whether to offer or not to offer a Player Contract to any
>     Unrestricted Free Agent or Undrafted Rookie;
>
> (d) whether to exercise or not to exercise a Right of First
>     Refusal; or
>
> (e) concerning the terms or conditions of employment offered
>     to any player for inclusion, or included, in a Player
>     Contract.

15.    Additionally, SSA Article XV § 2 provides:

> **Circumvention:**  Neither the parties hereto, nor any Club or
> player shall enter into any agreement . . . or other transaction

which includes any terms that are designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by (a) the provisions of this Agreement with respect to Total Revenues, Salary Cap, Entering Player Pool, and Minimum Team Salary, and (b) any other term and provision of this Agreement.

16.    Further, SSA Article XIX § 6 provides:

Defendants . . . each hereby pledge their best efforts and cooperation . . . to implement the provisions of the [SSA] in a manner consistent with good faith and fair dealing.

17.    As a matter of New York law (which governs the SSA (SSA Art. XXVII)), the SSA also includes an implied covenant of good faith and fair dealing.  "Good faith connotes an actual state of mind motivated by proper motive and encompasses, among other things, an honest belief, the absence of malice and the absence of a design to defraud or to seek an unconscionable advantage.  In addition, good faith requires that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *White*, 766 F. Supp. 2d at 950-51 (citations, quotations, ellipsis omitted).

**The Pre-Lockout, Uncapped 2010 League Year**

18.    The SSA initially set the 2012 League Year as the Final League Year.  (*See* SSA Art. I(bf); SSA Art. XXV § 2.)  As a result of the NFL's and the Owners' decision to opt out of the SSA two years early, the 2010 League Year became the Final League Year.  (SSA Art. XXV § 3.)  As part of the careful balance struck in the SSA, the parties agreed that "[t]he Final League Year shall always be an Uncapped Year," *i.e.*, a "League Year for which a Salary Cap is not in effect."  (SSA Art. I(be)-(bf).)  Indeed, SSA Article

XI § 1 made the parties' intentions clear:  "No Salary Cap shall be in effect during the Final League Year."

19.   A key purpose of the SSA's prohibition of a Salary Cap in the Final League Year was to create an incentive for the NFL and the Owners to negotiate extensions of the SSA rather than let it expire.  In exchange for receiving an Uncapped Year, the players agreed to several concessions in negotiations with the NFL and the Owners, including provisions of the SSA that moved the qualification for Unrestricted Free Agency from four to six years of service, as well as provisions imposing certain other limitations on their free agency during the Final League Year.  (SSA Art. XI.)  In the past, these provisions effectively led to four different extensions of the SSA.

20.   In 2010, however, the NFL and the Owners concluded that they did not want another extension of the SSA.  It now has been revealed that one of the NFL's and the Owners' strategies for resisting such an extension was to covertly collude and circumvent the SSA to restrain player compensation by, at a minimum, imposing a secret $123 million salary cap for 2010.  All the while, the NFL and the Owners led the NFLPA and the players to believe, and the NFLPA and the players did reasonably believe, that the NFL and the Owners abided by and implemented the SSA's requirement that the 2010 League Year be an Uncapped Year.

**The NFL's And The Owners' Collusive Agreement To Impose An Illegal Salary Cap In The 2010 League Year**

21.   On or about March 12, 2012, the NFLPA and the players first learned of information indicating that the NFL and the Owners had secretly, in violation of the SSA,

conspired and colluded with each other to impose a secret salary cap for the 2010 League

Year (the "Collusive Agreement") – a League Year in which the SSA purposely and

expressly prohibited any salary cap.

22.   Through media reports, the NFLPA and the players first learned of the NFL's

and the Owners' Collusive Agreement to impose a secret 2010 salary cap that – in the

words of John Mara – "came up several times in [ownership-level] meetings" before the

2010 League Year.  (D. Graziano, *Mara:  Redskins, Cowboys got off "lucky,"* ESPN

NFC East Blog (Mar. 25, 2012); *see also*, *e.g.*, M. Florio, *NFL warned teams "at least six*

*times" about not dumping salary in uncapped year,* NBC ProFootballTalk (Mar. 12,

2012) ("teams were told 'at least six times' during ownership-level meetings").)  The

NFLPA and Class Counsel are informed and believe, and thereon allege, that one or more

of the NFL's and the Owners' outside and/or inside counsel were a witness to at least

some of these discussions and warnings at ownership-level meetings.

