IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

|  |  |
|---|---|
| REGGIE WHITE, *et al.,* | ) |
| | ) |
| Plaintiffs, | ) No. 4:92-cv-00906-DSD |
| | ) |
| v. | ) |
| | ) |
| NATIONAL FOOTBALL LEAGUE, *et al.,* | ) |
| | ) |
| Defendants. | ) |

_____

## NFL'S OPPOSITION TO THE PETITION TO REOPEN THE STIPULATION AND SETTLEMENT AGREEMENT

August 4, 2011 marked the end of one historic era—an era in which labor relations in the National Football League were overseen by this Court—and the beginning of another. On that day, the NFLPA and the NFL reached agreement on a new Collective Bargaining Agreement to govern their relationship, as well as the terms and conditions of NFL player employment, for the following decade. At the same time, they agreed—not once, but twice—to put an end to all claims of any kind arising under the *White* Stipulation and Settlement Agreement, which had expired on March 11, 2011.

In the new CBA, the Union released and covenanted not to bring any claims arising under the expired SSA, specifically including claims of collusion. And in a separate stipulation of dismissal filed in the *White* docket, the

Union and Class Counsel agreed to dismiss "*all* claims, known *and unknown*, whether pending *or not*," regarding the SSA.

Now that the players have secured the benefits of the new CBA, the NFLPA and Class Counsel seek to rescind part of the *quid pro quo* that made that historic event possible. The plain language of their agreements confirms that they may not do so. This Court should emphatically reject their effort to return to an expired labor era—one that, in order to secure a broad agreement that ensures labor peace for a decade, the parties agreed to close.

In short, as the parties intended, the *White* case is over and the SSA is history. The Petition should be denied.

Even if the old labor era were still in place, the claims would be time-barred. Under the expired SSA, collusion claims were required to be brought no later than 90 days after the first regular season game of the League Year or 90 days after Class Counsel or the NFLPA should reasonably have discovered them, whichever was later. Months before the first regular season game, played on September 9, 2010, NFLPA Executive Director DeMaurice Smith made what he asserted was such a discovery: He declared that during the 2010 League Year, there was "almost a uniform decrease" in club payrolls that "you wouldn't expect in a completely free market." The claims asserted in the Petition to Reopen, filed more than *600* days later, would therefore be more than 500 days too late.

## PROCEDURAL HISTORY

The SSA expired on March 11, 2011. *See* SSA (Dkt No. 524), Art. XXV, §§ 2, 3(a). At that time, six *White*- and CBA-related matters were pending: Four related to the television revenue proceeding; one, filed on the last day of the SSA term, related to an alleged shortfall with respect to compensation of rookies of the Philadelphia Eagles; and one involved allegations of collusion during the 2010 League Year.

On the same date, the players filed yet another antitrust suit against the NFL: *Brady v. NFL*, No. 11-cv-639 (D. Minn.). One month later, on April 11, 2011, Judge Nelson ordered "the parties and attorneys" to participate in mediation and appointed Chief Magistrate Judge Boylan as the mediator. *Id.*, Dkt. 56.

The mediation overseen by Judge Boylan was successful. On August 4, 2011, in the wake of a mediated settlement of the *Brady* case the week before, the NFLPA and the NFL reached agreement on a new, comprehensive CBA. As part of that agreement, the parties agreed to resolve all claims (with only one exception—the pending claim involving the Eagles Rookies) arising out of the old agreements.

The agreement to resolve all claims regarding the old SSA, expressed in the new CBA itself, is reflected in this release and covenant not to sue:

The NFLPA on behalf of itself, its members and their respective heirs ... releases and covenants not to sue, or to support financially or administratively, or voluntarily provide testimony of any kind, including by declaration or affidavit in, any suit or proceeding (including any Special Master proceeding brought pursuant to the *White* SSA and/or the Prior [CBA]) against the NFL or any NFL Club or any NFL Affiliate with respect to any antitrust or other claim asserted in *White v. NFL* or *Brady v. NFL*, *including, without limitation ... collusion with respect to any League Year prior to 2011*, or any claim that could have been asserted in *White* or *Brady* related to any other term or condition of employment with respect to conduct occurring prior to the execution of this Agreement.

