

## COLLECTIVE BARGAINING AGREEMENT

August 4, 2011



# NFL PLAYERS
## ASSOCIATION

Berens Affidavit
Exhibit 1

## ARTICLE 3
## NO STRIKE/LOCKOUT/SUIT

***Section 1.*** **No Strike/Lockout:** Except as otherwise provided in Article 47 (Union Security), Section 6, neither the NFLPA nor any of its members will engage in any strike, work stoppage, or other concerted action interfering with the operations of the NFL or any Club for the duration of this Agreement, and no Clubs, either individually or in concert with other Clubs, will engage in any lockout for the duration of this Agreement. Any claim that a party has violated this Section 1 will not be subject to the grievance procedure or the arbitration provisions of this Agreement and the party will have the right to submit such claim directly to the courts.

***Section 2.*** **No Suit:** The NFLPA agrees that neither it nor any of its members, nor agents acting on its behalf, nor any member of its bargaining unit, will sue, or support financially or administratively, or voluntarily provide testimony or affidavit in, any suit against the NFL or any Club with respect to any claim relating to any conduct permitted by this Agreement, or any term of this Agreement, including, without limitation, the Articles concerning the College Draft, the Compensatory Draft, the Option Clause, the Rookie Compensation System, Veterans With Less Than Three Accrued Seasons, Veteran Free Agency, Franchise and Transition Players, Guaranteed League-wide Cash Spending, the Salary Cap, Minimum Team Cash Spending, and the Waiver System, and provisions applicable to the trading of players; provided, however, that nothing contained in this Section 2 will prevent the NFLPA or any player from asserting that any Club, acting individually or in concert with other Clubs, or the NFL, has: (1) breached the terms of this Agreement, the NFL Player Contract, or the NFL Constitution and Bylaws, and from processing such asserted breach as a non-injury grievance under Article 43 or asserting any claim before the System Arbitrator or the Impartial Arbitrator as provided in this Agreement; or (2) breached the terms of the *Brady* Settlement Agreement and from asserting such a claim before the System Arbitrator, Impartial Arbitrator, or the Appeals Panel, as provided for in the *Brady* Settlement Agreement. In addition, neither the NFLPA nor any of its members, agents acting on its behalf, nor any members of its bargaining unit will sue, or support financially or administratively any suit against, the NFL or any Club relating to the provisions of the Constitution and Bylaws of the NFL, which are appended to the side letter dated August 4, 2011, as they were operative and administered at the beginning date of the 2011 League Year; provided, however, that nothing herein shall prevent the NFLPA, its members, agents or bargaining unit members from asserting any rights they may have under the federal labor laws or under this Agreement or the *Brady* Settlement Agreement.

***Section 3.*** **Releases and Covenants Not to Sue:**

(a)   The NFLPA on behalf of itself, its members, and their respective heirs, executors, administrators, representatives, agents, successors and assigns, releases and covenants not to sue, or to support financially or administratively, or voluntarily provide testimony of any kind, including by declaration or affidavit in, any suit or proceeding (including any Special Master proceeding brought pursuant to the *White* SSA and/or the

Prior Agreement) against the NFL or any NFL Club or any NFL Affiliate with respect to any antitrust or other claim asserted in *White v. NFL* or *Brady v. NFL*, including, without limitation, any claim relating to the 2011 lockout, any restrictions on free agency, any franchise player designations, any transition player designations, the Draft, the Entering Player Pool, the Rookie Compensation Pool, Total Revenues ("TR") or television rights fees with respect to any League Year prior to 2011, collusion with respect to any League Year prior to 2011, or any claim that could have been asserted in *White* or *Brady* related to any other term or condition of employment with respect to conduct occurring prior to the execution of this Agreement. For purposes of clarity, this release does not cover any claim of any retired player.

(b)     The NFL, on behalf of itself, the NFL, and the NFL Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns, releases and covenants not to sue, or to support financially or administratively, or voluntarily provide testimony of any kind, including by declaration or affidavit in, any suit (including any Special Master proceeding brought pursuant to the *White* SSA and/or the Prior Agreement) against the NFLPA or any of its members, or agents acting on its behalf, or any member of its bargaining unit, with respect to conduct occurring prior to the execution of this Agreement.

(c)     Other than as provided in the Settlement Agreement, the releases and covenants not to sue in Subsections (b) and (c) above shall not apply to any Injury or Non-Injury Grievance asserted under the Prior Agreement, or to any proceeding to confirm an Injury or Non-Injury Grievance award under the Prior Agreement.

(d)     The parties shall take prompt and immediate steps to dismiss the litigation, grievances, and arbitration referenced in Paragraph 4 of the Settlement Agreement and the NLRB proceeding referenced in the side letter to the Settlement Agreement dated July 26, 2011.

SHYAM DAS, ARBITRATOR

| | | |
|---|---|---|
| In the Matter of Arbitration | ) | ARBITRATOR'S OPINION |
| Between | ) | AND AWARD |
| | ) | |
| | ) | |
| | ) | |
| THE NATIONAL FOOTBALL LEAGUE | ) | Article 3 Release Issue |
| PLAYERS ASSOCIATION | ) | |
| | ) | |
| | ) | Case Heard: |
| and | ) | May 16, 2012 |
| | ) | |
| | ) | |
| THE NATIONAL FOOTBALL LEAGUE | ) | Award Issued: |
| MANAGEMENT COUNCIL | ) | June 8, 2012 |

## Appearances

For the NFL Players Association:

        Jeffrey L. Kessler, Esq.
        David G. Feher, Esq.
        David L. Greenspan, Esq.
        Richard A. Berthelsen, Esq.
        Tom DePaso, Esq.
        Heather McPhee, Esq.

For the NFL Management Council:

        W. Buckley Briggs, Esq.
        Daniel L. Nash, Esq.
        Stacey R. Eisenstein, Esq.
        Marla S. Axelrod, Esq.

Berens Affidavit
Exhibit 2

<u>BACKGROUND</u>                Article 3
                                    Release Issue

        On May 3, 2012, the National Football League Players
Association (NFLPA) filed the following grievance with the
National Football League Management Council (NFLMC).

                Pursuant to Article 43 of the CBA, the NFL
                Players Association hereby commences a non-
                injury grievance seeking an order of
                compliance with Article 3, Section 3(b) of
                the CBA ("Releases and Covenants Not to
                Sue"), and an order that the Commissioner
                cease and desist from violating that
                provision. ...

                Yesterday, Commissioner Goodell purported to
                suspend four players — Scott Fujita
                (Cleveland Browns), Anthony Hargrove (Green
                Bay Packers), Will Smith (New Orleans
                Saints), and Jonathan Vilma (New Orleans
                Saints) — for their alleged participation in
                a so-called "pay-for-performance/bounty"
                compensation system operated by the New
                Orleans Saints during the 2009-2011 seasons.
                The Commissioner claims that these players
                and certain current/former Saints coaches
                funded cash pools from which players
                received cash payments for, among other
                things, violent hits on opposing players.
                The gravamen of the conduct at issue is
                alleged to have occurred in 2009 and 2010.

                In connection with entering into the 2011
                CBA, however, the NFL *released* all players
                from conduct engaged in prior to execution
                of the CBA, on August 4, 2011:

                        The NFL, on behalf of itself, the
                        NFL, and the NFL Clubs and their
                        respective heirs, executors,
                        administrators, representatives,
                        agents, successors and assigns,
                        releases and covenants not to sue,
                        or to support financially or

administratively, or voluntarily
provide testimony of any kind,
including by declaration or
affidavit in, any suit (including
any Special Master proceeding
brought pursuant to the *White* SSA
and/or the Prior Agreement) against
the NFLPA or any of its members, or
agents acting on its behalf, or any
member of its bargaining unit, with
respect to conduct occurring prior
to the execution of this Agreement.

CBA, Art. 3, § 3(b). Thus, even assuming
for the sake of argument that the
Commissioner had the authority to punish
players for conduct detrimental under the
alleged facts and circumstances of this
particular situation — he does not — he
nevertheless would be prohibited from
punishing NFL players for any aspect of the
alleged "pay-for-performance/bounty" conduct
occurring before August 4, 2011.

Under the CBA, the Non-Injury Grievance
Arbitrators have jurisdiction over the
interpretation and scope of the NFL's
release in Article 3, Section 3(b). This
grievance seeks an order of compliance with
that provision, prohibiting punishment for
any player conduct occurring prior to August
4, 2011 (and likewise ordering the
Commissioner to cease and desist from the
imposition or enforcement of any player
punishment for conduct before that date).

We note that the NFLPA has commenced a
proceeding before the System Arbitrator in
which it contends, and will establish, that
only the System Arbitrator — and not the
Commissioner — has authority under the CBA
to punish players for their alleged

participation in the "pay-for-performance/
bounty" pool. [Footnote omitted.] ...  Any
such determination by the System Arbitrator
would, however, be confined to consideration
of conduct – if any – that has not been
released.

