IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| REGGIE WHITE, *et al.*, | ) |
| Plaintiffs, | ) No. 4:92-cv-00906-DSD |
| v. | ) |
| NATIONAL FOOTBALL LEAGUE, *et al.*, | ) |
| Defendants. | ) |

**NFL'S SUPPLEMENTAL MEMORANDUM
IN OPPOSITION TO THE PETITION TO REOPEN THE SSA**

Class Counsel and the NFLPA (collectively, "NFLPA" or "Union") allege (Pet. at 10) that the NFL Clubs agreed to a "secret $123 million cap … to restrict or limit each Club's spending on player salaries during the 2010 League Year," and that the Clubs "secretly restrict[ed] most Club Spending on player salaries to $123 million for the 2010 League Year." As demonstrated in Part III below, those allegations are fundamentally and demonstrably wrong—as the NFLPA very likely knew when it filed its Petition to Reopen.

First, however, we demonstrate in Parts I and II that notwithstanding the imaginative arguments asserted by the NFLPA in its Reply and at the hearing, the claims that it seeks to bring here are barred by both Article 3, Section 3(a) of the CBA and by the Stipulation of Dismissal filed in *White*.

## I. The Release and Covenant Not To Sue Bars the Claims.

**A.** The NFLPA acknowledges that the claims at issue here are barred by Article 3, Section 3(a) of the CBA if they "could have been asserted" before the CBA was signed. The Union contends that the claims "could not have been asserted" because "such claims were *unknown* to the NFLPA and the players at that time." (Reply at 13 (emphasis in original).)

But the NFLPA does not dispute that, as early as the Spring of 2010, they *suspected* and *publicly alleged* a collusive agreement depressing salaries. NFLPA Executive Director DeMaurice Smith complained in March 2010 about "almost a uniform decrease (in club payrolls) … . Virtually all of them are down … . That's something you wouldn't expect in a completely free market." (Ex. E.) NFLPA agent Ralph Cindrich stated: "It's almost like everybody got a memorandum for how things would go. … *I know that's not legal*. But that's been the pattern." (Ex. F (emphasis added).) Peter Schaeffer was more explicit, asserting collusion of precisely the same kind alleged in the Petition: "I see contracts being done *as if there is a cap*." (*Id.* (emphasis added).)

The question therefore is not whether the NFLPA knew the specific contours of any suspected collusive agreement. The question is whether, if the Union had asserted a collusion claim based on those suspicions and public allegations, their claims would have been barred: that is, whether claims

based on the facts and suspicions reflected in the Union's public statements "could *not* have been asserted."

There are no *legal* reasons why such claims could not have been asserted in the spring of 2010. There was no jurisdictional bar; there was no contractual bar (in the 2006 CBA or the SSA); there was no issue of immunity, privilege, authority, or standing that would have barred such a claim.

Nor would a claim based on those publicly-asserted facts and suspicions have been barred by Rule 11. In that regard, the test is whether "the attorney's conduct, viewed objectively [would have] manifest[ed] either intentional or reckless disregard of the attorney's duties to the court." *Clark v. UPS, Inc.*, 460 F.3d 1004, 1009 (8th Cir. 2006).[1]

---

[1] That a plaintiff need not "know" whether he has a claim is particularly true with respect to claims alleging conspiracy, including claims of collusion. All that is required is "reasonable suspicion" of cooperation between defendants" such that a rational inference of conspiracy is *plausible*. *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 95 (3d Cir. 1988). That test—"plausibility"—is plainly met by the public allegations of the NFLPA and its representatives. Indeed, this Court has repeatedly applied the plausibility test in assessing whether a claim could be asserted if the plaintiff does not "know" that he has a claim or is not certain of the facts that she alleges. *See, e.g., Patterson v. IATSE Local 13*, 2011 WL 1930572, at *2 (D. Minn. May 19, 2011) (denying request for sanctions against plaintiff, a non-union member, because "the acts and statements of Local 13 provided a *plausible*, albeit incorrect, basis for [her] belief that she was a member of Local 13 for the purposes of this action"); *EEOC v. Mid-Minnesota Federal Credit Union*, 820 F. Supp. 432, 433, 435–36 (D. Minn. 1993) (denying request for sanctions because, "so long as plaintiff has 'some basis' for the discrimination claim," the allegations cannot be deemed "groundless" or "without foundation").

Rule 11 does not require that a litigant "know" that he has a claim; nor does it require that a litigant "know" that the facts he alleges are true: A litigant "may have good reason to believe that a fact is true or false but may need discovery, formal or informal, from opposing parties or third persons to gather and confirm the evidentiary basis for the allegation." Fed. R. Civ. P. 11 cmt. (b)–(c). If the NFLPA representatives did not have "good reason" to believe the allegations that they made in the spring of 2010, they presumably would not have asserted them publicly on multiple occasions.

