# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

REGGIE WHITE, et al.,

        Plaintiffs,

v.                              **MEMORANDUM OF LAW & ORDER**
                                Civil File No. 92-906 (MJD)
                                **REDACTED**

NATIONAL FOOTBALL LEAGUE, et al.,

        Defendants.

DeMaurice F. Smith, Thomas DePaso, and Heather M. McPhee, National Football League Players Association; David A. Barrett, James R. Barrett, Daniel S. Schecter, Thomas J. Heiden, and Michael J. Nelson, Latham & Watkins LLP; Jeffrey L. Kessler, David G. Feher, and David L. Greenspan, Winston & Strawn LLP; James W. Quinn, Weil, Gotshal & Manges LLP; Barbara P. Berens, Berens & Miller, P.A.; and Mark A. Jacobson, Lindquist & Vennum, LLP; Counsel for Plaintiffs.

Daniel J. Connolly and Aaron D. VanOort, Faegre Baker Daniels LLP; and Gregg H. Levy and Benjamin C. Block, Covington & Burling LLP; Counsel for the National Football League and the NFL Clubs.

## I.    INTRODUCTION AND SUMMARY OF THE COURT'S ORDER

This matter is before the Court on Plaintiffs' Rule 60(b) Motion [Docket

No. 716] and on remand from the Eighth Circuit Court of Appeals.  See White v.

<u>Nat'l Football League</u>, 756 F.3d 585 (8th Cir. 2014).  The National Football League

Players Association ("NFLPA") claims that the case should be reopened under

Federal Rule of Civil Procedure 60(b)(3) because the National Football League

("NFL" or "League") engaged in fraud, misrepresentation or other misconduct to

coerce the NFLPA into dismissing unknown claims in exchange for ending the

lockout.  The Court denies the motion.

Overall, the NFLPA has failed to demonstrate that the NFL engaged in any

fraud or other misconduct that prevented the NFLPA from fully and fairly

presenting its case.  The parties were embroiled in a high-profile, high-pressure

labor dispute and multiple lawsuits.  After lengthy negotiations through

sophisticated counsel, the parties made a calculated decision to enter into a

settlement.  The terms of the settlement were carefully reviewed, and written

discussion was had regarding the release of unknown claims.  Knowing that

discovery was not yet closed and that there were allegedly significant gaps in

discovery, the NFLPA weighed the costs and benefits of a settlement at that time

and took the conscious risk to release unknown claims as part of the

consideration for an end to the lockout.  The NFLPA's claimed later discovery

that it might have possessed a valid collusion claim is not a basis for invalidating

the settlement.  That is precisely the danger in releasing "unknown" claims – a danger the NFLPA recognized and decided was worth the risk in order to settle at that point in time.

## II.    BACKGROUND

The NFLPA, a labor union which represents players in the NFL, has filed a Rule 60(b) motion to vacate a Stipulation of Dismissal filed in this action.  The Stipulation of Dismissal, filed in August 2011, purports to dismiss and release all claims against the NFL in this proceeding.  This includes collusion claims relating to an alleged salary cap in League Year 2010, among others.

The NFLPA asserts generally that it is entitled to relief from the Stipulation of Dismissal because the NFL engaged in fraud or misconduct to conceal or affirmatively misrepresent the NFL's violation of its agreement that the 2010 League Year would be an uncapped year, in an effort to improperly obtain the NFLPA's consent to dismiss this case.  The Court's earlier determination that it lacked jurisdiction to vacate the Stipulation of Dismissal pursuant to Rule 60(b) of the Federal Rules of Civil Procedure was reversed by the Eighth Circuit.  Accordingly, this matter is once again before the Court for review.

### A.    The Parties

In 1992, Reggie White and four other NFL players commenced this

antitrust class action against the League on behalf of all NFL players, seeking

injunctive relief and damages stemming from the League's free agency system,

the college draft, the right of first refusal component of Plan B, and other NFL

rules.  See White v. Nat'l Football League, 822 F. Supp. 1389, 1394-95 (D. Minn.

1993).  The Court certified a class of plaintiffs consisting of:

> (i) all players who have been, are now, or will be under contract to
> play professional football for an NFL club at any time from August
> 31, 1987 to the date of final approval of the settlement of this action
> and the determination of any appeal therefrom, and (ii) all college
> and other football players who, as of August 31, 1987, through the
> date of final approval of the settlement of this action and the
> determination of any appeals therefrom, have been, are now, or will
> be eligible to play football as a rookie for an NFL team.