23.   According to a report published on the NFL's own website on March 25,

2012, Mara, in discussing the NFL's and the Owners' Collusive Agreement, referred to

the SSA's requirement that the Final League Year be an Uncapped Year as a mere "one-

year loophole."  (*Giants owner Mara:  Cap penalties could have been worse*, NFL.com

(Mar. 25, 2012).)

24.   It has only recently come to light that, in order to circumvent this so-called

loophole – which was, in reality, a vital part of the delicate balance struck in the SSA

approved and ordered by the Court – the NFL and the Owners conspired and agreed

amongst themselves, according to NFL Commissioner Roger Goodell, to impose salary

cap "rules" on themselves.  (D. Graziano, *No date set for cap penalty hearings,* ESPN

NFC East Blog (Mar. 28, 2012).)  Indeed, in late March 2012, Goodell acknowledged

that:  "[T]he rules were articulated. . . .  [T]he rules were quite clear."  (*Id.*)  Chicago

Bears Chairman George McCaskey similarly admitted:  "It's very important that

everybody plays by the same set of rules. . . .  If they tell people what the rules are, they

all have to play by them."  (D. Pompei, *Bears' McCaskey leery of expanding rosters*,

Chicago Tribune (Mar. 26, 2012).)

    25.   The NFLPA and Class Counsel are informed and believe, and thereon allege,

that the rules of the Collusive Agreement included the following:

      a.   A secret $123 million cap per Club to restrict or limit each Clubs'

          spending on player salaries during the 2010 League Year; and

      b.   Threatened "serious consequences" for any Club that violated this secret

          salary cap.  (M. Florio, *NFL warned teams "at least six times" about*

          *not dumping salary in uncapped year,* NBC ProFootballTalk (Mar. 12,

          2012).)

    26.   It has become apparent in recent weeks that, not only did the NFL and the

Owners enter into this Collusive Agreement, but they executed and largely abided by the

Collusive Agreement and, in fact, did secretly restrict most Club spending on player

salaries to $123 million for the 2010 League Year.  As Goodell admitted, "the rules . . .

were followed."  (D. Graziano, *No date set for cap penalty hearings,* ESPN NFC East

Blog (Mar. 28, 2012).)  The NFLPA and Class Counsel are informed and believe, and

thereon allege, that at least 28 of the 32 Clubs fully or materially complied with the secret, collusive $123 million salary cap during the 2010 League Year.

27.   As to the other four Clubs – the Redskins, Cowboys, Raiders, and Saints – it recently has come to light that they refused, at least to some extent, to abide by their collusive conspiracy with the NFL and the other Owners, and exceeded the secret, collusive $123 million salary cap during the 2010 League Year.

28.   Shortly before March 12, 2012, the NFL forced the NFLPA to agree (i) to material, NFL-determined reductions in the Redskins' and Cowboys' salary cap room for the 2012-2013 seasons, and (ii) to spread the corresponding amounts among all other Clubs, except for the Raiders and the Saints, as the take-it-or-leave-it "price" for the NFL agreeing to the NFLPA's request to defer certain player benefit costs to later years when there would be increased television revenues to cover those costs.  At the time, on March 11, 2012, the NFLPA and the players had no information or knowledge that the NFL was seeking this redistribution of salary cap room as a means of (i) penalizing the Redskins and Cowboys, and to a lesser degree the Raiders and Saints (via denied redistribution), for not fully abiding by the Collusive Agreement in 2010 and (ii) rewarding the other 28 conspiring Clubs for adhering to the Collusive Agreement in 2010.  It was only after the NFL forced the NFLPA into this March 11, 2012 agreement that the NFL's and the Owners' collusive acts regarding the secret salary cap during 2010 finally came to light.

29.   The NFLPA and Class Counsel are informed and believe, and thereon allege, that:  (i) the NFL and the Owners furthered the concealment of their Collusive Agreement throughout 2010 and beyond by, among other things, approving the very player contracts

that enabled the Redskins, Cowboys, Raiders, and Saints to exceed the secret, collusive salary cap; (ii) as late as March 9, 2012, the NFL, at least in part through inside counsel, was communicating with its co-conspirator Owners about how and why to keep the Collusive Agreement a secret after Goodell and certain Owners resolved to impose the earlier-threatened "serious consequences" through the penalties and redistributions ultimately documented in the March 11, 2012 agreement; and (iii) the NFL and the Owners continued the concealment prior to and on March 11, 2012 by seeking the NFLPA's agreement to the salary cap reallocation without disclosing that the true reason for the then-proposed reallocation was to penalize the Redskins, Cowboys, Raiders, and Saints for not fully abiding by the Collusive Agreement.  The NFLPA and Class Counsel are informed and believe, and thereon allege, that one or more of the NFL's and the Owners' outside and/or inside counsel were a witness to this concealment.