(Ex. A at Art. 3, § 2 (emphasis added).[1])

The only exception to this comprehensive release and covenant not to sue is explained in a contemporaneous letter agreement, which provided that "notwithstanding anything ... in the [CBA] … the Special Master proceeding initiated March 11, 2011 pertaining to payments to be made … to rookies on the 2011 roster of the Philadelphia Eagles is not rendered moot or dismissed." (Ex. B.)

The agreement to resolve all claims regarding the old SSA (aside from the Eagles matter) is also and separately expressed in a stipulation filed by the NFLPA, Class Counsel and the NFL in *White*, stipulating:

to the dismissal with prejudice of *all claims, known and unknown, whether pending or not*, regarding the Stipulation and Settlement Agreement ("SSA") including but not limited to the claims asserting breach of the SSA related to (i) television con-

---

[1] All exhibits are attached to the supporting Declaration of Daniel Connolly.

tracts and broadcast revenues; and (ii) *asserted collusion with respect to the 2010 League Year*, excepting *only* the pending claim filed March 11, 2011 relating to an alleged rookie shortfall on the part of the Philadelphia Eagles.

(Ex. C (emphases added).)

If any collusion claims had been asserted under the old labor regime, they would have been subject to the limitations period of the SSA, which provided that any such claim "must be brought within ninety (90) days of the time when the player knows or reasonably should have known with the exercise of due diligence that he had a claim, or within ninety (90) days of the first scheduled regular season game in which a violation of Section 1 of this Article is claimed, whichever is later." SSA Art. XIII, § 17. The first scheduled regular season game of the 2010 season occurred on September 9, 2010.

Six hundred twenty-three days later, on May 23, 2012, the NFLPA and Class Counsel filed the Petition, seeking leave to reopen the *White* SSA to assert a claim for damages of "up to $1 billion, if not substantially more" (Pet. ¶ 35) for asserted collusion with respect to the 2010 League Year. That is the same League Year during which, two years before the Petition was filed, the NFLPA's Executive Director had asserted "almost a uniform decrease" in club payrolls that "you wouldn't expect in a completely free market." (Ex. E.)

## ARGUMENT

There are three independent, dispositive reasons why this Court should deny the Petition.

*First*, in the 2011 CBA, the NFLPA released and covenanted not to bring the claims that it now seeks to assert.

*Second*, in a separate stipulation, the NFLPA and Class Counsel agreed to dismiss with prejudice all claims, known and unknown, whether pending or not, regarding the SSA.

*Third*, even if the claims asserted in the Petition had not been released or dismissed twice, they would be time-barred; in 2010, Class Counsel and the NFLPA knew *and* "reasonably should have known with the exercise of due diligence" of their asserted collusion claim and were required to raise it no more than 90 days later.

## I.   In the 2011 CBA, the NFLPA Released the Claims That It Now Seeks Leave To Assert.

Article 3, Section 3(a) of the new CBA leaves no doubt that the claims that the Petition seeks to advance are barred. In that Section, the NFLPA comprehensively agreed on behalf of itself and its members to release, and not to bring itself, and not to support anyone who does bring, "*any* suit or proceeding … against the NFL or any NFL Club" that raises any claim related to the old SSA, including specifically:

- "any Special Master proceeding brought pursuant to the *White* SSA";

- "any antitrust or other claims asserted in *White v. NFL* or *Brady v. NFL*";

- "any claim that could have been asserted in *White* or *Brady*"; and

- "any claim relating to collusion with respect to any League Year prior to 2011."

It has long been settled that releases and covenants not to sue of the kind to which the NFLPA agreed in the CBA "are not to be shorn of their efficiency by any narrow, technical, and close construction"; the express language used "in the CBA indicates an intent to make an ending of every matter arising under or by virtue of the contract. If the parties intend to leave some things open and unsettled, their intent to do so should be made manifest." *United States v. William Cramp & Sons Ship & Engine Bldg. Co.*, 206 U.S. 118, 128 (1907).

Here, the claims at issue are unambiguously within the scope of the release and covenant not to sue to which the parties agreed in the comprehensive new CBA; the language used in the parties' agreement does not permit "any narrow, technical, [or close] construction" that would leave the matter "open and unsettled." There can be no reasonable doubt that, aside from the Eagles rookie matter (*see* Ex. B), the parties intended "to make

an ending of every matter arising under or by virtue of" the old CBA or the SSA.