Finally, even in the event that the release
does not cover all of the alleged conduct at
issue, and even in the event that the System
Arbitrator does not find Commissioner
discipline to be foreclosed with respect to
the pay-for-performance/bounty compensation
system, the only other conduct theoretically
at issue is the "on the playing field"
conduct of players allegedly attempting to
deliver violent hits on other players.  Such
conduct is governed by Article 46, Section
1(b) – "[f]ines or suspensions imposed upon
players for unnecessary roughness or
unsportsmanlike conduct on the playing field
with respect to an opposing player or
players" – and "shall be" determined
initially by the Commissioner's designee
(not the Commissioner), and then appealable
to Hearing Officers Ted Cottrell and Art
Shell (again, not the Commissioner).  CBA,
Art 46 §§ 1(b), 2(a).  It would be for the
Non-Injury Grievance Arbitrator to
determine, under Article 46, whether this
was a Section 1(b)-Shell/Cottrell situation,
or a Section 1(a)-Commissioner discipline
situation.  But such a determination is not
yet, and we believe should not become,
necessary.[1]

---

[1] At arbitration, the NFLPA reiterated its position that it is
not now seeking any ruling on this particular issue.

The NFLMC responded to the grievance on May 14, 2012, denying the grievance in its entirety.  The response states:

> Specifically, the Arbitrator does not have jurisdiction under Article 43 to resolve the claims you assert in your grievance.  To the contrary, under Article 46, the Commissioner has "exclusive" authority to determine discipline for conduct detrimental, which he properly exercised here.  Article 46 is clear that any disputes about the discipline issued by the Commissioner must be resolved by appealing to the Commissioner.
>
> Further, we deny that either CBA provision cited in the grievance either supports your assertion of jurisdiction or has any merit.

In addition to the NFLPA filing this grievance and commencing a proceeding with the System Arbitrator, scheduled to be heard on May 30, 2012, all four of the affected players filed appeals of their discipline to the Commissioner pursuant to Article 46, Section 1(a) of the CBA, which are pending.

Relevant provisions of the August 4, 2011 Collective Bargaining Agreement include the following:

ARTICLE 3
NO STRIKE/LOCKOUT/SUIT

*        *        *

Section 3.  Releases and Covenants Not to Sue:

    (a)  The NFLPA on behalf of itself, its members, and their respective heirs, executors, administrators, representatives, agents, successors and assigns, releases and covenants not to sue, or to support financially or administratively, or voluntarily provide testimony of any kind, including by declaration or affidavit in, any suit or proceeding (including any Special Master proceeding brought pursuant to the *White* SSA and/or the Prior Agreement) against the NFL or any NFL Club or any NFL Affiliate with respect to any antitrust or other claim asserted in *White v. NFL* or *Brady v. NFL*, including, without limitation, any claim relating to the 2011 lockout, any restrictions on free agency, any franchise player designations, any transition player designations, the Draft, the Entering Player Pool, the Rookie Compensation Pool, Total Revenues ("TR") or television rights fees with respect to any League Year prior to 2011, collusion with respect to any League Year prior to 2011, or any claim that could have been asserted in *White* or *Brady* related to any other term or condition of employment with respect to conduct occurring prior to the execution of this Agreement.  For purposes of clarity, this release does not cover any claim of any retired player.

    (b) The NFL, on behalf of itself, the NFL, and the NFL Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns, releases and covenants not to sue, or to support financially or administratively, or voluntarily provide testimony of any kind, including by declaration or affidavit in, any suit (including any Special Master proceeding brought pursuant to the *White* SSA and/or the

Prior Agreement) against the NFLPA or any of
its members, or agents acting on its behalf,
or any member of its bargaining unit, with
respect to conduct occurring prior to the
execution of this Agreement.

   (c) Other than as provided in the
Settlement Agreement, the releases and
covenants not to sue in Subsections (b) and
(c) above shall not apply to any Injury or
Non-Injury Grievance asserted under the
Prior Agreement, or to any proceeding to
confirm an Injury or Non-Injury Grievance
award under the Prior Agreement.

   (d) The parties shall take prompt and
immediate steps to dismiss the litigation,
grievances, and arbitration referenced in
Paragraph 4 of the Settlement Agreement and
the NLRB proceeding referenced in the side
letter to the Settlement Agreement dated
July 26, 2011.

                *       *       *

                   ARTICLE 43
               NON-INJURY GRIEVANCE

Section 1.  Definition:  Any dispute
(hereinafter referred to as a "grievance")
arising after the execution of this
Agreement and involving the interpretation
of, application of, or compliance with, any
provision of this Agreement, the NFL Player
Contract, the Practice Squad Player
Contract, or any applicable provision of the
NFL Constitution and Bylaws or NFL Rules
pertaining to the terms and conditions of
employment of NFL players, will be resolved
exclusively in accordance with the procedure
set forth in this Article, except wherever

another method of dispute resolution is set
forth elsewhere in this Agreement.

*       *       *

## ARTICLE 46
## COMMISSIONER DISCIPLINE

Section 1.  League Discipline:
Notwithstanding anything stated in Article
43:

(a) All disputes involving a fine or
suspension imposed upon a player for conduct
on the playing field (other than as
described in Subsection (b) below) or
involving action taken against a player by
the Commissioner for conduct detrimental to
the integrity of, or public confidence in,
the game of professional football, will be
processed exclusively as follows:  the
Commissioner will promptly send written
notice of his action to the player, with a
copy to the NFLPA.  Within three (3)
business days following such written
notification, the player affected thereby,
or the NFLPA with the player's approval, may
appeal in writing to the Commissioner.

(b) Fines or suspensions imposed upon
players for unnecessary roughness or
unsportsmanlike conduct on the playing field
with respect to an opposing player or
players shall be determined initially by a
person appointed by the Commissioner after
consultation concerning the person being
appointed with the Executive Director of the
NFLPA, as promptly as possible after the
event(s) in question.  Such person will send
written notice of his action to the player,
with a copy to the NFLPA.  Within three (3)
business days following such notification,

the player, or the NFLPA with his approval,
may appeal in writing to the Commissioner.

                    *       *       *

Section 2.  Hearings:

     (a) Hearing Officers.  For appeals under
Section 1(a) above, the Commissioner shall,
after consultation with the Executive
Director of the NFLPA, appoint one or more
designees to serve as hearing officers.  For
appeals under Section 1(b) above, the
parties shall, on an annual basis, jointly
select two (2) or more designees to serve as
hearing officers.  The salary and reasonable
expenses for the designees' services shall
be shared equally by the NFL and the NFLPA.
Notwithstanding the foregoing, the
Commissioner may serve as hearing officer in
any appeal under Section 1(a) of this
Article at his discretion

                    *       *       *

## NFLPA POSITION

     The NFLPA contends that the Non-Injury Grievance
Arbitrator has jurisdiction to determine the scope of the NFL's
release in Article 3, as the applicability of that release here
directly pertains to its effect on the terms and conditions of
employment of certain NFL players under the current CBA.
Article 43, Section 1 of the CBA broadly provides that any such
dispute involving interpretation of the CBA will be arbitrated
before the Non-Injury Grievance Arbitrator, unless another
method of dispute resolution is specified.  And, with respect to

Article 3, no such alternative method of dispute resolution is specified.

        The NFLPA argues that there is nothing in Article 46 that gives the Commissioner -- who for these purposes is simply another arbitrator -- any authority over Article 3.  The mere fact that the Commissioner said he was invoking his "conduct detrimental" authority does not give him authority to override the provisions of the CBA over which he has no jurisdiction or authority.  The NFLPA also rejects the NFLMC's contention that the ruling in <u>Benson v. NFL</u> (Townley 2011) is dispositive on this issue.

        The NFLPA maintains that Article 3, Section 3(b), in unambiguous terms, bars discipline against players for any conduct that occurred prior to August 4, 2011.  In Section 3(b), the NFL "releases ... [players] ... with respect to conduct occurring prior to the execution of this Agreement."  The "conduct" referred to in Section 3(b) is not qualified or limited other than it must have been engaged in before August 4, 2011 in order to be released.  The NFLPA points out that this release is much more expansive than the limited release granted by the NFLPA in Section 3(a).  It also stresses that the CBA contains no language reserving any purported authority of the Commissioner to punish player conduct occurring before August 4, 2011 -- even though the NFL was aware of the alleged "pay-for-performance/bounty" conduct prior to that date -- whereas the parties "carved out" other matters in Section 3(c).

The NFLPA rejects the NFLMC's argument that the NFLPA waived its right -- or is estopped --  to assert the release granted in Section 3(b) in this case by not raising it in other cases where the Commissioner has imposed discipline after August 4, 2011 for player conduct occurring before that date.  The NFLPA notes that most of those instances were drug program cases and some of the remaining cases involved players who no longer are in the League.  More importantly, the NFLPA insists that the terms of the CBA on which it relies in this case are controlling, regardless of what the NFLPA may or may not have asserted in different proceedings.