The logical inference to be drawn from the NFLPA's failure to initiate a second collusion claim with respect to the 2010 League Year is a conclusion that the Union's initial claim alleging collusion in the 2010 League Year *already* embraced collusive conduct of the kind that they had publicly alleged.

There is no question that the letter initiating the then-pending collusion proceeding was sufficiently broad to include those claims: It stated that "the full scope of the collusion at issue will be demonstrated at trial after full discovery is completed." (Ex. J., at 5). And the Union's discovery requests, seeking "any and all communications … regarding the structure or terms of 2010 player contracts," were sufficiently broad to pick up any evidence supporting such claims. (Ex. K, at Doc. Reqs. 12, 16, & 17.)

The bottom line is that the claims that the NFLPA now seeks leave to assert plainly "could have been asserted" prior to execution of the new CBA.

There was no bar on the Union's doing so. Assertions that the League denied or failed to disclose the "secret agreement" that the Union representatives publicly alleged are therefore of no moment. ("[T]hat has never stopped [them] before." (Tr. 65.)) Because the Union's claims are barred by Article 3, Section 3(a), the Union cannot satisfy its steep burden of justifying the extraordinary step of reopening the *White* SSA.

**B.** Separately, the Union fails to acknowledge that its release and covenant not to sue is not a static, one-moment-in-time commitment. "This Agreement [the new CBA] shall be effective from August 4, 2011 until the last day of the 2020 League Year … " 2011 CBA Art. 69, § 1. The operative verbs in Article 3, Section 3(a)—"releases" and "covenants"—are active verbs expressed in the present tense. Accordingly, each and every day of the new CBA's term, the Union releases and covenants not to bring claims that "could have been asserted" at any time in the past. The Petition seeks leave to assert such claims; the release and covenant not to sue bars them.[2]

---

[2] This conclusion is compelled not only by the plain meaning of the release and covenant not to sue, but also by governing principles of contract interpretation under both New York and federal law: "Words in the present tense include the future." N.Y. Stat. Ann. § 48; *see also* 1 U.S.C. § 1 ("[W]ords used in the present tense include the future as well as the present."). *See also generally* N.Y. Stat. Ann. § 91 cmt. (2012) (under New York law, the "rules of statutory interpretation are, in general, the same as are used in the construction of … contracts").

If the parties had intended to release only the then "pending" claim for collusion, narrowly circumscribed as the Union now contends, they would have so specified; instead, the CBA releases "*any* claim relating to … collusion with respect to *any* League Year prior to 2011." If the release and covenant not to sue were intended to work as the Union argues (and if the initial collusion claim were as narrow as the Union now contends) the quoted phrase in the prior sentence would have read instead: "the claim of collusion filed in January 2011 regarding offer sheets to restricted Free Agents in 2010 and exercise dates for 2010 option bonuses." The parties' agreement reflects no such limitation or intent.

**C.** The NFLPA also misleadingly argues that the claims at issue here could not have been released in the new CBA because they were not "within the contemplation of the parties at the time." (Reply at 16 n.14 (citing *Actrade Liq. Trust v. Greenwich Ins. Co.*, 424 B.R. 59, 69 (Bankr. S.D.N.Y. 2009).) As the public statements of its representatives demonstrate, that assertion is demonstrably and undeniably wrong as a factual matter.

The NFLPA is also wrong in suggesting that "within the contemplation" means that the party had to know of the specific claim that it was releasing. If that were the case, a party could never release an "unknown" claim. "[W]ithin the contemplation" instead refers to the *type* of claim being released. Thus, the *Actrade* court observed that a general release in a settle-

ment of a *contract* dispute about service payments did not bar a later claim between the parties for *patent* infringement. *See* 424 B.R. at 70 (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 470 F. Supp. 2d 1195 (S.D. Cal. 2007)). That has nothing to do with the situation here.

In the CBA release, the *White* Stipulation of Dismissal, and the *Brady* settlement, the parties were settling labor disputes, among others. It was clearly "within the contemplation" of the parties that each may have had grievances against the other under the prior CBA and SSA. And each agreed to release and dismiss those claims, known or unknown, pending or not, whether they had been asserted or could have been asserted, so that the parties could move forward under a new labor agreement.

**D.** There is also no basis for the NFLPA's argument that the SSA somehow precludes or trumps the release and covenant not to sue in the new CBA. Mr. Kessler is correct that the *expired* CBA (Article II, § 1) provided that the SSA controlled in the event of a conflict with that CBA. (*See* Tr. 22.) But under the *current* CBA, the *opposite* is true. The *current* CBA, including Article 3, Section 3(a)'s release and covenant not to sue, supersedes "any other document affecting terms and conditions of employment of NFL players." (2011 CBA Art. 2, § 1.) Thus, if there were any conflict between the new CBA and the Final Consent Judgment or the SSA—and we respectfully submit that there is no such conflict—the new CBA would control.