Id. at 1395.  A mandatory settlement class was certified, and the NFLPA became

the exclusive bargaining authority for the players.

## B.    The Stipulation and Settlement Agreement

On February 26, 1993, the parties entered into a Stipulation and Settlement

Agreement ("SSA") designed to bring an end to this proceeding and a number of

other related, pending lawsuits between the parties.  (Kessler Decl., Ex. B, SSA.)

As the Eighth Circuit explained:

> Although the SSA was styled as a settlement of the White lawsuit, it
> operated as a comprehensive collective bargaining agreement

4

governing all aspects of labor relations between the League and its players.  The SSA awarded monetary relief to each member of the <u>White</u> class to compensate them for the League's alleged antitrust violations, but it also set forth rules encompassing free agency, the college draft, player salaries, and a host of other labor-related issues.

<u>White</u>, 756 F.3d at 589.

The District Court granted final approval of the class settlement by Final Consent Judgment dated August 20, 1993, but retained jurisdiction over the action to "effectuate and enforce the terms of the [SSA], as amended" and the Final Consent Judgment.  <u>White v. Nat'l Football League</u>, 836 F. Supp. 1508, 1511 (D. Minn. 1993), <u>aff'd</u>, 41 F.3d 402 (8th Cir. 1994).

The parties amended and extended the SSA in 1996, 1999, 2002 and 2006. [Docket Nos. 415, 455, 504 and 526]  The SSAs provided for the appointment of a Special Master to enforce their terms and the Final Consent Judgment.

### C.    The 2010 League Year

On May 20, 2008, the NFL opted out of the final two years of the 2006 SSA. <u>White v. Nat'l Football League</u>, 766 F. Supp. 2d 941, 944 (D. Minn. 2011).  This meant that 2010 became the Final League Year under the 2006 SSA.  <u>White</u>, 756 F.3d at 590.  Under the 2006 SSA, the "Final League Year shall always be an Uncapped Year"—a year in which there would be no limit on the amount of money that teams could pay their players.  <u>Id.</u>  (<u>See also</u> SSA, Art. XI, § 1.)

Contrary to expectations, player salaries in 2010 did not increase, but remained stable.  White, 756 F.3d at 590.  This fueled the players' suspicions that NFL teams were colluding to avoid bidding wars over free agents that might otherwise follow from the lack of a salary cap.  Id.

### D.    Allegations Made During the 2010 League Year

During the 2010 League Year, NFLPA executives and agents publically accused the NFL of colluding by operating as if there were a salary cap.  (See, e.g., Block Decl., Ex. 2, Jarrett Bell, Lack of a Salary Cap Leaves Wide Range of Spending in NFL Clubs, USA Today, Mar. 17, 2010; Block Decl., Ex. 3, Barry Wilner, Business as Usual in NFL Free Agency, USA Today, Mar. 10, 2010; Block Decl., Ex. 5, Jon Saraceno, NFLPA Chief: Teams Spending Less Money on Player Salaries, USA Today, Oct. 9, 2010.)

### E.    TV Revenues Proceedings

In June 2010, the NFLPA brought a special master proceeding against the NFL claiming that certain provisions of the NFL's television contracts violated the SSA.  White, 766 F. Supp. 2d at 948.  In February 2011, the Special Master generally ruled for the NFL.  On March 1, 2011, the Court reversed, found that the NFL had violated the SSA, and scheduled additional hearings to decide the appropriate remedy.  See id. at 955.  The Court heard oral argument on remedies

on May 12, 2011.  The claim was never resolved and was later released by the

NFLPA.

### F.    Collusion Proceedings Before the Special Master

On January 10, 2011, the NFLPA filed a complaint with the Special Master

regarding the alleged collusion to suppress competition for free agents during

the 2010 season ("Restricted Free Agent ("RFA")/Option Bonus proceeding").

<u>White</u>, 756 F.3d at 590.

The parties agreed to a case management schedule for the proceedings,

which was endorsed by the Special Master.  (Block Decl., Ex. 22.)  The scheduling

order provided for mutual document production on an "equitable, rolling basis"

from May 10, 2011, through August 5, 2011, and stated that "[p]rivilege logs may

follow productions."  (<u>Id.</u>)  The parties also negotiated and agreed on the date

ranges and search terms to be used for electronic documents and the identity of

more than 130 NFL and team custodians whose files would be searched.  (Block

Decl. ¶¶ 16-23.)