30.   In finally publicly disclosing why the NFL sought to remove salary cap room from the Redskins and Cowboys, Mara candidly admitted the NFL's and the Owners' collusion regarding the secret salary cap in saying:  "I thought the penalties imposed were proper . . . .  What they did was in violation of the spirit of the salary cap.  They attempted to take advantage of a one-year loophole, and quite frankly, I think they're lucky they didn't lose draft picks."  (*Giants owner Mara:  Cap penalties could have been worse*, NFL.com (Mar. 25, 2012).)

31.   Mara similarly admitted:  "It has to do with teams attempting to gain a competitive advantage through a loophole in the system.  They attempted to take advantage of it knowing full well there would be consequences. . . .  [W]hen you look at

the overall scope of what they did, they were trying to take advantage and they were told not to."  (D. Graziano, *Mara:  Redskins, Cowboys got off "lucky,"* ESPN NFC East Blog (Mar. 25, 2012).)

32.   The NFL calculated the extent to which the four Clubs exceeded the NFL's secret, collusive salary cap in the uncapped 2010 League Year, and imposed cap fines on two of those Clubs, as follows:

|     | 2010 Charges | Above 123m | Cap Fine | Net Gain |
|-----|--------------|------------|----------|----------|
| WAS | 225,833,047  | 102,833,047 | 36,000,000 | 66,833,047 |
| DAL | 175,938,774  | 52,938,774 | 10,000,000 | 42,938,774 |
| OAK | 164,914,060  | 41,914,060 | 0 | 41,914,060 |
| NO  | 159,329,770  | 36,329,770 | 0 | 36,329,770 |

Thus, for example, the NFL calculated that the Redskins were nearly $103 million above the secret, collusive $123 million salary cap, and, on the basis of that calculation, the NFL fined the Redskins $36 million.  (In the NFL's view, even after the imposition of cap fines against two of the Clubs, the four Clubs ended up with a "net" salary cap "gain" of the amounts reflected in the "Net Gain" column in the table above.)

33.   Simply put, in bad faith violation and circumvention of the SSA, the NFL and the Owners conspired and then entered into the secret Collusive Agreement to restrict and limit all Clubs' player salary spending during the Final League Year, a League Year that the SSA mandated be uncapped.

**The NFL's And The Owners' Collusive Agreement Caused Substantial
Economic Injury**

34.    The NFL's and the Owners' Collusive Agreement has caused economic
injury to the players by, among other things, wrongly and significantly reducing the
amount Clubs spent on player salaries during the 2010 League Year.

35.    While the precise amount of the players' resulting economic injuries is not
yet known at this pre-discovery stage, the fact of those economic injuries is known.  The
amounts by which the Redskins, Cowboys, Raiders, and Saints exceeded the secret,
collusive $123 million salary cap during the 2010 League Year indicate that, but for the
secret, collusive $123 million salary cap and possibly other collusive agreements, all
Clubs would have spent substantially more on player salaries during the 2010 League
Year.  On information and belief, the conspiracy alleged herein resulted in actual
damages to the players of up to $1 billion, if not substantially more.  (Pursuant to the
SSA, the players are entitled to compensatory damages and an additional amount equal to
two times such compensatory damages, which would result in SSA damages of up to
$3 billion or more.  (*See* SSA Art. XIII § 9.))