Indeed, the exception from the release and covenant not to sue of "only" the Eagles matter confirms that when the parties intended to create an exclusion from a release and covenant not to sue, they knew how to do so. *Expressio unius est exclusio alterius. See White v. NFL (In re Ashley Lelie)*, 533 F. Supp. 2d 929, 934 (D. Minn. 2008) (applying *expressio unius* canon in interpreting SSA and CBA). They did not do so for any claims of collusion; to the contrary, the release and covenant not to sue expressly applies to claims of "collusion with respect to any League Year prior to 2011." In addition, "claims of asserted collusion with respect to the 2010 League Year" were expressly included within the scope of the Stipulation of Dismissal simultaneously filed in the *White* docket.

It is also well-settled under New York law that "a general release bars an action on any cause of action arising prior to its execution." *Clark v. Buffalo Wire Works Co. Inc.*, 3 F. Supp. 2d 366, 372–73 (W.D.N.Y. 1998) (quoting *Mergler v. Crystal Props. Assocs., Ltd.*, 583 N.Y.S.2d 229, 230–31 (N.Y. Sup. Ct. 1992)).[2] This principle applies with equal force to claims of which the releasor professes to have been unaware at the time that the release was

---

[2] To the extent that federal law does not apply, both the SSA and the CBA are governed by New York law. *See* SSA Art. XXVII; CBA Art. 70, § 1.

executed. *See, e.g., Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. De C.V.,* 952 N.E. 2d 995, 1000 (N.Y. 2011) ("Notably, a release may encompass unknown claims, including unknown fraud claims, if the parties so intend and the agreement is fairly and knowingly made.") (citation and internal quotation marks omitted); *Mergler,* 179 A.D.2d at 180 ("[I]t is not a prerequisite to the enforceability of a release that the releasor be subjectively aware of the precise claim he or she is releasing."); *G.S.C. Holding Corp. v. Cervoni,* 415 N.Y.S.2d 57, 59 (N.Y. Sup. Ct. 1979) (release barred claim even though facts were unknown to releasor at time of execution); *Pickwick Comm'ns, Inc. v. Weinberg,* 1994 WL 620950, at *12 (S.D.N.Y. 1994) ("As to defendants' contention that [they] did not fully appreciate the magnitude of the alleged fraudulent scheme, we point out that a broad release of the kind at issue here bars all claims, irrespective of whether these claims had ripened at the time of the release's execution or whether the releasor was even aware of them at the time of execution."); *Omaha Indemnity Co. v. Johnson & Towers, Inc.,* 599 F. Supp. 215 (E.D.N.Y. 1984) (fraud and breach of contract claims barred even though at the time he signed the release plaintiff was "unaware of the alleged damage or indeed the existence of a cause of action").

And, of course, it is well-settled that the NFLPA has the power and authority to release claims of its members. *See, e.g., Metro. Edison Co. v. NLRB,* 460 U.S. 693, 705 (1983) (A "union may bargain away its members' economic

rights"). *Accord Ia. Beef Processors, Inc. v. Amalgamated Meat Cutters & Butcher Workmen of N. Am.,* 597 F.2d 1138, 1144 (8th Cir. 1979) (affirming enforcement of broad "no strike" provision in a CBA); *Mont.-Dak. Utilities Co. v. NLRB*, 455 F.2d 1088, 1093–94 (8th Cir. 1972) ("We hold that under the bargaining contract as a whole … the Union and the members which it represents waived any right they might otherwise have had … .").

Indeed, in the context of stipulations or dismissals of claims, "employees are bound by their union's decisions as *quid pro quo* for the benefit they receive from collective bargaining." *Monahan v. N.Y. City Dep't of Corrections*, 214 F.3d 275, 287 (2d Cir. 2000); *see also Espinoza v. Cargill Meat Solutions Corp.*, 622 F.3d 432, 442 (5th Cir. 2010) (recognizing the "right of the union to waive some employee rights … [including] an employee's right to sue"); *Wallin v. Minn. Dep't of Corrections*, 974 F. Supp. 1234, 1238 (D. Minn. 1997) (holding that plaintiff was barred from asserting claims against his employer that were released under a settlement agreement negotiated and entered into by plaintiff's union). Thus, in *Monahan*, the Second Circuit noted that the benefits that individual workers realize "when their union litigates on their behalf" justifies "the potential cost of preclusion imposed on individual members," and confirmed that a stipulation dismissing a challenge to sick leave policies by the union's president barred individual union members from bringing their own challenges to the policies. 214 F.3d at 287–88.