As relief, the NFLPA seeks an order of compliance with the release language in Article 3, Section 3(b) and a cease and desist order against the NFL imposing any discipline on these four players for conduct occurring before August 4, 2011.[2]

### NFLMC POSITION

The NFLMC contends that the Non-Injury Grievance Arbitrator lacks jurisdiction over this dispute.  Article 43

---

[2] The NFLPA notes that two of the players, Hargrove and Fujita, no longer were on the New Orleans Saints team after the new CBA took effect, so that the release as to them should be 100% effective.  If the NFL wishes to discipline Smith and Vilma solely for conduct occurring on or after August 4, 2011, it has the ability to do so by initiating the appropriate proceeding, which -- in the NFLPA's view -- would be before the System Arbitrator, pursuant to Article 15, Section 1 of the CBA.

limits the Non-Injury Grievance Arbitrator's jurisdiction
"wherever another method of dispute resolution is set forth
elsewhere in this Agreement."  Article 46, Section 1 provides
that:  "Notwithstanding anything stated in Article 43:  (a) All
disputes involving ... action taken against a player by the
Commissioner for conduct detrimental ... will be processed
exclusively [under the procedures set forth in Article 46,
Section 1(a).]"  The Commissioner's exclusive jurisdiction to
hear all disputes arising out of discipline for conduct
detrimental is consistent with his sole authority to impose such
discipline.  The NFL Constitution and Bylaws, expressly
incorporated in the CBA, states that the Commissioner has
"complete authority" to "decide" when a player "has been or is
guilty of conduct detrimental to the welfare of the League or
professional football."  The Commissioner's authority in this
regard also is recognized in the NFL Player Contract,
incorporated into the CBA in Appendix A.

        The NFLMC maintains that this case plainly involves a
"dispute" over Commissioner discipline for conduct detrimental
that is outside the jurisdiction of the Non-Injury Grievance
Arbitrator.  The NFLMC asserts that this was the precise holding
in the 2011 Benson decision, and that holding constitutes the
"law of the shop" under NFL arbitration precedent, including
Denver Broncos v. Lelie (Das 2007).

        The NFLMC also insists that Article 3 in no way limits
the Commissioner's authority to impose the discipline at issue

here.  Article 3, Section 3(b) states that the NFL "releases and
covenants not to sue...[or maintain] any suit" against the Union
or its members.  Section 3(b) constitutes an agreement not to
bring "suit", that is, a proceeding in a court of law, against
players based on conduct occurring prior to August 2011.  That
also is made clear when Article 3 is read as a whole.
Subsection 3(c) explains that "the releases and covenants not to
sue ... above shall not apply to" injury or non-injury
grievances asserted under the prior CBA or actions to confirm
awards arising out of those cases.  Subsection 3(d) further
states that the parties will take steps to "dismiss the
litigation, grievances, and arbitration" which they had agreed
to dismiss in a separate settlement agreement.  Read in this
context, Section 3(b) can only be interpreted as an agreement by
the NFL not to bring *suit* against the players for conduct
occurring prior to August 4, 2011.

        Moreover, the NFLMC stresses, Section 3(b) notably
says nothing about any limit on the Commissioner's authority to
impose discipline.  As sophisticated parties with a long-
standing collective bargaining relationship, had the NFLMC and
NFLPA intended this provision to serve as a limitation on the
Commissioner's authority under Article 46, they would have done
so explicitly.  This is confirmed by the parties' conduct since
the CBA was executed.  In Benson, the player and the NFLPA
disputed the Commissioner's authority to suspend the player
during the 2011 season for conduct that took place during the
lockout -- obviously before August 4, 2011 -- but never argued

13                                              Article 3
                                           Release Issue


that the NFL "released" the player from any conduct that
occurred prior to that date, which would have been dispositive
of that case.  Similarly, the NFLPA never asserted that Article
3, Section 3(b) released any of the at least 12 other players
who have been disciplined since Augusts 4, 2011 for conduct that
occurred prior to that date.  For that reason, the NFLMC argues,
the NFLPA should be estopped from raising that assertion here.


        Accordingly, the NFLMC contends that this grievance
should be dismissed for lack of jurisdiction.


                           **FINDINGS**


        This is a "dispute involving ... action taken against
a player by the Commissioner for conduct detrimental to the
integrity of, or public confidence in, the game of professional
football...."  The Commissioner imposed suspensions on the
players in issue for conduct he deemed to be "conduct
detrimental."  Consistent with the controlling language in
Article 46, Section 1 "[n]otwithstanding anything stated in
Article 43," all such disputes "will be processed exclusively"
under the procedures set forth in Article 46, Section 1.[3]
Article 43, Section 1, correspondingly carves out an exception
from the broad authority granted to a Non-Injury Grievance

---

[3] The present decision does not encompass or purport to decide
the issue of whether the discipline imposed in this case
constituted discipline subject to the procedure in Section 1(b),
rather than Section 1(a) of Article 46.  In either case, the
procedures in Article 46, rather than Article 43, apply.

Arbitrator "wherever another method of dispute resolution is set
forth elsewhere in this Agreement."

As the NFLMC concedes, the Commissioner does not have
unlimited authority to arbitrarily designate any action he takes
as action taken against a player for conduct detrimental and
thereby shield that action from any independent scrutiny.  But,
without prejudice to any arguments that may be raised in an
Article 46 or other proceeding, the present record does not
establish a justifiable basis for concluding that the
Commissioner's action in this case was *ultra vires*.

It is reasonable to question, however, whether the
parties to the CBA contemplated that Article 46 decision makers
would be called upon to interpret the parties' respective
undertakings in Article 3.[4]  In any event, the NFLPA has not made
a compelling case for finding that Article 3 limits the
authority of the Commissioner to impose discipline for conduct
of a player occurring before August 4, 2011.

Article 3, Section 3(b) contains a release and
covenant not to sue by the NFL.  As indicated in the court cases
cited by the NFLPA, releases are to be narrowly construed.
There is no express reference in Section 3(b) to action taken by
the Commissioner to discipline a player for conduct detrimental

---

[4] Benson presented a somewhat different case in that it involved
interpretation of a side letter specifically related to
discipline.

or, more generally, to discipline.  Although the grammar and
wording of the release and covenant not to sue are obtuse,
removal of certain non-essential explanatory clauses and
punctuation yields the following:

> The NFL ... releases and covenants not to
> sue ... or to support financially or
> administratively ... any suit against the
> NFLPA or any of its members ... or any
> member of its bargaining unit ... with
> respect to conduct occurring prior to the
> execution of this Agreement.

This provision, particularly in the overall context of Article
3, addresses legal claims and suits or similar actions.  It does
not, as I read it, constitute an agreement by the NFL that the
Commissioner relinquishes authority to impose discipline for
conduct detrimental occurring prior to the execution of the CBA
on August 4, 2011.

Accordingly, this grievance is dismissed.

### AWARD

The grievance is dismissed as set forth in the above
Findings.

Shyam Das, Arbitrator

**BEFORE ARBITRATOR SHYAM DAS**
**IN THE MATTER OF THE ARBITRATION BETWEEN:**

-------------------------------------------------------x

THE NATIONAL FOOTBALL LEAGUE   :
    PLAYERS ASSOCIATION,

                            :

                Grievant,

                            :

    v.

                            :

THE NATIONAL FOOTBALL LEAGUE
    MANAGEMENT COUNCIL,         :

              Respondent.   :

-------------------------------------------------------x

## PRE-HEARING BRIEF OF THE NFL MANAGEMENT COUNCIL

## INTRODUCTION

This grievance challenges the decision of NFL Commissioner Roger Goodell to suspend four NFL players for engaging in conduct detrimental to the League. The Commissioner suspended the players after the League's investigation revealed that, while they were employed by the New Orleans Saints, the players participated in a "bounty" program that targeted opposing players for injuries intended to cause them to be "carted off" the field or "knocked out" of the game. One of the players was also disciplined for obstructing the League's investigation when allegations about the program first surfaced in 2010. Although the players' involvement varied, the Commissioner determined that each was culpable and that their behavior regrettably – but quite obviously – constituted "conduct detrimental to the integrity of, or public confidence in, the game of professional football." NFL CBA, Art. 46, Sec. 1. He accordingly disciplined each pursuant to his established authority under the NFL Constitution and the NFL CBA.

Berens Affidavit
Exhibit 3

As is their right, each of the four players has appealed their discipline under the "final" and "exclusive" appeal procedures set forth in Article 46 ("Commissioner Discipline") of the CBA. (Ex. A.) Those appeals are pending. However, in an improper attempt to bypass those mandatory proceedings, the players also have commenced this Non-Injury Grievance. (Ex. B.)

The NFL objects to this grievance because the Non-Injury Grievance Arbitrator lacks jurisdiction over this matter, which involves a dispute over discipline imposed by the NFL Commissioner for "conduct detrimental to the integrity of, or public confidence in, the game of professional football." NFL CBA, Art. 46, Sec. 1.[1] The CBA specifically excepts this case from the jurisdiction of the Non-Injury Grievance Arbitrator and instead requires that "all disputes" over the discipline imposed here be resolved under the exclusive, final, and binding appeal procedures of Article 46 of the CBA. Accordingly, the appropriate course is for the Arbitrator to dismiss the grievance for lack of jurisdiction.

The absence of jurisdiction here may not be overcome by the claim that the Non-Injury Grievance Arbitrator has the general authority to "enforce" the terms of the CBA. The CBA is unequivocal that *all disputes* involving Commissioner discipline for conduct detrimental must be resolved under Article 46 and may not be the subject of a non-injury grievance. Indeed, another NFL arbitrator recently held exactly that in rejecting a similar claim. *See Benson v. NFL* (2011) (Townley, Arb) (Ex. C.).

---

[1] The Non-Injury Grievance Arbitrator lacks jurisdiction even as to the question of arbitrability. It is well-established that "the question of whether the parties agreed to arbitrate is to be decided by the court[s], not the arbitrator." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). Nothing in the CBA here vests the arbitrator to consider issues of arbitrability, and the Management Council does not agree that the arbitrator may do so. To conclude otherwise would "force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1995). Thus, while the Non-Injury Grievance Arbitrator can and should dismiss the grievance for lack of jurisdiction, the NFL hereby reserves all rights on this issue.