–7–

**E.** Finally, the Union's citation to Arbitrator Das's decision regarding the meaning of the new CBA release (Reply at 16) is wholly inapposite. Arbitrator Das held that Commissioner discipline for conduct detrimental is not a "suit" and therefore not within the scope of the NFL's release. (Ex. 3, at 18.) In contrast, the claim that the NFLPA seeks to assert is obviously a "suit or proceeding" within the scope of the NFLPA's release in Article 3, Section 3(a).

## II. The Stipulation of Dismissal Also Bars the Claims.

**A.** Class Counsel and the NFLPA's reliance on the Final Consent Judgment is misplaced. We agree that neither the Stipulation of Dismissal nor the CBA terminated that Judgment, which vested jurisdiction in the Court to resolve viable claims for breach of the SSA. But the release and covenant not to sue in the new CBA and the Stipulation of Dismissal each operates to bar "all claims, known and unknown, whether pending or not," including the claims for breach that Class Counsel and the NFLPA seek leave to assert. The Final Consent Judgment, like any judgment, can become effectively moot due to intervening events. That is the case here, as the parties intended when they closed the book on one era of labor relations, releasing and dismissing claims that could have been brought under the SSA, and opened a new one.

**B.** The NFLPA cannot mean what it says when it argues that "the [Stipulation of Dismissal] could not and did not dismiss any claims." (Reply

at 9.) The Union concedes that the Stipulation dismissed the pending claims regarding television revenues and collusion. For the same reasons, and by its express terms, it dismissed any unknown SSA claims as well.

**C.** The NFLPA also argues that "if anything was going to change" under the SSA, a court order was required by Rule 23(e). (Reply at 14.) But that is not the standard. The question is not whether "anything was going to change" *under* the SSA; the question is whether there was any material change *to* the SSA *itself*. Only an amendment of the SSA could trigger a requirement of court approval.

The Stipulation of Dismissal did not amend the SSA. Nor did it purport to do so. It instead was a binding promise on the part of Class Counsel and the NFLPA to dismiss "all claims, known and unknown, whether pending or not," for breach of the SSA. Far from amending the SSA, such dismissals were expressly contemplated by the SSA itself, which obligated the parties to attempt to "negotiate a resolution" of disputes alleging collusion (Art. XIII, § 18) or circumvention of its provisions (Art. XV, § 9), but says nothing about Court approval being required for any such resolution.

**D.** The Stipulation of Dismissal was not the compromise or settlement of the claims of a certified class. The claims of the certified class in *White*—as alleged in the Second Amended Complaint—were allegations that Plan B, the Draft, the NFL Player Contract, and agreements among the Clubs on insur-

ance benefits and preseason pay were Sherman Act violations, and that Plan B also constituted "tortious interference with prospective contracts." (*See* Doc. No. 69, at ¶ 1; *id.* at Counts I–VI.)

The claims in the Petition are fundamentally different: They are contract claims for breach of the SSA (and parallel CBA provisions). Those claims could be asserted (and compromised) by players who signed Player Contracts in 2010, *regardless of whether they were members of the White class*. *See* SSA Art. XIII, § 5. In contrast, no such claims could be brought by the many hundreds of class members (Reggie White, Michael Buck, Dave Duerson, Hardy Nickerson, *et al.*) who were out of the League by 2010. Accordingly, the Stipulation of Dismissal could not have been a settlement or compromise of the claims of a certified class.

**E.** The record also reflects that Class Counsel and the NFLPA understood that the Stipulation of Dismissal would be self-executing. As distinct from the original SSA, which *was* a settlement of the antitrust claims of the certified *White* class, the *Brady* Settlement Agreement, which required the stipulation of dismissal to be "filed" with the Court, did not contain provisions requiring the parties jointly to provide notice to a class or to seek a hearing from the Court. Such steps were unnecessary because no claims of a certified class were settled by the Stipulation of Dismissal. *Compare* SSA Art. XXIII

("Settlement Notice and Hearing") & App. I ("Proposed Order for Preliminary Approval") *with* NFLPA Ex. 4 (*Brady* Settlement Agreement).