Between May 10, 2011, and July 25, 2011, the NFL made 6 productions for

a total of more than 15,000 pages.  (Block Decl. ¶ 29; Block Decl., Exs. 24-29.)  The

NFLPA asserts, however, that during these two months, the NFL produced

hardly any documents from the League Office, which was the likely custodian of

any secret salary cap documents.  (Feher Decl. ¶ 10.)  By July 25, 2011, neither

party had provided any privilege logs, other than with respect to one document

that the NFL inadvertently produced and "clawed back" pursuant to the

protective order.  (Block Decl. ¶¶ 32-34; Block Decl., Exs. 23, 31-32.)

The NFLPA never filed a motion to compel or any other request for

remedy regarding the NFL's responses to its discovery requests.  (Block Decl. ¶

35.)  The NFLPA prepared, but never filed a draft motion to compel.  (Feher Decl.

¶ 11; Feher Decl., Ex. A.)

## G.   Brady v. National Football League

On March 11, 2011, when the parties were unable to renegotiate a new

labor agreement prior to the end of the 2010 League Year, the 2006 SSA expired.

The NFL then instituted a lockout of the players until a new labor agreement

could be signed.  White, 756 F.3d at 590.  In response, several players filed a

putative class action against the NFL, alleging antitrust violations arising from

the lockout.  See Brady v. Nat'l Football League, 644 F.3d 661, 663 (8th Cir. 2011).

While the Brady litigation was pending, SSA proceedings were pending before

the Court and the Special Master in White: the TV revenues proceeding, White,

766 F. Supp. 2d at 955, the RFA/Option Bonus, and the Philadelphia Eagles

Rookie claims regarding alleged shortfall in certain payments made to them

under the SSA (Feher Decl. ¶¶ 6-7).

On April 11, 2011, the Court ordered the parties to the <u>Brady</u> antitrust

litigation to take part in confidential mediation before the Chief Magistrate

Judge.  (Block Decl., Ex. 35, Apr. 11, 2011 <u>Brady</u> Mediation Order.)  The Order

provided that "the fact of participation in this Court-ordered mediation, and any

communications conveyed between the parties in this process, shall not be

admitted or used against any party in any other proceeding or forum, for any

purpose."  (<u>Id.</u> at 3.)  According to the NFLPA, during the months of mediation

before the Chief Magistrate Judge, the NFL never proposed that the NFLPA

dismiss "unknown" claims under the SSA as part of any settlement.  (Feher Decl.

¶ 12.)  **[REDACTED]**

On July 24, 2011, the main deal terms to end the lockout had been agreed

to and the players and owners were assembling in Washington, D.C., to

announce the end of the lockout the following day.  (Kessler Decl., Ex. D, Sam

Farmer, <u>NFL Lockout Nearing End, Camps Could Open Saturday, Report Says</u>,

LA Times, July 24, 2011.)  **[REDACTED]**

**[REDACTED]**

9

**H.     The 2011 Collective Bargaining Agreement and End to Lockout**

The NFL and NFLPA executed the <u>Brady</u> Settlement Agreement on July 25, 2011.  (Block Decl. ¶ 37; Block Decl., Ex. 36, <u>Brady</u> Settlement Agreement.)  Under the settlement agreement, the parties agreed upon the terms of a new collective bargaining agreement (the "2011 CBA").  (Block Decl., Ex. 36.)  On August 4, 2011, the parties executed the new CBA, the lockout ended, and the players returned to work.  (Block Decl., Ex. 42, 2011 CBA.)

The 2011 CBA contains the following provision:

*Section 3.*  Releases and Covenants Not to Sue:

(a)     The NFLPA on behalf of itself, its members, and their respective heirs . . . releases and covenants not to sue, or to support financially or administratively, or voluntarily provide testimony of any kind . . . in, any suit or proceeding (including any Special Master proceeding brought pursuant to the <u>White</u> SSA and/or the Prior [CBA]) against the NFL or any NFL Club or NFL Affiliate with respect to any antitrust or other claim asserted in <u>White v. NFL</u> or <u>Brady v. NFL</u>, including, without limitation, any claim relating to . . . collusion with respect to any League Year prior to 2011, or any claim that could have been asserted in <u>White</u> or <u>Brady</u> related to any other term or condition of employment with respect to conduct occurring prior to the execution of this Agreement.