**THE CLAIMS PRESENTED HERE ARE ENTIRELY NEW**

36.    The claims asserted in this enforcement action were not pending, and were
not part of the previously-asserted and now-dismissed limited collusion claims lodged on
January 10, 2011.  Those January 10, 2011 collusion claims concerned only, and
specifically, (i) limits on Offer Sheets to Restricted Free Agents to suppress that distinct
player group's salaries in 2010 and thereafter, and (ii) trigger dates in player contracts to

delay certain Option Bonus payments until the start of the then uncertain 2011 regular season.  Those prior collusion claims did *not* at all concern, for example, the previously unknown Collusive Agreement among the NFL and the Owners to impose a secret $123 million salary cap in the uncapped Final League Year.  Moreover, those claims brought on January 10, 2011 did not include, as alleged herein, circumvention or good faith and fair dealing claims relating to the secret imposition of a salary cap in the 2010 League Year.  Additionally, the claims asserted herein were not otherwise part of any "claims pending regarding the [SSA]" on August 11, 2011.  (8/11/11 Text Entry Order.) They could not have been, as the NFLPA and the players only first discovered the claims alleged herein on or about March 12, 2012.  Accordingly, the claims asserted herein were not and are not covered by – and thus were not dismissed by – this Court's August 11, 2011 dismissal order, which expressly "dismissed" only those "claims [then] pending" before the Court.  (*Id.*)  Indeed, the claims in this proceeding could not have been previously asserted in this Action as the NFLPA and the players had no knowledge of the NFL's and the Owners' secret salary cap agreement at all until, at the earliest, March 12, 2012.

### COUNT I – COLLUSION – VIOLATION OF SSA ARTICLE XIII

37.   The NFLPA and Class Counsel allege and incorporate by reference each paragraph above as if fully set forth herein.

38.   The NFL and the Owners entered into an agreement among themselves to, *inter alia*, impose a secret $123 million per-Club salary cap on all the Clubs during the 2010 League Year – a mandatory Uncapped Year under the SSA.  (SSA Art. XIII § 1.)

39.   In this agreement, the NFL and the Owners restricted and/or limited individual Club decision making as to the total amount each Club would/could spend on player salaries in the 2010 League Year.  (SSA Art. XIII § 1.)

40.   Thereby, the NFL and the Owners restricted and/or limited individual Club decision making at least (i) on whether to negotiate or not to negotiate with any player and/or (ii) concerning the terms or conditions of employment.  (SSA Art. XIII § 1(a), (e).)

41.   This conduct of the NFL and the Owners violated the SSA's Anti-Collusion provisions, including SSA Article XIII § 1.

42.   This conduct of the NFL and the Owners caused economic injury to the players by, among other things, suppressing the salaries they otherwise would have received absent the collusion.  (SSA Art. XIII § 5(2).)

43.   As a result of the NFL's and the Owners' violations of SSA Article XIII § 1, the NFL and the Owners are liable for compensatory damages in an amount to be proven at trial.  (SSA Art. XIII § 9.)

44.   Through the NFL's and the Owners' agreement among themselves to impose a secret $123 million per-Club salary cap on all the Clubs during the 2010 League Year, all Clubs violated SSA Article XIII § 1, and, as a result, the NFL and the Owners are liable for additional SSA "non-compensatory" damages of at least two times the amount of compensatory damages.  (SSA Art. XIII § 9(a).)

## COUNT II – CIRCUMVENTION – BREACH OF SSA ARTICLE XV § 2

45.   The NFLPA and Class Counsel allege and incorporate by reference each paragraph above as if fully set forth herein.

46.   As reflected by SSA Article I(be)-(bf) and SSA Article XI § 1, the parties to the SSA intended the Final League Year generally and the 2010 League Year specifically to be an Uncapped Year, *i.e.,* a League Year for which a Salary Cap is not in effect.

47.   The NFL and the Owners entered into an agreement among themselves to, *inter alia*, impose a secret $123 million per-Club salary cap on all the Clubs during the uncapped 2010 League Year.

48.   Thereby, the NFL and the Owners entered into a collusive agreement that included terms that were designed to serve the purpose of defeating or circumventing the intention of the parties, as reflected in the SSA, that the Final League Year generally, and the 2010 League Year specifically, be an Uncapped Year.

49.   Accordingly, the NFL and the Owners breached the SSA's Anti-Circumvention provision, SSA Article XV § 2.

50.   As a direct result of the NFL's and the Owners' breach of SSA Article XV § 2, the NFL and the Owners have caused the players to suffer damages in an amount to be proven at trial.

## COUNT III – BREACH OF SSA ARTICLE XIX § 6 / BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

51.   The NFLPA and Class Counsel allege and incorporate by reference each paragraph above as if fully set forth herein.

52.    The NFL and the Owners – by entering into an agreement among themselves to impose a secret $123 million per-Club salary cap on all the Clubs during the 2010 League Year – violated the SSA's express good faith and fair dealing provision in which they "pledge[d]" to use "their best efforts and cooperation . . . to implement the provisions of the [SSA] in a manner consistent with good faith and fair dealing."  (SSA Art. XIX § 6.)  They also violated the SSA's implied covenant of good faith and fair dealing mandated under New York law.