## II. In a Separate Stipulation of Dismissal, the NFLPA and Class Counsel Also Released the Claims That They Seek Leave To Assert.

At the time that the parties reached agreement on their new CBA, there were pending before this Court in *White* claims under the old CBA and the SSA that had been filed before those agreements expired. To make a complete end of their disputes under the old agreements, the parties filed a self-executing Stipulation of Dismissal under Federal Rule of Civil Procedure 41(a).

In that Stipulation of Dismissal, the NFLPA and Class Counsel both agreed to dismiss—with prejudice—"*all* claims*, known *and unknown*, whether pending *or not*, regarding the Stipulation and Settlement Agreement," specifically including "*asserted collusion with respect to the 2010 League Year*." (Ex. C (emphases added).) The Stipulation of Dismissal with prejudice is a separate and independent reason why the claims that Class Counsel and the NFLPA now seek leave to assert are barred.

### A. The dismissal of the claims with prejudice was accomplished by the Stipulation; the Court's "text entry" was an administrative act that did not and could not alter the Stipulation.

Class Counsel and the NFLPA suggest that the *res judicata* effect of the Stipulation of Dismissal was determined by the Court's subsequent text entry noting the dismissal of all pending claims and motions. (Pet. ¶ 36, at

page 15.) That argument ignores Rule 41 and misunderstands the nature of the Court's action.

Under Rule 41(a), "a stipulation of dismissal signed by all parties who have appeared" dismisses the action on its own, automatically, without requiring any further action. *U.S. v. Altman*, 750 F.2d 684, 696 (8th Cir. 1984); *see generally* WRIGHT & MILLER, 9 FED. PRAC. & PROC. CIV. § 2363 (3d ed. & Supp. 2011). Indeed, as the Eighth Circuit has confirmed, a court may not alter or limit such an agreement. *See Gardiner v. A.H. Robins Co., Inc.*, 747 F.2d 1180, 1189 (8th Cir. 1984) (judge's "So Ordered" notation imposed an impermissible material condition on the parties' right to a stipulated dismissal without court approval). The *res judicata* effect of the Stipulation of Dismissal in this case was thus established by the Stipulation itself; it did not depend on and was not affected by any subsequent action of the Court.

In addition, while we cannot be certain of the Court's purpose in entering the text-only order, it appears to have been intended as an administrative, housekeeping entry to reflect, rather than to effect, the Stipulation. That minute Order, entered on August 11, 2011, reads:

> TEXT ENTRY ONLY. IT IS HEREBY ORDERED that all claims pending regarding the Stipulation and Settlement Agreement 637 are dismissed. All other outstanding motions - 642 ; 652 and 677 are dismissed. By Senior Judge David S. Doty on 8/11/2011. (PJM) (Entered: 08/11/2011)

Under this District's ECF Filing Procedures Guide for Civil Cases, text-only docket entries are described as being used only for "*routine* orders or notices." Guide § II.G(1)(c) (emphasis added). Throughout the eighteen years of *White*, text-only entries were used only subject to that limitation.[3] Perhaps this particular entry was intended to ensure that then-pending motions would not appear on the "six month list" reported to the Administrative Office of the U.S. Courts. *See* 28 U.S.C. § 476(a).[4] Whatever the particular intent, however, the entry did not express a limitation on the Stipulation of Dismissal, and under Eighth Circuit law, it could not have done so.

**B.    There is no basis for excusing the NFLPA and Class Counsel from the effect of their Stipulation of Dismissal.**

Rule 41(a) stipulations of dismissal are intended to bring finality. There is no reason to excuse the NFLPA and Class Counsel from the intended consequences of their Stipulation here. Specifically, Class Counsel and the NFLPA should not be heard to argue that, because *White* was initially filed

---

[3] There have been thirteen "text-only" entries in the *White* docket. Seven noted the grant of motions for admission *pro hac vice*; four noted that a matter had been taken under advisement after a hearing (including one noting that a motion to lift a protective order had been granted); and one noted that an unopposed motion to close the Settlement Fund had been granted. In the two entries that addressed resolution of a motion (other than for admission *pro hac vice*), there was a notation that an order would be forthcoming.