2

Moreover, the CBA provisions cited in the grievance, on their face, in no way limit the Commissioner's exclusive authority here. Although the Union claims that Article 3 "released" all NFL players from "conduct arising prior to August 4, 2011," that contract provision says no such thing. Rather, Article 3, which is entitled "No Strike/Lockout/Suit," does nothing more than release the NFLPA and its members from any *suit* for pre-CBA conduct. It says nothing about player discipline and it does not even mention – no less limit – the Commissioner's express authority under the CBA to discipline players for conduct detrimental to the NFL, either before or after the execution of the agreement. Indeed, as detailed below, since the CBA was signed, numerous NFL players have been disciplined by the Commissioner for conduct occurring before August 4, 2011 and the Union has never asserted that the discipline was barred by Article 3. As a result, jurisdiction cannot be created by reliance on a CBA provision that simply does not apply and, more importantly, in no way limits the parties' express agreement that all disputes over the discipline at issue are subject exclusively to Commissioner arbitration.

Nor is there any basis for the claim that "the only conduct theoretically at issue here" falls exclusively under the disciplinary and appeal procedures applicable to "on-field" infractions of "unsportsmanlike conduct" or "unnecessary roughness." (Ex. B, at 2.) As with the players' claim about Article 3, this assertion is frivolous. The suspensions here were not based on any particular play in which they committed either of these infractions. Rather, the players were suspended for their involvement in an improper plan to deliberately injure opposing players (and, for one player, his obstruction of the League's investigation) – conduct that the Commissioner was expressly authorized to determine was far more serious and unquestionably "detrimental" to the League.

3

In short, the CBA reserves all disputes over the discipline imposed here to the appeal proceedings currently pending before the Commissioner.  Neither CBA provision cited in the grievance limits the Commissioner's exclusive jurisdiction in this matter or provides any basis for the Non-Injury Grievance Arbitrator to intervene.  The grievance should be dismissed.

## RELEVANT CONTRACT PROVISIONS

Article 43, Section 1 defines the jurisdiction of the Non-Injury Grievance arbitrator to include:

> Any dispute (hereinafter referred to as a "grievance") arising after the execution of this Agreement and involving the interpretation of, application of, or compliance with, any provision of this Agreement, the NFL Player Contract, the Practice Squad Player Contract, or any applicable provision of the NFL Constitution and Bylaws or NFL Rules pertaining to the terms and conditions of employment of NFL players, will be resolved exclusively in accordance with the procedure set forth in this Article, *except wherever another method of dispute resolution is set forth elsewhere in this Agreement.*

*Id.* (emphasis added).

Article 46, Section 1(a) and 1(b) set forth "another method of dispute resolution" that is applicable here.  Art. 43, Sec. 1.  In particular, Article 46, Section 1(a) states:

> *Notwithstanding anything stated in Article 43*:   (a) *All disputes* involving a fine or suspension imposed upon a player for conduct on the playing field (other than as described in Subsection (b) below) or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public confidence in, the game of professional football, will be processed *exclusively* as follows: the Commissioner will promptly send written notice of his action to the player, with a copy to the NFLPA. Within three (3) business days following such written notification, the player affected thereby, or the NFLPA with the player's approval, may appeal in writing to the Commissioner.

*Id.*, Sec. 1(a) (emphasis added).  Players have the right to appeal discipline imposed by the Commissioner, and the parties have agreed that either the Commissioner or his designee may serve as a hearing officer.  Art. 46, Sec. 2(a).  Further,

4

> [a]s soon as practicable following the conclusion of the hearing, the hearing officer will render a written decision which will constitute full, final and complete disposition of the dispute and will be binding upon the player(s), Club(s) and the parties to this Agreement with respect to that dispute.

*Id.*, Sec. 2(d).

Article 46, Section 1(b) sets forth the procedures that apply in the event a player is disciplined for certain on-field infractions:

> Fines or suspensions imposed upon players for unnecessary roughness or unsportsmanlike conduct on the playing field with respect to an opposing player or players shall be determined initially by a person appointed by the Commissioner after consultation concerning the person being appointed with the Executive Director of the NFLPA, as promptly as possible after the event(s) in question. Such person will send written notice of his action to the player, with a copy to the NFLPA. Within three (3) business days following such notification, the player, or the NFLPA with his approval, may appeal in writing to the Commissioner.

Appeals pursuant to Article 46, Section 1(b) will be heard by two designees jointly selected by the Union and the NFL. *Id.*, Sec. 2(a). The parties have selected Art Shell and Ted Cottrell to serve as hearing officers pursuant to Article 46, Section 2(a).

## BACKGROUND

On May 2, 2012, the Commissioner suspended NFL players Scott Fujita, Anthony Hargrove, Will Smith, and Jonathan Vilma (the "Players") for their participation in what has become widely known as the "bounty" program operated by coaches and players of the New Orleans Saints during the 2009 through 2011 seasons. (Ex. D.) The suspensions were based on the findings set forth in a report issued by the NFL Security Department on March 2, 2012 (the "Report"), a copy of which was provided to the NFLPA. (Ex. E.)[2]

---

[2] The Union has described the Report as providing the "factual basis for the Commissioner's punishments" at issue here. (Ex. F, at 2.)

### A.     The NFL Security Report

Allegations about the Saints' bounty program first surfaced in early 2010, when the

Minnesota Vikings alleged that the Saints had placed a bounty of $10,000 to be paid to any

player who knocked Vikings quarterback Brett Farve out of the Saints' playoff game against the

Vikings. A similar bounty was allegedly placed on Arizona Cardinals quarterback Kurt Warner,

the Saints' playoff opponent the previous week. In response to these allegations, the NFL

Security Department conducted an investigation that included detailed interviews of several

Saints' coaches and players. *Id.* at 2-3.

One of the players interviewed was Anthony Hargrove, who was believed to have

knowledge of the bounties. All coaches and players, including Hargrove, denied any knowledge

of the activity. Moreover, the opposing player who originally made the allegation declined to

provide any supporting evidence and later retracted the charge. Saints General Manager Mickey

Loomis was also interviewed. He denied any knowledge of any bounty program and pledged to

ensure that no such program was in place. *Id.*

During the latter part of the 2011 season, the NFL Security Department received new and

credible information that a bounty program had been in place during the 2009, 2010, and perhaps

2011 seasons. As a result, the investigation was re-opened, which included interviews of

multiple independent sources and a review of substantial documentary evidence. *Id.* at 2. The

detailed findings of the investigation were set forth in the Report.

Among the Report's findings, NFL Security concluded that an improper bounty program

had in fact been operated by the Saints' during the 2009 through 2011 seasons. The program was

administered by Defensive Coordinator Greg Williams, and "many of the Saints defensive

players were active and enthusiastic participants in the pay-for-performance/bounty program,

both in terms of contributing funds to the pool and in supporting payments for 'cart-offs' and 'knockouts.'" (Ex. E, at 2.) As explained by the Report:

> A "cart-off" literally meant that an opposing player was carried off the field. A "knockout" meant that the player did not return to the game. A player would receive $1,000 for a "cart-off" and $1,500 for a "knockout." The cash payments would double or triple during the playoffs.

*Id.*

### B. The Commissioner Imposes Discipline On The Saints' Organization And Its Front Office And Coaching Staff

In response to the Report, and based on his determination that the Saints' bounty program constituted conduct detrimental to the NFL, the Commissioner issued a confidential "Memorandum of Decision" on March 21, 2012 that was provided to the NFL Clubs and the NFLPA. (Ex. G.) The memorandum explained the Commissioner's determination regarding the discipline of the Saints' organization, its general manager, and several coaches. The Club was fined $500,000 and stripped of its selections in the second round of the 2012 and 2013 NFL drafts. *Id.* at 6. Saints' Head Coach Sean Payton was suspended without pay for the 2012 NFL season. *Id.* Saints' General Manager Mickey Loomis was suspended without pay for the first eight regular season games of the 2012 NFL season and fined an additional amount raising his forfeited pay to a total of $500,000. *Id.* at 7. Defensive Coordinator Gregg Williams was suspended indefinitely with the possibility of reinstatement at the end of the 2012 season. *Id.* Assistant Head Coach Joe Vitt was suspended for the first six games of the 2012 season and fined so that his fine and forfeited pay totaled $100,000. *Id.*

In concluding his decision, the Commissioner announced that he would address the question of sanctions for the players involved at a later time and that "[a]ny sanctions will be imposed consistent with the provisions of the Collective Bargaining Agreement." *Id* at 8.

7

C.      **The Commissioner Imposes The Discipline At Issue Here**

On May 2, 2012, the Commissioner notified the Players by letter that he was suspending them for engaging in conduct detrimental to the League based on their participation in the pay-for-performance/bounty program.  The letters detailed the specific grounds upon which each player's discipline was based.  With respect to Fujita, the Commissioner explained:

> the record establishes that you pledged a significant amount of money to the pool during the 2009 NFL Playoffs.  While the evidence does not establish that you pledged money toward a specific bounty on any particular player, the "pool" to which you pledged that money paid large cash rewards for "cart-offs" and "knockouts."