Moreover, when the parties filed that Stipulation on August 4, 2011, they expressly exempted the pending proceeding alleging breach of the SSA with respect to payments to Eagles rookies. On August 11, 2011, this Court's Text Entry stated that "*all* claims pending regarding the Stipulation and Settlement Agreement are dismissed." (8/11/11 Order (emphasis added).) If the NFLPA truly believed that the Court had the power under Rule 23 to alter the terms of the Stipulation of Dismissal, the *Union* would have petitioned the Court for relief to amend the Text Entry to reflect that the Eagles proceeding was still pending and had not been dismissed. The NFLPA did not.

### III. The NFLPA Knows Or At Least Should Know That There Was No "Secret" Salary Cap.

Because of the release and covenant not to sue, as well as the Stipulation of Dismissal, no claim for breach of the SSA can be brought by Class Counsel or the NFLPA. There is nothing for the Court to enforce under the Final Consent Judgment. That having been said, it bears emphasis that, by the time that they filed their Petition to Reopen in May 2012, the NFLPA almost certainly knew that its allegations of a secret Salary Cap were untrue.

The Petition alleges that the NFL Clubs "in fact, did secretly restrict most Club Spending on player salaries to $123 million for the 2010 League

Year." (Pet at 10.) The Salary Cap for the *2009* League Year was $123 million. But as the NFLPA's own general counsel forthrightly admits in his Declaration, "NFL owners actually paid a greater amount of total salaries to players [during the 2010 League Year] than in the 2009 League Year, and several teams, like the Dallas Cowboys and Washington Redskins, spent substantially more on players." (DePaso Decl. ¶ 5.)

In fact, as the accompanying Declaration of Peter Ruocco and related Exhibit (prepared in the ordinary course before this proceeding was filed) confirm, for the 2010 League Year, *twenty-one* of the thirty-two Clubs *exceeded* the alleged "$123 million cap"; most Clubs did so by more than $10 million.

**2010 Adjusted Team Salary**

| Club | Adjusted Team Salary |
|---|---|
| WAS | 216,190,860 |
| DAL | 175,938,774 |
| OAK | 164,747,394 |
| NO | 159,254,770 |
| SEA | 149,486,030 |
| NYJ | 145,842,659 |
| MIN | 145,503,232 |
| IND | 144,411,300 |
| GB | 143,576,638 |
| MIA | 139,092,304 |
| CLV | 135,538,267 |
| NE | 135,477,245 |
| CHI | 134,691,709 |
| SF | 134,422,473 |
| HST | 134,272,004 |
| NYG | 133,326,181 |
| DET | 129,727,410 |
| PHI | 129,604,698 |
| PIT | 128,845,357 |
| BLT | 127,018,420 |
| TEN | 124,597,407 |
| ATL | 121,587,690 |
| DEN | 120,730,921 |
| BUF | 118,686,825 |
| SL | 115,058,251 |
| CAR | 114,745,123 |
| SD | 113,034,979 |
| CIN | 104,360,891 |
| ARZ | 103,237,607 |
| KC | 97,976,130 |
| JAX | 96,624,476 |
| TB | 93,570,429 |
| Total: | 4,231,178,451 |
| Average: | 132,224,327 |

The Union, of course, could have done this calculation before it filed its Petition; it received all of the 2010 Player Contracts within a few days of their execution. And if the NFLPA has not done such a calculation, we invite it to do one now. Any such calculation would confirm that there was no "secret Salary Cap" during the 2010 League Year at $123 million (the level alleged by the NFLPA, which also happens to be the level of the 2009 Salary Cap) or at any other level.

## CONCLUSION

There was no "secret Salary Cap" with respect to the 2010 League Year. (Ruocco Decl. ¶ 10.) There were no rules or agreements broken by the Redskins, the Cowboys, or any other Club with respect to Player Contracts executed in the 2010 League Year. (*Id.*)

To be clear, we are not asking the Court to make that factual determination, because even if the Court were to assume such a Cap, the Petition must be denied. The claims that the Union seeks to assert are barred by the plain language of the release and covenant not to sue in Article 3, Section 3(a) of the CBA; they have been dismissed with prejudice by the Stipulation of Dismissal; and they are untimely, as demonstrated in our Opposition. As a result, the NFLPA and Class Counsel have not satisfied the heavy burden required to reopen litigation that they conclusively terminated in two separate forms when they ushered in a new era of labor peace with the 2011 CBA.

For the foregoing reasons, as well as those set forth in the NFL's Opposition, the Petition to Reopen should be denied.

Respectfully submitted,

 /s/Daniel J. Connolly
Daniel J. Connolly
Aaron D. VanOort
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7806
(612) 766-1600 (fax)
dconnolly@faegre.com
avanoort@faegre.com

Gregg H. Levy
Benjamin C. Block
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC 20004-2401
(202) 662-6000
(202) 662-6291 (fax)
glevy@cov.com
bblock@cov.com

*Counsel for the NFL and NFL Clubs*

September 25, 2012