(2011 CBA, Art. 3, Section 3(a).)  An August 4, 2011 letter agreement confirmed that the only carve-out from the release and covenant not to sue was for a claim

regarding Eagles Rookies, which was also carved out from the Stipulation of

Dismissal.  (Block Decl., Ex. 43.)

## I.        The Stipulation of Dismissal

As required by the <u>Brady</u> Settlement Agreement (<u>Brady</u> Settlement

Agreement ¶ 1), on August 4, 2011, the parties filed a Stipulation of Dismissal

("SOD") with prejudice in this case.  [Docket No. 701]  The one-page SOD

provided:

> The parties stipulate to the dismissal with prejudice of all
> claims, known and unknown, whether pending or not, regarding the
> stipulation and Settlement Agreement ("SSA") including but not
> limited to the claims asserting breach of the SSA related to (i)
> television contracts and broadcast revenues; and (ii) asserted
> collusion with respect to the 2010 League Year, excepting only the
> pending claim filed March 22, 2011 relating to an alleged rookie
> shortfall on the part of the Philadelphia Eagles.

On August 11, 2011, the Court issued a text-only docket entry in the <u>White</u>

case: "IT IS HEREBY ORDERED that all claims pending regarding the

Stipulation and Settlement Agreement 637 are dismissed.  All other outstanding

motions – 642; 652 and 677 are dismissed."  The parties also filed a stipulation of

dismissal of the <u>Brady</u> case.  (Block Decl., Ex. 45.)

## J.        Statements by NFL Owners Regarding Alleged Collusion in 2010

After the SOD was filed, several NFL owners made public statements about the League's alleged collusion in League Year 2010.  White, 756 F.3d at 590. For example, New York Giants owner John Mara stated in an interview that the Washington, D.C., and Dallas clubs had acted "in violation of the spirit of the salary cap" by "attempt[ing] to take advantage of a one-year loophole."  Id.  NFL Commissioner Roger Goodell also referred to an unofficial salary cap in 2010 at a press conference in March 2012.  Id.  The NFLPA interpreted these and similar statements as admissions that the NFL had colluded during the 2010 season.  Id. at 591.

According to the NFL, in March 2012, in connection with the NFL and NFLPA's agreement on the precise amount of the 2012 salary cap, they agreed to reallocate salary cap room from the Washington, D.C., and Dallas clubs to twenty-eight other clubs.  (Block Decl., Exs. 48-49.)  The NFL claims that, based on press reports regarding this agreement, to which the NFLPA was a party, the NFLPA mistakenly inferred that the NFL clubs had colluded in 2010 to implement a secret salary cap.

## K.    NFLPA's Petition to Reopen These Proceedings

On May 23, 2012, the NFLPA filed a petition to reopen and enforce the SSA, premised on allegations that the NFL had engaged in a secret, recently-

revealed collusive and circumventing agreement under which each of the NFL clubs agreed to suppress player salaries under a secret salary cap for the uncapped 2010 season.  [Docket No. 703]  By Order dated December 31, 2012, the Court denied the petition to reopen on the grounds that, "because the SOD was executed after the expiration of the 2006 SSA, the court is without jurisdiction to enforce the agreement."  White v. Nat'l Football League, Civil No. 4-92-906 (DSD), 2012 WL 6738394, at *3 (D. Minn. Dec. 31, 2012) [Docket No. 740].  The NFLPA appealed.  [Docket No. 754]

**L.     NFLPA's Rule 60(b) Motion**

While the petition to reopen was pending, the NFLPA filed a separate "precautionary, prophylactic motion" pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.  [Docket No. 716]  It asked that, in the event that the Court denied the NFLPA's petition to reopen, the Court relieve the White Class from the SOD under Rule 60(b)(3), (5), or (6).  The motion was filed, in part, to preserve the timeliness of a request for relief under Rule 60(b)(3), which is subject to a one-year time limit under Rule 60(c).

After the Court denied the petition to reopen, the NFLPA moved to modify the briefing schedule and engage in limited discovery in relation to its Rule 60(b) motion.  [Docket No. 741]  Neither party submitted memoranda of law

13

regarding the Rule 60(b) motion before the Court addressed the motion to

modify the briefing schedule and engage in limited discovery.