53.    The NFL and the Owners breached their express and/or implied good faith and fair dealing obligations because their secret $123 million per-Club salary cap, among other things, had the "effect of destroying or injuring the right of the other party to receive the fruits of the [SSA]," *White*, 766 F. Supp. 2d at 951, specifically the requirement that the Final League Year, and thus the 2010 League year, be an Uncapped Year.  (SSA Art. I(be)-(bf); SSA Art. XI § 1.)  The NFL's and the Owners' secret $123 million per-Club salary cap also demonstrates, among other things, the NFL and the Owners failed to act with "an actual state of mind motivated by proper motive" and instead acted "[dis]honest[ly], with "malice," and/or with a "design to defraud or to seek an unconscionable advantage" over the players.  *White*, 766 F. Supp. 2d at 950-51.

54.    Thereby, the NFL and the Owners breached SSA Article XIX § 6.

55.    Additionally, the NFL and the Owners thereby breached their implied covenant of good faith and fair dealing in the SSA.

56.     As a direct result of the NFL's and the Owners' breach of SSA Article XIX § 6 and/or their implied covenant of good faith and fair dealing, the NFL and the Owners have caused the players to suffer damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, the NFLPA and Class Counsel respectfully request that the Court reopen this Action, hear this enforcement proceeding pursuant to the Final Consent Judgment and the SSA, and enter an order:

a.     Finding in favor of the players and against the NFL and the Owners;

b.     Granting immediate and expedited discovery as provided in the SSA;

c.     Awarding compensatory damages in an amount to be determined at trial;

d.     Awarding additional SSA "non-compensatory" damages two times the amount of compensatory damages pursuant to SSA Article XIII § 9;

e.     Awarding reasonable attorneys' fees and costs pursuant to SSA Article XIII § 15;

f.     Awarding interest; and

g.     Granting such other and further relief as the Court deems just and proper.

Dated:  May 23, 2012

Respectfully submitted,

By: s/Barbara P. Berens

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION
  DeMaurice F. Smith *(pro hac vice)*
  Thomas DePaso
    *(pro hac vice forthcoming)*
  Heather M. McPhee *(pro hac vice)*
  1133 20th Street, NW
  Washington, DC 20036
  202-756-9136
  demaurice.smith@nflplayers.com
  tom.depaso@nflplayers.com
  heather.mcphee@nflplayers.com

LATHAM & WATKINS LLP
  David A. Barrett *(pro hac vice)*
  James R. Barrett *(pro hac vice)*
  555 Eleventh Street NW, Suite 1000
  Washington, DC 20004
  202-637-2200
  david.barrett@lw.com

  Daniel S. Schecter
    *(pro hac vice forthcoming)*
  355 South Grand Avenue
  Los Angeles, CA 90071
  213-485-1234
  daniel.schecter@lw.com

  Thomas J. Heiden *(pro hac vice)*
  Michael J. Nelson
    *(pro hac vice forthcoming)*
  233 South Wacker Drive, Suite 5800
  Chicago, IL 60606
  312-876-7700
  thomas.heiden@lw.com
  michael.nelson@lw.com

WINSTON & STRAWN LLP
  Jeffrey L. Kessler *(pro hac vice)*
  David G. Feher *(pro hac vice)*
  David L. Greenspan *(pro hac vice)*
  200 Park Avenue
  New York, NY 10166
  212-294-6700
  jkessler@winston.com
  dfeher@winston.com
  dgreenspan@winston.com

WEIL, GOTSHAL & MANGES LLP
  James W. Quinn *(pro hac vice)*
  767 Fifth Avenue
  New York, NY 10153
  212-310-8385
  james.quinn@weil.com

BERENS & MILLER, P.A.
  Barbara P. Berens, #209788
  Justi Rae Miller, #387330
  3720 IDS Center
  80 South Eighth Street
  Minneapolis, MN 55402
  612-349-6171
  bberens@berensmiller.com

LINDQUIST & VENNUM, PLLP
  Mark A. Jacobson, #188943
  4200 IDS Center
  80 South 8th Street
  Minneapolis, MN 55402
  612-371-3211
  mjacobson@lindquist.com

*Attorneys for the NFLPA and Class Counsel*