[4] The four motions to which the text entry referred were the Motion/Objection to the Special Master's Recommendation regarding the TV revenue dispute (Dkt No. 637) and various motions to intervene and/or to unseal the record in that proceeding (Dkt Nos. 642, 652, 677).

as a class action, the Stipulation of Dismissal required Court approval under Rule 23.

As a threshold matter, "Rule 23(e) only requires court approval of the dismissal or compromise of '[the] class action' itself; it in no way suggests that negotiated resolutions of disputes peripheral to the class action need be approved." *Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 4 (1st Cir. 1999); *see also Rodgers v. U.S. Steel Corp.*, 70 F.R.D. 639, 643 (W.D. Pa. 1976) ("By its terms, Rule 23 applies and is limited to the dismissal or compromise of a class action itself ...."). The Stipulation of Dismissal, which addresses "claims *regarding the Stipulation and Settlement Agreement*," resolves claims "peripheral to the class action," a fact confirmed by Class Counsel's failure to provide notice to the Class when the Stipulation of Dismissal was filed.

In any event, the claims that Class Counsel and the NFLPA seek leave to assert are not the claims of the *White* Class, 99% of whose members left the NFL before the 2010 League Year. *See* SSA Art. I(d) (defining "Class Members"). Moreover, any "Class Member" who might claim injury as a result of asserted collusion in the 2010 League Year would also be a member of the NFLPA, which stipulated to the dismissal with prejudice of "all claims, known or unknown, whether pending or not," regarding the SSA. The Union's stipulation of dismissal binds its members. *See Monahan*, 214 F.3d at 287–

88; *see also Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 449 (D.C. Cir. 2004) (overruling NLRB decision refusing to enforce a settlement agreement entered into by a Union and employer over objection of a union member).

If a member of the NFLPA's bargaining unit is now unhappy with that dismissal, his remedy is a claim against the NFLPA for breach of the duty of fair representation, not a petition to this Court to reopen an expired settlement agreement. *See, e.g.*, *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 270–72 (2009) ("It was Congress' verdict that the benefits of organized labor outweigh the sacrifice of individual liberty that this system necessarily demands. Respondents' argument that they were deprived of [a] right to pursue their … claims in federal court by a labor union with a conflict of interest is therefore unsustainable; it amounts to a collateral attack on the NLRA.").

Nor does unhappiness with or second thoughts about the Stipulation of Dismissal permit Class Counsel or the NFLPA to rescind their promise not to bring the claims they now seek to bring. It is a well-established principle that parties are bound by the acts of their "lawyer-agent." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962) ("Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is con-

sidered to have 'notice of all facts, notice of which can be charged upon the attorney.'"); *see also Poehl v. Randolph*, 2008 WL 1946865 (8th Cir. May 6, 2008) ("[H]aving chosen an advocate to speak on her behalf, [plaintiff] was bound by her counsel's decision to dismiss voluntarily the claims against [defendants]."); *Tequila Cuervo La Rojena, S.A. de C.V. v. Jim Beam Brands Co.*, 2011 WL 407938 (S.D.N.Y. Feb. 8, 2011) (rejecting argument that a stipulation of dismissal requires signature of the party as opposed to counsel (citing *Link*, 370 U.S. at 634)).

## III.   Even If They Were Not Released, the Claims that the NFLPA and Class Counsel Seek Leave to Assert Would Be Time-Barred.

Even if the parties had not, as part of their comprehensive 2011 agreement, conclusively resolved and released all disputes under the old labor era, the collusion claims that the NFLPA and Class Counsel seek leave to assert here would be untimely under the plain terms of the expired SSA.

Article XIII, Section 17 of the SSA provided that any claim for collusion had to be brought within 90 days of the later of two dates: (1) the date when the NFLPA first "knows or reasonably should have known with the exercise of due diligence that [it] had a claim"; or (2) the date of the first regular season game in the season in which a violation is claimed.