(Ex. D-1, at 1.)  The Commissioner suspended Fujita for the first three games of the 2012 regular season based on his "determination that [Fujita's] actions constitute conduct detrimental to the integrity of and public confidence in the game of professional football."  *Id.* at 2.

With respect to Hargrove, the Commissioner explained that:

> the record establishes that you actively participated in the program while a member of the Saints.  Your declaration makes clear that the program existed at the Saints, and establishes that you knew about and participated in it.  In addition, although you later denied it, the circumstances strongly suggest that you told at least one player on another club about the program, and confirmed that Vikings quarterback Brett Favre was the target of a bounty.
>
> Moreover, and perhaps most important, you admitted that you intentionally obstructed the league's investigation into the program by being untruthful to investigators.  Your declaration acknowledges that you lied, but claims that you were instructed to do so by the coaching staff.  Assuming that to be the case, it in no way absolved you from your obligation to cooperate with the investigation, particularly with respect to matters involving player safety and the integrity of the game.

(Ex. D-2, at 1-2.)  The Commissioner suspended Hargrove for the first eight games of the 2012 regular season based on his "determination that [Hargrove's] participation in the bounty program

8

and deliberate effort to impede the league's initial investigation both constitute conduct detrimental to the integrity of and public confidence in the game of professional football." *Id.*

With respect to Smith, the Commissioner explained that:

> the record establishes that you assisted Coach Williams in establishing and funding the program during a period in which you were a captain and leader of the defensive unit.  More disturbing, multiple sources confirm that you pledged significant sums during the 2009 playoffs toward the program pool for cart-offs and knockouts of Saints' opposing players.

(Ex. D-3, at 1.)  The Commissioner suspended Smith for the first four games of the 2012 regular season based on his "determination that [Smith's] active participation in the bounty program, role in its establishment and funding, and the offer of significant sums toward the program pool, all constitute conduct detrimental to the integrity of and public confidence in the game of professional football." *Id.* at 2.

With respect to Vilma, the Commissioner explained:

> the record establishes that, as a captain of the defensive unit, you assisted Coach Williams in establishing and funding the program. More disturbing, several independent sources confirm that during the 2009 NFL Playoffs you offered a $10,000 bounty to any player who knocked quarterback Kurt Warner out of the Divisional Playoff game and later pledged that same amount to anyone who knocked Brett Favre out of the NFC Championship game.

(Ex. D-4, at 1.)  The Commissioner suspended Vilma without pay for the 2012 season based upon his "determination that [Vilma's] general participation in the bounty program, [his] role in its funding, and the specific offer of bounties against specific players, all constitute conduct detrimental to the integrity of and public confidence in the game of professional football." *Id.* at 2.

9

### D.     The Players Challenge Their Discipline

This grievance was filed the next day, on May 3, 2012.[3]  (Ex. B.)  The Players also

commenced a proceeding with the CBA's "System Arbitrator."  (Ex. F.)  (That proceeding is

scheduled to be heard on May 30.)  In that filing, invoking Article 14, Section 1 and Article 4,

Section 5(a), the players contend that any punishment related to the bounty system has to be

determined by the System Arbitrator.  *See id.*

On May 7, 2012, all four of the Players filed appeals of their discipline to the

Commissioner pursuant to Article 46, Section 1(a) of the CBA.  (Ex. A.)  Those appeals are

pending.

## ARGUMENT

### I.     THE NON-INJURY GRIEVANCE ARBITRATOR LACKS JURISDICTION OVER THIS DISPUTE.

"[A]rbitration is a matter of contract and a party cannot be required to submit to

arbitration any dispute which he has not agreed so to submit."  *AT&T Techs., Inc. v. Commc'ns

Workers of Am.,* 475 U.S. 643, 648 (1986) (quoting *United Steelworkers of Am. v. Warrior &

Gulf Navigation Co.,* 363 U.S. 574, 582 (1960)).  As the Supreme Court has explained,

"[w]hether enforcing an agreement to arbitrate or construing an arbitration clause, courts and

arbitrators must 'give effect to the contractual rights and expectations of the parties.'"  *Stolt-

Nielsen S.A. v. AnimalFeeds Int'l Corp.,* No. 08-1198, slip. op. at 18 (U.S. Sup. Ct. Apr. 27,

2010).

---

[3] Citing Article 43, Section 4, the Union claims that "[b]ecause this grievance concerns player suspensions, the NFLPA has the option of immediate appeal, which it is exercising." (Ex. B, at 1.) That section makes clear, however, that the Union has the automatic right to an expedited appeal only when "the grievance involves a suspension of a player *by a Club*," which indisputably is not the case here. Art. 43, Sec. 4. Nonetheless, the League has consented to an expedited appeal on the condition that this expedited grievance must count against one of the Union's four opportunities for expedited appeal per calendar year. *Id.*

Thus, an arbitrator's authority "is derived from" the parties' agreement, *see Texas Workers' Compensation*, at 16 (2005) (Das, Arb.), and arbitrators may not act in "excess" of that authority. *Wilson v. Denver Broncos*, at 35 (2008) (Townley, Arb.). Accordingly, the arbitrator must dismiss a grievance where, as here, that agreement does not give him jurisdiction to decide the dispute. *See, e.g., In re Honeywell, Inc.*, 116 Lab. Arb. Rep. (BNA) 707, 709-10 (2001) (Duff, Arb.) (dismissing grievance where arbitrator determined he lacked jurisdiction over matter at issue); *see also* ELKOURI & ELKOURI, HOW ARBITRATION WORKS 285, Alan Miles Ruben, ed., BNA Books 2003 (Sixth ed.) (arbitrators must be "aware of the limitations of their authority and scrupulously try to avoid any transgressions of those limitations.").

**A.     All Disputes Involving Discipline By The Commissioner For Conduct Detrimental Must Be Resolved Exclusively Under The Procedures Set Forth In Article 46, Section 1(a).**

The jurisdiction of the Non-Injury Grievance Arbitrator is defined by Article 43, which provides:

> Any dispute . . . involving the interpretation of, application of, or compliance with, any provision of this Agreement, the NFL Player Contract, the Practice Squad Player Contract, or any applicable provision of the NFL Constitution and Bylaws or NFL Rules pertaining to the terms and conditions of employment of NFL players, will be resolved exclusively in accordance with the procedure set forth in this Article 43, *except wherever another method of dispute resolution is set forth elsewhere in this Agreement.*

Art. 43, Sec. 1 (emphasis added).

Precisely such other method of dispute resolution is applicable here as set forth in Article 46 ("Commissioner Discipline"):

> *Notwithstanding anything stated in Article 43*: (a) *All disputes* involving a fine or suspension imposed upon a player for conduct on the playing field (other than as described in Subsection (b) below) or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public

11

confidence in, the game of professional football, will be processed
*exclusively*" in accordance with the procedures in Article 46.

Art. 46, Sec. 1 (emphasis added).

On their face, Articles 43 and 46 unambiguously establish the Commissioner's broad
jurisdiction to hear "all disputes" arising out of any suspension for conduct detrimental.  Indeed,
whereas Article 43 plainly limits the Non-Injury Grievance arbitrator's jurisdiction "wherever
another method of dispute resolution is set forth elsewhere in" the CBA, Article 46 contains no
such limitation.  These provisions must be enforced in accordance with their plain meaning.
ELKOURI at 435-36  (citing, e.g., *Clean Coverall Supply Co.*, 47 Lab. Arb. Rep. (BNA) 272,
277 (1966) (Witney, Arb.) ("an arbitrator cannot 'ignore clear-cut contractual language' and
'may not legislate new language, since to do so would usurp the role of the labor organization
and employer'"); *Detroit Lions v. Rogers*, at 7-8 (2008) (Das, Arb.) (interpreting contract
provision consistent with its unambiguous language).

The Commissioner's exclusive jurisdiction to hear all disputes arising out of discipline
for conduct detrimental is consistent with his sole authority to impose such discipline.  The NFL
Constitution and Bylaws, expressly incorporated in the CBA, states that the Commissioner has
"complete authority" to "decide" when a player "has been or is guilty of conduct detrimental to
the welfare of the League or professional football."  *See* Constitution and Bylaws of the National
Football League Rule 8.13(A).[4]

---

[4] The Constitution and Bylaws are recognized in the CBA as binding upon NFL players
to the extent they are not superseded by conflicting provisions of the CBA. *See* Art. 2, Sec. 1.
NFL arbitrators have acknowledged that the CBA incorporates the provisions of the Constitution
and Bylaws. *See Speight v. Los Angeles Rams*, at 9 (1988) (Kagel, Arb.) ("the Player Agreement
includes the NFL Constitution as written"); *Hagy v. Seattle Seahawks*, at 17 (1995) (Kagel, Arb.)
(Article 17.16 "Player Leaving Camp" binding upon player); *Ruzek v. Dallas Cowboys*, at 10
(1992) (Kagel, Arb.) (player bound by provision of the Bylaws giving Commissioner authority to
grant club "roster exemption" for player holding out).

The NFL Player Contract, incorporated into the CBA in Appendix A, similarly states:

> 15. INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he . . . is guilty of any other form of conduct *reasonably judged by the League Commissioner* to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

CBA, App. A, ¶ 15. (emphasis added). Thus, the parties have agreed that the Commissioner, and only the Commissioner, may determine whether conduct by a player is detrimental to the League. And any challenge to the imposition of discipline based on that determination is limited to the exclusive appeal procedures under Article 46.