By Order dated February 22, 2013, the Court denied the NFLPA's motion

to modify the briefing schedule and engage in limited discovery, and in turn, its

Rule 60(b) motion.  See White v. Nat'l Football League, Civil No. 4-02-906 (DSD),

2013 WL 656682 (D. Minn. Feb. 22, 2013) [Docket No. 759].  The Court concluded

that Rule 60(b) did not apply to stipulations for dismissal pursuant to Rule 41(a)

because a voluntary dismissal by stipulation is effected without an order of the

court.  Id. at *2-3.  Consequently, the Court denied the NFLPA's motion to

modify the briefing schedule and engage in limited discovery as futile.  Id. at *3.

Finding that additional briefing was unnecessary, the Court also denied the Rule

60(b) motion to reopen.  Id. at *4.

The NFLPA appealed.  [Docket No. 761]

### M.    The Eighth Circuit's Opinion

On June 20, 2014, the Eighth Circuit affirmed the Court's decision

regarding the NFLPA's motion to reopen, but reversed the denial of the Rule

60(b) motion.  White, 756 F.3d at 596.

The Eighth Circuit overruled its prior unpublished decisions in favor of

the holding by other circuits that a stipulated dismissal constitutes a "judgment"

14

for the purposes of Rule 60(b).  <u>Id.</u> at 594-96 (collecting cases).  It concluded that

the District Court had jurisdiction to consider the Rule 60(b) motion on the

merits.  <u>Id.</u> at 596.

> However, the Eighth Circuit advised that its holding:

> should not be read as in any way expressing a view on the merits of
> the [NFLPA's] Rule 60(b) motion.  Rule 60(b) authorizes relief in
> only the most exceptional of cases, and the [NFLPA] bears a heavy
> burden in attempting to convince the district court that the [SOD]
> was fraudulently procured.  We hold only that the [NFLPA] should
> be given the opportunity to meet this burden.

<u>Id.</u> (citation omitted).  The Eighth Circuit remanded the matter to this Court for

proceedings consistent with its opinion.  <u>Id.</u>

### N.    Discovery on Remand

On February 5, 2015, the Court denied the NFLPA's request for leave to

seek discovery from Defendants in the limited context of the NFLPA's motion for

relief pursuant to Rule 60(b) [Docket No. 741], because the NFLPA had not

demonstrated a colorable or prima facie claim.  [Docket No. 785] <u>White v. NFL</u>,

No. 92–906 (MJD), 2015 WL 501973, at *3 (D. Minn. Feb. 5, 2015).  The Court

reasoned that the evidence submitted by the NFLPA "speaks only to the merits

of the NFLPA's underlying collusion claim, that is, whether or not the NFL had a

secret salary cap in League Year 2010.  It does not support a colorable basis for

relief under Rule 60(b)(3), i.e., that the NFL engaged in unfair <u>litigation</u> tactics or

misconduct." Id. at *2.  With regard to the NFLPA's allegations that the SOD

was fraudulently procured, it had "not demonstrated a colorable claim that the

NFL improperly <u>forced</u> it to settle, or <u>misled</u> it as to the legal effect of the

settlement." Id.

However, the Court also held: "In light of the Eighth Circuit's direction

that the NFLPA should be given the opportunity to meet [Rule 60(b)'s heavy]

burden, out of an abundance of caution, the Court exercises its discretion to

allow the parties to fully brief the Rule 60(b) motion before the Court makes a

ruling on the merits." Id. (citations omitted).

## O.   Current Motion

The NFLPA now requests that the Court grant its Rule 60(b) motion to set

aside the SOD and allow the NFLPA to assert collusion claims against the NFL.

Alternatively, it asks that the Court conclude that the NFLPA has now presented

a colorable claim and order a period of discovery, followed by an evidentiary

hearing.

## III.   DISCUSSION

### A.   Rule 60(b) Motion Standard

Rule 60(b) is "grounded in equity" and promotes the principle "that justice should be done." Harley v. Zoesch, 413 F.3d 866, 870 (8th Cir. 2005) (citation omitted). The Court "has wide discretion in ruling on a Rule 60(b) motion." Jones v. Swanson, 512 F.3d 1045, 1049 (8th Cir. 2008). However, "Rule 60(b) authorizes relief in only the most exceptional of cases, and the [NFLPA] bears a heavy burden in attempting to convince the district court that the [SOD] was fraudulently procured." White, 756 F.3d at 596 (citation omitted).

In 2012, the NFLPA moved for relief, citing Rules 60(b)(3), and, in the alternative, Rules 60(b)(5) and 60(b)(6). [Docket No. 716] However, in its 2015 briefs, the NFLPA requests relief solely on the basis of Rule 60(b)(3). That provision states:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> . . .
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

Fed. R. Civ. P. 60(b).