For claims of collusion with respect to the 2010 League Year, the very latest that the SSA's limitation period could have expired was December 8,

2010—90 days after the first regular season game on September 9, 2010—because there is no question that the NFLPA and Class Counsel knew *and* reasonably should have known long before that first game of the claim that they now seek leave to pursue.

Class Counsel and the NFLPA recognized their December 8, 2010 deadline to file collusion claims addressing the 2010 League Year. Indeed, they asked the NFL to extend that deadline for 32 days—until January 10, 2011. As a courtesy, the NFL agreed to do so. Thus, on December 7, 2010, the day before the limitations period was to expire, Class Counsel, the NFLPA, and the NFL entered into a tolling agreement addressing claims of "alleged collusion amongst the NFL Parties with respect to this [2010] League Year" and agreeing "that any limitations defenses relating to a collusion proceeding with respect to the 2010 League Year shall be tolled for thirty-two days from December 8, 2010 until January 10, 201[1]." (Ex. D.)

As noted above, the NFLPA and Class Counsel knew *and* reasonably should have known long before December 8, 2010 or January 10, 2011 of the claim that they now seek leave to pursue. Their claim, remember, is that the NFL and its Member Clubs colluded to suppress salaries paid to players for the 2010 season. Because the vast majority of contracts for a season are signed well before the season begins, any such suppression would have been

apparent during the summer of 2010 and, in any event, by the end of the 2010 regular season in early January 2011.

The NFLPA had knowledge of the terms of all of those Player Contracts. Pursuant to both the SSA and the CBA, the NFL sent to the NFLPA promptly after execution a copy of every Player Contract signed by an NFL player during the 2010 League Year. *See* SSA Art. XVII, § 5; *see also id.* Art. XXIX, § 5. Calculation of total player compensation, on a League-wide or Club-specific basis, would have been a simple arithmetic exercise for the NFLPA's in-house staff, the sophisticated economists that it had on retainer, or Class Counsel.

With "the exercise of due diligence" that the SSA requires, any collusion claim—especially one that assertedly cost the players $1 billion or more—could, should, and would have been discovered by the time of the first regular season game.

Indeed, the public statements of NFLPA executives in 2010 confirm that they in fact *did* believe that they had such a claim because they *publicly* declared that club spending levels during the 2010 League Year could be explained only by collusion. NFLPA Executive Director DeMaurice Smith, for example, stated in March 2010: "[Y]ou see almost a uniform decrease (in club payrolls) … . Virtually all of them are down … . That's something you wouldn't expect in a completely free market." (Ex. E.)

NFLPA agents made similar public comments. For example, prominent agent Ralph Cindrich remarked in March 2010: "It's almost like everybody got a memorandum for how things would go. ... I know that's not legal. But that's been the pattern." (*Id.*) Agent Peter Schaffer was similarly explicit: "I see contracts being done as if there is a cap." (Ex. F.) And Drew Rosenhaus, who represents more than 100 NFL players, said in June 2010: "This has been a terrible offseason for NFL players for the most part. Collusion or not, the NFL has decided not to be aggressive in signing guys." (Ex. G; *see also* Ex. H (October 10, 2010, *Washington Post* article reporting that "The [NFLPA] is preparing a possible collusion case accusing teams of improperly conspiring to restrict players' salaries last offseason ... . [T]he union's collusion case would cite decreased spending by teams on free agent players ...." and quoting the NFLPA's director of communications that "[t]he players continue to gather evidence on possible collusion"); Ex. I (quoting DeMaurice Smith's March 2011 public statement that "the National Football League [has been] meeting in secret to talk about collusion, leverage, [and] conspiracy").)

What is more, on January 10, 2011, as the tolling agreement referred to above was about to expire, the NFLPA and Class Counsel actually filed a claim alleging collusion in the 2010 League Year. In their letter initiating that claim, they made clear that the "the full scope of the collusion at issue will be demonstrated at trial after full discovery is completed." (Ex. J, at 5.)