### B. This Case Plainly Involves A "Dispute" Over Commissioner Discipline For Conduct Detrimental To The NFL That Is Outside Of The Jurisdiction Of The Non-Injury Grievance Arbitrator

There can be no serious question that this grievance "disputes" the Commissioner's authority to impose discipline for conduct that he has determined constituted conduct detrimental to the League. In each of the four letters to the Players, the Commissioner explained that, upon his review of the information obtained during the League's investigation, he had made a "*determination* that [the player's] action constitute[d] conduct detrimental to the integrity of and public confidence in the game of professional football." (Ex. D) (emphasis added). There is no evidence that the discipline was imposed for any other reason, and there is no basis to conclude otherwise. There is also no question that this grievance fundamentally presents a "dispute" by the Players over their suspension by the Commissioner. As such, in accordance with the CBA's

13

clear and unambiguous language, the Non-Injury Grievance Arbitrator lacks any authority to intervene.

This was the precise holding in *Benson*. There, the player filed a non-injury grievance challenging the Commissioner's authority to suspend him for conduct detrimental at the beginning of the 2011 season for his violations of the NFL Personal Conduct Policy during the 2011 lockout. (Ex. C.) The grievance referenced a side letter that was executed with the 2011 CBA in which the League agreed that violations during the lockout by "first-time" offenders would not be disciplined under the Policy, but that "repeat offenders," specifically including Benson, remained subject to Commissioner discipline. *Id.* at 3. In an argument identical to the one asserted here, the Union argued that the Non-Injury Grievance Arbitrator had jurisdiction to intervene, notwithstanding the Commissioner's exclusive authority under the CBA, because the grievance presented a dispute over the meaning of the side letter agreement, which the arbitrator had authority to interpret under Article 43.

Arbitrator Townley flatly rejected the Union's argument and dismissed the grievance for lack of jurisdiction. She explained that, "[a]s a general rule, the resolution of disputes concerning side letters adopted during negotiations would usually be subject to an Article 43 interpretation because such letters are part and parcel of the CBA and thus constitute '. . . the terms and conditions of employment of NFL Players.'" *Id.* at 10. However, she further recognized "her jurisdiction is limited by the last phrase of the section '*except wherever another method of dispute resolution is set forth elsewhere in this Agreement.*'" *Id.* "The other 'method of dispute resolution set forth elsewhere in this Agreement' is that found in Article 46, 'Commissioner Discipline,'" which Arbitrator Townley held gave only the Commissioner the authority to resolve the dispute:

14

> These two articles of the CBA, read together, make clear that an
> Article 43, Non-Injury Grievance Arbitrator's jurisdiction is over
> those disputes enumerated in Section 1 of that article, <u>excepting</u>
> the disputes set forth in Article 46, Section 1 (a) which are
> "exclusively" within the jurisdiction of the Commissioner,
> including matters such as fines, suspension for conduct on and off
> the playing field for the reasons set forth in that section.

*Id.* at 11 (emphasis in original).  Thus, because a Non-Injury Grievance Arbitrator "has no

jurisdiction to review the decisions of the Commissioner on any disciplinary matter or regarding

the interpretation of issues that might be raised during those disciplinary proceedings," Arbitrator

Townley declined to interpret the side letter or otherwise review the discipline imposed by the

Commissioner and denied the grievance.  *Id.*

    As the Arbitrator here has held in prior cases, decisions like *Benson,* which are "binding"

on the parties (*see* Art. 43, Sec. 8), constitute the "law of the shop." *Denver Broncos v. Lelie*, at

25 (2007) (Das, Arb.) ("Absent a controlling court decision compelling a finding that the

analysis and rationale [in a prior arbitration award] is legally indefensible, it is the law of the

shop."); *Chicago Bears v. Haynes*, at 20-21 (2011) (Townley, Arb.) (relying on analogous prior

NFL precedent in resolving dispute); *Bills, Jets, Panthers*, at 19 (2007) (Das, Arb.) (following

prior NFL precedent in deciding dispute and noting that "the CBA contemplates a uniform 'law

of the shop'."); *see also E. Assoc'd Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S.

57, 62 (2000) (holding that arbitrator's properly issued award "is not distinguishable from the

contractual agreement.").

    This case is on all fours with *Benson*.  As in *Benson*, the Players here challenge their

suspension by the Commissioner for conduct detrimental to the NFL.  Also as in *Benson*, the

Players here claim that the Non-Injury Grievance Arbitrator's general authority to interpret the

CBA provides a jurisdictional basis for the grievance.  But just like in *Benson*, this case is and

15

remains a "dispute" over discipline that the CBA reserves exclusively to the Commissioner to resolve. *See also Comm'r of Baseball v. World Umpires Ass'n*, 242 F. Supp. 2d 380, 386 (S.D.N.Y. 2003) (Where CBA gave the Commissioner exclusive authority to impose and review discipline, party could not seek review through CBA's third-party arbitration provision: "An aggrieved party often could skirt the ban on arbitration of disputes involving discipline by arguing that the true nature of the dispute is not the discipline applied, but the interpretation of rules giving rise to the discipline.").

C.      **Neither CBA Provision Cited In The Grievance Supports Jurisdiction Here**

The Union alleges jurisdiction based on the claim that the Non-Injury Grievance Arbitrator has authority to "enforce" terms of the CBA that fall outside of the Commissioner's jurisdiction. (Ex. B.)  Even if that incorrect assertion is accepted, as the party alleging a breach of the CBA, the Union has the burden of proving such a contract violation. *See, e.g., Scott v. Dallas Cowboys*, at 16 (1990) (Kasher, Arb.); *New York Jets v. Powell*, at 23-24 (1988) (Kasher, Arb.); *see also City of Miamisburg, Ohio*, 123 Lab. Arb. Rep. (BNA) 1506, 1509 (2007) (Bell, Arb.) ("[I]t is incumbent upon the party affirmatively asserting a contract violation to prove . . . that such a violation existed."). The Union cannot carry that burden.

1.      Article 3 In No Way Limits The Commissioner's Authority To Impose The Discipline At Issue Here

The Union claims that the Commissioner is "prohibited from punishing NFL players for any aspect of the alleged 'pay-for-performance/bounty' conduct occurring before August 4, 2011" because Article 3 *release[s]* all players from conduct engaged in prior to execution of the CBA, on August 4, 2011." (Ex. B, at 1-2) (emphasis in original).  This claim finds no support in the

plain language of Article 3.  It is also completely inconsistent with the conduct of the parties since the agreement was executed.[5]

Article 3(b) states that the NFL "releases and covenants not to sue . . . [or maintain] any suit" against the Union or its members.  By definition, a "suit" is a "proceeding by a party or parties against another in a court of law."  Black's Law Dictionary (9th ed. 2009).  Thus, by its plain terms, Article 3 constitutes an agreement not to bring a proceeding against Players in a court of law based on conduct occurring prior to August 2011.  That is also made clear when Article 3 is read as a whole.[6]  The subdivision immediately following subsection 3(b) explains that "the releases and covenants not to sue [] above shall not apply to" injury or non-injury grievances asserted under the prior CBA or actions to confirm awards arising out of those cases.  Art. 3, Sec. 3(c).  Subsection 3(d) further states that the parties will take steps to "dismiss the *litigation, grievances,* and *arbitration*" which they had agreed to dismiss in a separate settlement agreement.  (Emphasis added.)  Read in this context, Article 3, Section 3(b) can only be interpreted as an agreement by the NFL not to bring *suit* against the players for conduct occurring prior to August 4, 2011.

---

[5]Moreover, even the Union concedes that at least part of the conduct forming the basis for the Players' discipline occurred after August 2011.  The timing of the conduct in question and any possible implications under Article 3 are inextricably intertwined with the Players' Article 46, Section 1(a) challenges to their discipline can only be decided by the Commissioner in course of that appeal.

[6] Arbitrators must give meaning to a provision in a collective bargaining agreement by looking not at "a single word or phrase, but [at] the instrument as a whole" and determining "its relation to all other parts or provisions."  ELKOURI at 462 (quoting Riley Stoker Corp., 7 Lab. Arb. Rep. (BNA) 764, 767 (1947) (Platt, Arb.)); see also *United Grocers*, 92 Lab. Arb. Rep. (BNA) 566, 569 (1989) (Gangle, Arb.) ("if a single, obvious and reasonable meaning appears from a reading of the language in the context of the rest of the contract . . . that meaning is to be applied") (internal citation omitted); ELKOURI at 462 (citing RESTATEMENT (SECOND) OF CONTRACTS § 202, cmt. d (1981)) ("Meaning is inevitably dependent on context . . . Where the whole can be read to give significance to each part, that reading is preferred . . . .").