The NFLPA notes that "in considering a [R]ule 60(b) motion, a court is entitled to assume that the movant's factual allegations are true, as on a motion

to dismiss." <u>United States v. Denham</u>, 817 F.2d 1307, 1309 (8th Cir. 1987).

However, "[t]o prevail on its Rule 60(b)(3) claim, [the NFLPA] must show by

clear and convincing evidence that [the NFL] engaged in fraud or other

misconduct and that this conduct prevented [the NFLPA] from fully and fairly

presenting its case." <u>In re Levaquin Products Liab. Litig.</u>, 739 F.3d 401, 404 (8th

Cir. 2014) (citation omitted).

### B.   Whether the NFL Engaged in Misconduct to Force the NFLPA to Sign the SOD

The NFLPA asserts that the NFL coerced it to agree to the SOD because the

players had no practical choice but to agree to the SOD on the NFL's terms in

order to end the lockout.  The record demonstrates that the NFL did not engage

in misconduct to force the NFLPA to sign the SOD.

### 1.   Whether the NFL's Actions Were Coercive

**[REDACTED]**  The NFLPA's attorneys and Smith aver that they would

not have agreed to the SOD if they had known about the NFL's alleged 2010

salary cap.  (<u>See</u> Smith Decl. ¶ 9; DePaso Decl. ¶ 9; Kessler Decl. ¶ 12; Quinn

Decl. ¶ 9.)  The NFLPA concludes that, although a lockout is a legitimate tactic,

the NFL's concealment of the salary cap and last minute demand were not

legitimate litigation tactics.

18

Press reports on an end to the lockout and players' travel plans to Washington, D.C., to announce the end of the lockout cannot be said to have forced the NFLPA to release unknown claims. While there was pressure on the NFLPA from these events, there was also pressure on the NFL to not prolong the lockout.

A lockout is a legitimate tactic under the labor laws for an employer to "bring[] economic pressure to bear in support of his legitimate bargaining position." Am. Ship Bldg. Co. v. NLRB, 380 U.S. 300, 318 (1965). The NFLPA had sophisticated and skilled counsel with experience negotiating collective bargaining agreements in the sports industry. There was no timeline or deadline for a deal. Only convenience, public relations, and a preference not to prolong the lockout stood in the way of the NFLPA simply continuing to negotiate beyond July 24. Thus, declarations from the NFLPA's attorneys that the players had "no real choice" but to acquiesce to the NFL's demand (see e.g., Kessler Decl. ¶¶ 8-9) because of pressure to avoid cancelling the preseason games, pressure from news reports that a deal had been reached, and the fact that players and owners were gathering in Washington, D.C. to be ready to sign the papers to end the lockout fall short.

**[REDACTED]**

Furthermore, hard bargaining does not invalidate a settlement.  There is no case law to support the proposition that it is improper for a party to ask for a release of unknown claims as a condition of settlement.  <u>See, e.g.</u>, <u>Scientific Holding Co., Ltd. v. Plessey, Inc.</u>, 510 F.2d 15, 22 (2d Cir. 1974) ("If [party A] was entitled not to close, it thus would not be exercising economic duress in insisting on modifications, however little opportunity [party B] had to resist.") (addressing New York law ); <u>Coral Gables Imported Motorcars, Inc. v. Fiat Motors of N. Am., Inc.</u>, 673 F.2d 1234, 1239 (11th Cir. 1982) ("Mere hard bargaining positions or the pressure of financial circumstances is not sufficient [to void a franchise agreement on the basis of economic duress under New York law]."), <u>modified on other grounds by</u> 680 F.2d 105 (11th Cir. 1982).

**[REDACTED]**  Two teams of sophisticated adversarial attorneys argued about this term, and the NFLPA made the decision to agree to it in order to achieve an end to the lockout at that time.  The NFLPA could have insisted that it would not include "unknown" claims and then the pressure would have been on the NFL to decide whether ending the lockout was sufficiently important to drop that term.  Moreover, the evidence shows that the NFLPA at least suspected that

there was a 2010 salary cap.  The term "unknown claim" applies precisely

because the NFLPA did not have clear evidence of such a claim – i.e., it was not a

"known" claim.  The NFLPA made a calculated decision to release those claims,

knowing that there might be no viable claims or there might be viable claims.