The discovery requests served by the NFLPA and Class Counsel in that proceeding confirm that the claim was not limited to a specific flavor of collusion or to a specific subset of players. They sought, for example, without limitation, "[a]ll documents regarding any and all communications between or among the NFLMC, the NFL, and/or any Clubs, regarding the structure or terms of 2010 player contracts" and all documents regarding any and all communications within the NFL or between the NFL and any Club discussing "player contract negotiations [or] player contract analyses or evaluations." (Ex. K, at Doc. Reqs. 12, 16 & 17.) The breadth of such requests is obvious.

In sum, if there were a "uniform decrease" in payrolls, as the NFLPA's Executive Director asserted in 2010, if the NFLPA's agents believed that "contracts [were] being done as if there [was] a cap" or "like [all NFL clubs had received] a memorandum for how things would go," as two prominent NFLPA agents remarked, the NFLPA and Class Counsel were plainly on notice of a collusion claim for the 2010 season because, in the context of a limitations period like that of the SSA, "facts that should arouse suspicions … are equated with actual knowledge of the claim." *Wolf v. Wagner Spray Tech. Corp.*, 715 F. Supp. 504, 508–09 (S.D.N.Y. 1989). *Accord, e.g.*, *In re Cirpofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 225 (E.D.N.Y. 2003) ("[C]ourts have found that '[a]ny fact that should excite [a plaintiff's] suspi-

cion is the same as actual knowledge of his entire claim.'" (quoting *Dayco v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975))); *Anderson v. Dairy Farmers of Am., Inc.*, 2010 WL 1286191, at *5 (D. Minn. Mar. 29, 2010) ("[T]he statute of limitations begins to run when the plaintiff knows facts sufficient to 'arouse [] suspicion or curiosity.'" (quoting *Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 928 F.2d 238, 241 (7th Cir. 1991))).

In addition, suspicion of possible wrongdoing gives rise to a "duty to inquire into the possible existence of a claim." *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998); *see also Garza v. U.S. Bureau of Prisons*, 284 F.3d 930, 935 (8th Cir. 2002) ("[S]uspicions do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence."); *Thompson v. Metro. Life Ins. Co.*, 149 F. Supp. 2d 38, 48 (S.D.N.Y. 2001) ("[P]laintiff simply needs to have a 'hint' or 'suspicion' of the injury and its causes to be put on inquiry notice."). As a result, "all that is necessary to cause the tolling period to cease is for there to be reason to suspect the probability of any manner of wrongdoing." *131 Maine Street Assoc. v. Manko*, 179 F. Supp. 2d 339, 348 (S.D.N.Y. 2002).

To be clear, there was no collusion with respect to the 2010 League Year. But for purposes of evaluating whether the SSA's tolling period ceased—and even without regard to the public statements of the NFLPA's Executive Director and agents—it suffices to say that it is simply incredible

for the NFLPA and Class Counsel to assert on the one hand that over $1 billion in player compensation was "missing" in 2010 (Pet. ¶¶ 3, 35), but to assert on the other that they did not know—and would not have known with the reasonable exercise of due diligence—until two years later that they had a potential claim of collusion.

## CONCLUSION

On August 4, 2011, the parties, aided by the Chief Magistrate Judge of this Court, ushered in a historic new era. The SSA, a vestige of the prior era, had expired and the parties—not once, but twice—agreed that any claims arising under that regime were behind them. Having received the comprehensive benefits of a new CBA, Class Counsel and the NFLPA should not be allowed to revise the bargain that they struck or to turn back the clock. The Petition should be denied.

Respectfully submitted,

/s/Daniel J. Connolly

| | |
|---|---|
| Gregg H. Levy (*pro hac vice*) | Daniel J. Connolly (#197247) |
| Benjamin C. Block (*pro hac vice*) | Aaron D. VanOort (#315539) |
| COVINGTON & BURLING LLP | FAEGRE BAKER DANIELS LLP |
| 1201 Pennsylvania Ave., NW | 2200 Wells Fargo Center |
| Washington, DC 20004-2401 | 90 South Seventh Street |
| (202) 662-6000 | Minneapolis, MN 55402-3901 |
| (202) 662-6291 (fax) | (612) 766-7806 |
| glevy@cov.com | (612) 766-1600 (fax) |
| bblock@cov.com | dconnolly@faegre.com |
| | avanoort@faegre.com |

August 16, 2012        *Counsel for the NFL and NFL Clubs*