Moreover, Article 3 notably says *nothing* about any limit on the Commissioner's authority to impose discipline. As sophisticated parties with a long-standing collective bargaining relationship, had the Union and the Management Council intended Article 3 to serve as a limitation on the Commissioner's authority under Article 46, they would have done so explicitly. They did not.[7]

This is confirmed by the parties' conduct since the CBA was executed. Here again, the *Benson* case should be dispositive. In *Benson*, the player and the Union disputed the Commissioner's authority to suspend the player during the 2011 season for conduct that took place during the lockout – obviously *before* August 4, 2011. But the Union never argued that the NFL "released" Benson from any conduct that occurred prior to the execution of the new CBA, which would have been dispositive in that case. (Ex. C, at 6-9.)[8] Nor has the Union ever asserted that Article 3 released any of the at least 12 players who have been disciplined by the Commissioner since August 4, 2011 for conduct that occurred *prior* to that date. *See* (Ex H.) In fact, in the months between the issuance of the Report and the disciplinary actions at issue here, the Union corresponded with the League and never once questioned the Commissioner's

---

[7] *See Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527, 537 (7th Cir. 1978) ("[T]he Commissioner [of Major League Baseball] was vested with broad authority [to determine actions not in the best interest of baseball] and that authority was not to be limited in its exercise to situations where Major League Rules or moral turpitude was involved. When professional baseball intended to place limitations upon the Commissioner's powers, it knew how to do so."); ELKOURI at 473 (arbitrators take a literal approach to contract interpretation where "the negotiators were 'capable and shrewd,' 'sophisticated veterans' of negotiations, or 'experienced in labor relations matters'"); *see also Hilo Transp. & Terminal Co.*, 36 Lab. Arb. Rep. (BNA) 1132, 1135 (1961) (Burr, Arb.) ("[T]his [agreement] is the product of negotiation between sophisticated veterans . . . . The language we conclude means precisely what it said. There is no ambiguity here.").

[8] Additionally, if the Union's claim here that Article 3 released all NFL players from conduct were correct, there would have been no need for the parties to have executed the side letter agreement at issue in *Benson*, in which it was agreed that "first-time offenders" of the Personal Conduct Policy would not be disciplined for conduct occurring during the lockout, but that repeat offenders, like Benson, would.

18

authority to discipline players for engaging in conduct detrimental in this matter. *See, e.g.,* (Ex. I.)

Having failed to assert that discipline imposed by the Commissioner for pre-August 4, 2011 conduct violates Article 3, Section 3(b) in these prior proceedings, the Union is "estopped" from raising this assertion here. *Ralphs Grocery Co.*, 109 Lab. Arb. Rep. (BNA) 33, 36 (1997) (Kaufman, Arb.); *see also Port Drum Co.*, 82 Lab. Arb. Rep. (BNA) 942 (1984) (Holman, Arb.). Indeed, this Arbitrator has relied on a party's previous failure to assert that conduct violates a particular contract provision a basis for rejecting later claims that substantially similar conduct violates that provision. *See Dolphins Workers' Compensation*, at 20 (2011) (Das, Arb.) ("prior to the 2008 AFL decision by Arbitrator Wittenberg, the Dolphins never cited the Implementation Agreement in defending against" 14 different claims"); *Bills, Jets, Panthers*, at 20 (2007) (Das, Arb.) ("[I]f the NFLPA believed such damages were available through the grievance and arbitration procedure of the CBA it is difficult to understand why they waited 12 years during which other players were similarly affected by state offset laws before seeking such a remedy.").

2.  The Discipline and Appeal Procedures Applicable To "Unnecessary Roughness" and "Unsportsmanlike Conduct" Penalties Have No Application Here

Finally, jurisdiction over this grievance cannot be supported based on the claim that "the only conduct theoretically at issue here" falls exclusively under the disciplinary and appeal procedures applicable to "on-field" infractions of "unsportsmanlike conduct" or "unnecessary roughness." (Ex. B, at 2.)[9]

---

[9] It should be noted that the Union essentially takes the opposite position in its filing to the System Arbitrator, where it claims that this matter should be within his exclusive jurisdiction because "any punishments for [the] conduct [at issue here] would be exclusively within the jurisdiction of the System Arbitrator." (Ex. F, at 1.)

First, the Union's contention is based on the faulty premise that all conduct that occurs "on the playing field" must be subject to Article 46, Section 1(b).  In fact, Article 46, Section 1(a) unambiguously applies to "[a]ll disputes involving a fine or suspension imposed upon a player *for conduct on the playing field* (other than as described in Subsection (b) below) or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public confidence in, the game of professional football."  Art. 46, Sec. 1(a) (emphasis added). Thus, Article 46, Section 1(a) establishes both that the Commissioner has authority to impose discipline for conduct "on the playing field," and that any disputes arising from that discipline must be resolved exclusively in accordance with Article 46, Section 1(a).

In any event, Section 1(b), upon which the Union relies, merely creates a separate discipline and appeal mechanism for fines imposed on players for specific plays that involve two – and only two – narrow types of game-day infractions, "unnecessary roughness" and "unsportsmanlike conduct."  Under that provision, fines for these infractions are imposed by the designees jointly selected by the Union and the NFL (Art Shell and Ted Cottrell), who also have the authority to resolve the players' appeals regarding the level of discipline imposed.  *See* Art. 46, Sec. 2(a).

On their face, these procedures have absolutely no application to the circumstances here, where the Commissioner has disciplined the Players for engaging in conduct detrimental to the League.  It is undisputed that the Commissioner suspended the players not for "unsportsmanlike conduct or unnecessary roughness," but based on their involvement in the "pay-for-performance/bounty" system whereby they encouraged their teammates to injure opposing players, and in the case of Hargrove, for impeding the investigation concerning the bounty

20

program. This discipline, regardless of whether it is characterized as based on conduct on or off the field, falls squarely within Article 46, Section 1(a).

In fact, *The League Policies For Players* distributed each year, including in 2011, to the players make clear that players will be subject to suspensions for conduct detrimental where they participate in a bounty program such as the one devised by the Saints. (Ex. J.)[10]  The Policies specifically address discipline for "paying bonuses to a player for . . . on-field misconduct, such as personal fouls to or injuries inflicted on opposing players." *Id.* at 46.  Further, "[t]he 'bounty rule' is designed not only to preserve the League's competitive integrity, but also to promote player safety by prohibiting a player or players from placing a 'bounty' on their opponents that could lead to unnecessarily violent acts." *Id.*  Players are warned that "[v]iolators may be subject to appropriate disciplinary action *for conduct detrimental to the League or professional football*." *Id.* (emphasis added).

While it is true that players carrying out the bounty system may have been subject to penalties for specific acts of unnecessary roughness or unsportsmanlike conduct, that conduct is not at issue in this grievance.  In fact, Saints' players who engaged in unnecessary roughness or unsportsmanlike conduct (whether due to the "bounty system" or not), including Vilma and Smith, during 2009-2011 were *separately* disciplined for their unsportsmanlike conduct and/or unnecessary roughness on the playing field. *See, e.g.,* (Ex. L.)  But the fact that the bounty

---

[10] The NFL has furnished these Policies to the Union and the Union has never challenged either the League's authority to issue the Policies or the specific grant of authority to the Commissioner to discipline players for participation in a bounty system. *See, e.g.,* (Ex. K.)  This failure to challenge or insist upon bargaining is particularly significant here, where the parties just recently engaged in collective bargaining and agreed upon a new CBA. *American Diamond Tool, Inc.,* 306 N.L.R.B. 570 (1992) (When a union has the opportunity to request bargaining about an issue, fails without excuse to do so, and expressly signals its willingness to permit certain conduct, then the union through its conduct has waived its bargaining rights); *Allied-Signal. Inc.,* 307 N.L.R.B. 752 (1992) (same).

21

program may have caused players to commit specific infractions of unnecessary roughness or unsportsmanlike conduct on the field cannot possibly detract from the indisputable fact that the discipline here was imposed for conduct that was more serious and, according to the determination reserved by the CBA to the Commissioner, constituted conduct detrimental to the NFL.

## CONCLUSION

For the foregoing reasons, the grievance should be dismissed for lack of jurisdiction.

Respectfully submitted,

_____/s/_____
William Buckley Briggs
NFL MANAGEMENT COUNCIL
345 Park Avenue
New York, NY 10154
Telephone: (212) 450-2275

Daniel L. Nash
Stacey R. Eisenstein
Marla S. Axelrod
AKIN GUMP STRAUSS HAUER & FELD, LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 887-4067

*Attorneys for the NFL Management Council*

Dated: May 14, 2012

<u>SETTLEMENT AGREEMENT</u>

1.      This Settlement Agreement is intended to settle and fully resolve all claims brought by plaintiffs in <u>Brady, et al.</u> v. <u>National Football League, et al.</u>, No. 011-cv-00639-SRN-JJG (D. Minn.).  This Settlement Agreement is contingent upon (a) the submission by the NFL Players Association ("NFLPA") of appropriate evidence of its designation as the bargaining representative by a majority of the players in the National Football League ("NFL"); and (b) the ratification, on or before Thursday, August 4, 2011, by the NFLPA and the bargaining unit of a comprehensive collective bargaining agreement ("CBA"). This Settlement Agreement is also contingent upon the release and dismissal with prejudice by the NFLPA and Class Counsel of any and all claims asserted under the *White* Stipulation and Settlement Agreement and, subject to Paragraph 4 below, the 2006 CBA (including the claims regarding TV contracts and asserted collusion in the 2010 League Year), as well as the release and dismissal with prejudice by the NFLPA and the NFL of the pending grievances that each has brought against the other pertaining to the <u>Starcaps</u> litigation, release and dismissal with prejudice by the NFLPA of its grievance regarding practice jersey sponsorships, and release and dismissal with prejudice by the NFLPA and Players, Inc. of their grievance brought under the prior Commercial Agreement, such releases and dismissals to take effect concurrent with the ratification of the CBA in accordance with the forms attached hereto.