### 2.    Whether the NFL Misled the NFLPA Regarding the Legal Effect of the Settlement

The NFLPA asserts that the NFL misled it regarding the legal effect of

agreeing to dismiss unknown claims in the SOD because the NFL knew that the

2010 salary cap collusion claim existed **[REDACTED]**.

**[REDACTED]** the NFLPA understood that dismissal with prejudice of

unknown claims meant that the NFLPA could not later seek to bring claims of

which it purportedly did not know at the time of the settlement, including claims

related to conduct that allegedly violated the expired SSA.

It is irrelevant that the NFLPA now claims that, at the time of settlement, it

did not know that it might have a claim for collusion.  "There is no doubt that a

person, as a matter of contract, may release, in exchange for consideration she

deems adequate, claims existing at the time but not known to her.  This is simply

part of the bargain."  In re Gen. Am. Life Ins. Co. Sales Practices Litig., 357 F.3d

800, 804 (8th Cir. 2004).  "[T]his [claim that the plaintiff had not discovered the

fraud at the time that she released such claims] is the kind of argument designed to be encompassed by the provision of the settlement agreement releasing claims unknown as well as those known." Id.

In any case, the record indicates that the NFLPA at least suspected that a secret salary cap might have been in place for the 2010 League Year.

**[REDACTED]**  Moreover, they had noticed what they perceived to be deficiencies in the ongoing discovery and had prepared, but not filed, a motion to compel.  Therefore, the record demonstrates that the NFLPA was aware of the possibility of a collusion claim based on a secret salary cap in the 2010 League Year; it was aware that, if it agreed to release unknown claims, undiscovered violations of the SSA would be barred; and it was aware that discovery was not yet closed and that it had not received documents that it perceived to be important from the League Office.  It had more than sufficient information to understand the import of releasing unknown claims.

### 3.    Failure to Present the SOD to the Court

The NFLPA also claims that the NFL engaged in litigation misconduct by refusing to submit the SOD to the Court to consider and by withholding the "unknown claims" demand until the Chief Magistrate Judge was no longer

supervising negotiations between the parties in <u>Brady</u>.  It asserts that the NFL

took those actions to prevent the Court from asking questions about the SOD.

The NFLPA concludes that the NFL prevented the Court from discovering that

unknown claims were being dismissed under the Court-supervised SSA.

There was no misconduct based on the failure to obtain Court approval of

the SOD.  The Eighth Circuit has held that Court approval was not required for

dismissal in <u>White</u>.  <u>See</u> <u>White</u>, 756 F.3d at 591-94.  The evidence submitted by

the NFLPA confirms the Court's earlier observation that the NFLPA's assertions

in support of this allegation only demonstrate that the NFL wanted to quickly

end the <u>White</u> litigation in conjunction with the 2011 CBA and <u>Brady</u> litigation.

### C.     Whether the NFL Engaged in Misconduct by Concealing the Salary Cap During this Litigation

#### 1.     Discovery

The NFLPA asserts that the NFL possessed responsive documents

revealing the secret 2010 League Year cap, yet no information regarding the cap

was produced by the NFL in the RFA/Option Bonus proceeding.  The NFLPA

concludes that the NFL participated in litigation misconduct by failing to comply

with its discovery obligations to produce relevant documents.

The parties had agreed that the production of responsive documents would occur on an "equitable, rolling basis" between May 10, 2011, and August 5, 2011.  The global settlement was reached on July 25, 2011, eleven days before the deadline for production of documents in the RFA/Option Bonus proceeding. Between May 5, 2011, and July 25, 2011, the NFL made 6 productions of documents totaling more than 15,000 pages.  The NFLPA claims that the NFL failed to produce any files from the League Office or other important custodians; yet, the NFLPA presented no discovery disputes to the Special Master for resolution.

The NFLPA waived its Rule 60(b)(3) claim based on the NFL's alleged failure to produce relevant discovery by choosing to settle the lawsuit before discovery closed.  As in Advanced Multilevel Concepts, Inc. v. Bukstel, "with full knowledge that discovery was ongoing, that additional evidence was likely be disclosed," the NFLPA "chose to cut off the process and settle [its] claims based on whatever information was available to [it] at the time."  Civil Action No. 11–3718, 2014 WL 6907973, at *7 (E.D. Pa. Dec. 9, 2014).  Thus, "to the extent there was any interference with [the NFLPA's] ability to fully and fairly present [its]

case it was attributable to [the NFLPA's] decision to settle [its] claims and cut short the discovery process." Id.