2.      The NFLPA has advised the NFL that it will be seeking re-designation of the NFLPA as the collective bargaining representative of NFL players, and that the NFLPA has a target date of Thursday, July 28, 2011 to obtain consents to such re-designation by a majority of NFL players, under the current schedule because by such date 20 of 32 NFL teams will have opened training camp. The NFL does not waive any rights to assert that such re-designation is or would be unnecessary.

3.      This Settlement Agreement incorporates by reference the terms of the agreement set forth in the Attachment appended hereto.  The CBA to which reference is made above must include (1) the terms reflected in that Attachment, with conforming modifications necessary for a collective bargaining agreement (including but not limited to appropriate revisions to the dispute resolution procedures for Articles not within the jurisdiction of the System Arbitrator), (2) the following Articles of the recently expired CBA between the NFL Management Council and the NFLPA, with conforming modifications as required by the terms reflected in the Attachment, and such other changes to such Articles, if any, upon which the NFL and the NFLPA may agree: Articles III–XI, XIII, XXII, XXIII, XXXI, XXXIV, XXXIX–LIII, and LV (and related appendices), as well as the Policy and Program on Substances of Abuse and the Policy on Anabolic Steroids and Related Substances.

4.      Promptly upon ratification of a CBA as described above: (1) the parties shall file a stipulation of dismissal, with prejudice, in <u>Brady</u> v. <u>National Football League</u> in the form attached hereto. During the period between the date hereof and the ratification of the CBA, all deadlines in the *Brady* case shall be tolled, and the parties shall file any necessary papers to toll such deadlines.  Notwithstanding the foregoing, nothing in this Settlement Agreement, any CBA, or any Player Contract shall release (i) the claims previously asserted by *White* Class Counsel and the NFLPA regarding Philadelphia Eagles Rookie Contracts and the Entering Player Pool

Article of the Prior CBA; or (ii) any Injury or Non-Injury Grievance timely asserted under the prior CBA other than the grievances specified in Paragraph 1 above.

5.     Immediately upon ratification of a CBA as described above, the group insurance benefits referenced in Article XLIX, Section 1 of the recently-expired CBA shall resume.

6.     In the event that any of the contingencies set forth in Paragraph 1 above is not timely satisfied, or if the dismissals specified in Paragraph 4 are not timely filed, this Settlement Agreement shall be null and void and of no legal effect.  In particular, (a) no person shall be able to assert any claim against the NFL or the NFL member clubs, on the one hand, or the players or the NFLPA, on the other hand, arising from conduct engaged in pursuant to the express terms of this Agreement prior to its becoming void; (b) the lawsuits and proceedings identified above, including the Brady litigation, and the TV contracts and collusion proceedings initiated under the White settlement agreement, shall be reinstated to the status quo that existed in such actions and proceedings prior to the date of this Settlement Agreement; (c) any Player Contracts entered into after the execution of this Settlement Agreement but prior to its becoming void shall be void and of no legal effect; (d) any waivers, trades, or terminations of Player Contracts occurring after the execution of this Settlement Agreement but prior to its becoming void shall be void and of no legal effect; (e) any and all actions of NFL players and the NFLPA after the execution of this Settlement Agreement but before the Agreement becomes void in connection with (i) the potential or actual formation of a players union or (ii) any negotiation of a potential CBA in the event a players union is formed may not be used by the NFL and its Clubs to assert any antitrust labor exemption or other defense, or to support any position in any legal proceeding of any kind, including without limitation in any NLRB proceeding; and (f) any and all actions of the NFL and NFL Clubs after the execution of this Settlement Agreement but before the Settlement Agreement becomes void may not be used by any player or the NFLPA to assert or support any antitrust, collusion, breach of contract, or tortious interference with contract claim.  Any claim regarding breach of this Settlement Agreement shall be resolved by the System Arbitrator described in Article 15 of the Attachment.  Any claim regarding breach of the terms of the Attachment during the period between the execution of this Settlement Agreement but prior to its becoming void shall be resolved by the System Arbitrator or Impartial Arbitrator, as applicable.

7.     This settlement is being done on a non-class basis without the certification of a class under Rule 23 of the Federal Rules of Civil Procedure ("Non-Class Settlement"). The NFL and its Clubs, any of their affiliates or related entities, and anyone acting on behalf of any of these persons ("NFL Entities") covenant and agree not to use or refer to in any way the resolution of the Brady action through a Non-Class Settlement (including but not limited to the fact of such settlement on such basis), in connection with any assertion of any antitrust labor exemption, any other claimed defense, or any position in any legal proceeding of any kind, in connection with any dispute with or position adverse to the NFLPA and/or any NFL players including without limitation in any NLRB proceeding.  Without limiting the foregoing, the NFL Entities specifically agree that, in any future legal proceeding concerning any potential future disclaimer by the NFLPA of its union status, the NFL Entities may not use or refer to the fact that the Brady action was resolved by  a Non-Class Settlement, to support any argument that the non-statutory labor exemption or any other defense applies to a lockout, or implementation of terms or conditions of employment, against NFL players, or to support any position in any legal

2

proceeding of any kind.  In the event of any willful breach of the obligations set forth in
this Paragraph, the NFLPA  may seek appropriate sanctions in the court in which the breach
occurred, which may be awarded only upon a finding that the breach was in bad faith.

8.     This Settlement Agreement may be signed in counterparts.


Dated this 25th day of July, 2011


Counsel for Plaintiffs Tom Brady, Drew Brees,
Vincent Jackson, Ben Leber, Logan
Mankins, Peyton Manning, Von Miller,
Brian Robison, Osi Umenyiora, and
Mike Vrabel

Counsel for Defendants National Football
League and its Member Clubs

3

## STIPULATION OF DISMISSAL

The parties stipulate to the dismissal with prejudice of all of the pending grievances brought under Article IX of the 2006 Collective Bargaining Agreement related to the *Starcaps* litigation and practice jerseys, as well as the pending grievance brought pursuant to the Commercial Agreement.

SO STIPULATED:

_____, __, 2011

_____
Counsel for the NFLPA and Players, Inc.

_____
Counsel for the NFL, NFLMC, and NFL
Properties

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| REGGIE WHITE, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) No. 4:92-cv-00906-DSD |
| | ) |
| v. | ) |
| | ) |
| NATIONAL FOOTBALL LEAGUE, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## STIPULATION OF DISMISSAL

The parties stipulate to the dismissal with prejudice of all claims, known and unknown, whether pending or not, regarding the Stipulation and Settlement Agreement ("SSA") including but not limited to the claims asserting breach of the SSA related to (i) television contracts and broadcast revenues; and (ii) asserted collusion with respect to the 2010 League Year, excepting only the pending claim filed March 11, 2011 relating to an alleged rookie shortfall on the part of the Philadelphia Eagles.

SO STIPULATED:

_____, __, 2011

_____
Class Counsel and Counsel for the NFLPA

_____
Counsel for Defendants National Football League, et al.

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| TOM BRADY; DREW BREES; VINCENT JACKSON; BEN LEBER; LOGAN MANKINS; PEYTON MANNING; VON MILLER; BRIAN ROBISON; OSI UMENYIORA; MIKE VRABEL, individually, and behalf of all others similarly situated,<br><br>            Plaintiffs,<br>      v.<br><br>NATIONAL FOOTBALL LEAGUE, *et al.*,<br><br>            Defendants. | )<br>)<br>) No. 0:11-cv-00639-SRN-JJG<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## STIPULATION OF DISMISSAL

Pursuant to Federal Rule of Civil Procedure 41(a)(1), the parties hereby stipulate that this action shall be dismissed with prejudice.

SO STIPULATED:

s/Barbara P. Berens
Barbara P. Berens #209788
BERENS & MILLER P.A.
3720 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 349-6171
(612) 349-6416 (fax)


Timothy R. Thornton #109630
BRIGGS & MORGAN, P.A.
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 977-8550
(612) 977-8650 (fax)

s/Daniel J. Connolly
Daniel J. Connolly #197247
Aaron D. Van Oort #315539
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7806
(612) 766-1600 (fax)


Gregg H. Levy (*pro hac vice*)
Benjamin C. Block (*pro hac vice*)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC 20004-2401
(202) 662-6000
(202) 662-6291 (fax)

James W. Quinn (*pro hac vice*)
Bruce S. Meyer (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 259-8000

DeMaurice F. Smith (*pro hac vice*)
NFL PLAYERS ASSOCIATION
63 Gene Upshaw Place
1133 20th Street NW
Washington, DC 20036
202-759-9101

*Counsel for Plaintiffs Tom Brady, Vincent Jackson, Ben Leber, Logan Mankins, Peyton Manning, Osi Umenyiora, and Mike Vrabel,*

David Boies (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200
(914) 749-8300 (fax)

*Counsel for Defendants National Football League, et al.*

_For Plaintiffs Tom Brady, Drew Brees, Vincent Jackson, Ben Leber, Logan Mankins, Peyton Manning, Von Miller, Brian Robison, Osi Umenyiora, and Mike Vrabel

For Defendants National Football League and its Member Clubs

2