Moreover, although the NFLPA may not have known that the NFL was allegedly withholding documents that would have proven the existence of a 2010 cap, it clearly did know that the NFL had not yet produced any files from particular custodians.  In fact, the NFLPA avers that it did notice a lack of documents being produced from the NFL League Office, where documents regarding the alleged 2010 salary cap were likely located, and that it prepared a draft motion to compel, dated July 14, 2011, to be filed with the Special Master. (Feher Decl. ¶¶ 10-11; Feher Decl., Ex. A.)  Yet the NFLPA chose not to bring a motion to compel or to complete the discovery period before agreeing to the settlement.  This was a calculated risk.  See, e.g., Dukes v. City of Minneapolis, 339 F. App'x 665, 668 (8th Cir. 2009) (holding that Rule 60(b)(3) was unavailable for alleged failure to produce records in advance of adverse summary judgment ruling because plaintiff "was obligated to pursue the release of those records prior to the grant of summary judgment"); Miller v. Baker Implement Co., 439 F.3d 407, 410, 414 (8th Cir. 2006) (holding no basis for Rule 60(b)(3) relief when party "failed to avail himself of available discovery remedies before the district

court issued its order"). See also Floorgraphics Inc. v. News Am. Mktg. In-Store

Servs., Inc., 434 F. App'x 109, 112 (3d Cir. 2011) (holding that when a receiving

party objects to a discovery request and the requesting party "failed to move to

compel," it is reasonable to conclude that the requesting party "abandoned its

request," and the claimed failure to produce responsive documents does not

constitute clear and convincing evidence of discovery misconduct under Rule

60(b)(3) recovery); Info-Hold, Inc. v. Sound Merch., Inc., 538 F.3d 448, 458 (6th

Cir. 2008) (no ground for Rule 60(b)(3) relief when no court order had

"affirmatively placed an obligation on [the responding party] to respond to

[requesting party]'s discovery request").

Even if the Court did not decide that the NFLPA had waived its discovery

argument, there is no evidence that the NFL engaged in discovery misconduct.

Its production of documents was not due until eleven days after the settlement

was reached, so even if, at the time of the settlement, it had failed to produce

responsive, relevant documents regarding a secret salary cap, there is no way to

know whether it would have met its discovery obligations in the next eleven

days if a settlement had not been reached.  As of July 25, 2011, it did not violate

any discovery obligation by not yet turning over relevant documents.  The

NFLPA never filed a motion to compel, despite noticing the alleged deficiency in the NFL's production.  Additionally, unlike the cases relied upon by the NFLPA, there is no evidence here that the NFL made affirmative misrepresentations regarding the existence of relevant documents or violated a Court-issued discovery order.

### 2.      Whether the NFL Had an Affirmative Duty to Disclose

The NFLPA also asserts that the NFL had an affirmative duty to reveal the salary cap and that, by failing to do so, it engaged in litigation misconduct.  The NFLPA claims that such a duty arose out of the SSA or out of a fiduciary relationship created under New York law.

As the Court noted in its Order denying the NFLPA's motion for discovery, whether the NFL and its owners should have revealed the alleged salary cap or not goes to the underlying collusion claim, not whether the NFL engaged in misconduct in the White litigation such that the settlement should be voided.  See White, 2015 WL 501973, at *2.  A Rule 60(b)(3) motion is an inappropriate vehicle through which to litigate an alleged violation of the SSA or breach of fiduciary duty.  See, e.g., Roger Edwards LLC v. Fiddes & Son, Ltd., 427 F.3d 129, 134 (1st Cir. 2005) ("[L]itigants who seek to utilize Rule 60(b) fraud

motions to redress non-litigation conduct are typically rebuffed at the threshold."); <u>In re Hope 7 Monroe St. Ltd. P'ship</u>, 743 F.3d 867, 875 (D.C. Cir. 2014) ("Hope 7 cannot rest a motion for relief under Rule 60(b)(3) on allegations that RIASO . . . committed fraud or misconduct in making the underlying loan.").

## IV.    CONCLUSION

After hard-fought negotiations between sophisticated and talented counsel, the NFLPA decided to settle its disputes with the NFL and made the calculated decision to release unknown claims in order to end the lockout at that point in time.  Belated regret over that decision is not a basis for relief under Rule 60(b)(3).

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

Plaintiffs' Rule 60(b) Motion [Docket No. 716] is **DENIED**.


Dated:   September 8, 2015                    s/ Michael J. Davis
                                             Michael J. Davis
                                             United States District Court